## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT BAER and ALFRED O'MEARA, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>SHIFT4 PAYMENTS, INC., JARED ISAACMAN, NANCY DISMAN, and BRADLEY HERRING,<br><br>                Defendants. | Case No. 5:23-cv-03206-JFL<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Robert Baer and Plaintiff Alfred O'Meara ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Shift4 Payments, Inc. ("Shift4" or the "Company"), analysts' reports and advisories about the Company, discussions with confidential witnesses, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Shift4 securities between

June 5, 2020 and April 18, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and its Chief Executive Officer ("CEO").

2.     Shift4 provides software and payment processing solutions in the U.S.  The Company provides, among other products and services, integrated and mobile point-of-sale ("POS") solutions.  Shift4 conducted its initial public offering ("IPO") and began operating as a publicly traded company on or about June 5, 2020.

3.     Throughout the Class Period, Defendants made materially false and misleading statements and/or failed to disclose that Shift4 had inadequate disclosure controls and procedures and internal controls over financial reporting, and as a result, failed to properly account for customer acquisition costs.

4.     The Company's misclassification of the cash outflows associated with capitalized customer acquisition costs enabled the Company to inflate its cash flows provided by operating activities, which is a key financial metric investors use in assessing a company's performance. This misled investors to believe that the Company generated far more cash from its operating activities than it actually did.  Accordingly, Shift4 would likely be forced to restate, and actually restated, one or more of its previously issued financial statements.

5.     The SEC questioned Shift4's treatment of customer acquisition costs in correspondence dated May 11, 2022 and June 21, 2022.

6.     Prior to submitting its response to the SEC's second letter (and the day before the Company disclosed its Q2 2022 financial results), Chief Financial Officer ("CFO") Bradley Herring ("Herring") abruptly parted ways with the Company.

7.      According to the Company's August 3, 2022 Form 8-K, on August 3, 2022, CFO Herring and the Company agreed that Herring would no longer serve as the Company's CFO, effective August 5, 2022."  The disclosure was silent as to the reason for the sudden and almost immediate departure of the CFO.

8.      Five days later, on August 8, 2022, Shift4 submitted its response to the SEC's June 21, 2022 correspondence in defense of its treatment of customer acquisition costs.  The timing makes it likely that Herring's sudden departure from the Company was related to the Company's accounting maneuver related to its treatment of customer acquisition costs.

9.      After defending its position on its treatment of customer acquisition costs in two letters submitted to the SEC, the Company abandoned its arguments and, on October 21, 2022, disclosed in an SEC filing that the Company's Q3 2021, full year 2021, first quarter ("Q1") 2022, and second quarter ("Q2") 2022 financial statements should no longer be relied upon and would need to be restated because of a material weakness in the Company's internal control over financial reporting, which had caused it to incorrectly treat customer acquisition costs as cash used in investing activities rather than cash used in operating activities in its Consolidated Statements of Cash Flows.

10.     On this news, Shift4's stock price fell $1.21 per share, or 2.67%, to close at $44.16 per share on October 24, 2022.

11.     On November 8, 2022, Shift4 filed restated financial statements with the SEC to properly account for its historical customer acquisition costs.  The restatements negatively revised its financials as follows:

- For the years ended December 31, 2019, 2020, and 2021, respectively, Shift4 negatively revised its net cash provided by operating activities to $8 million (down

from its originally reported $26.7 million), $4 million (down from its originally reported $23.4 million), and $3 million (down from its originally reported $29.2 million).

- For the three months ended March 31, 2021 and 2022, respectively, it negatively revised its net cash used in operating activities to $7.1 million (down from its originally reported $1.7 million) and net cash provided by operating activities to $30.8 million (down from its originally reported $37.1 million);

- For the six months ended June 30, 2021, it negatively revised its originally reported $5 million of net cash *provided by* operating activities to $7.7 million of net cash *used in* operating activities;

- For the six months ended June 30, 2022, it negatively revised net cash provided by operating activities to $70.8 million (down from its originally reported $85 million); and

- For the nine months ended September 30, 2021, it negatively revised its net cash provided by operating activities to $6.3 million (down from its originally reported $25.6 million).

12.     Also in 2022, CEO Isaacman faced the threat of a margin call during the downturn of the stock market which could have resulted in him being forced to sell 10 million shares of Shift4 Class A common stock (~12% of diluted shares outstanding).

13.     The threat of a margin call forced Isaacman to repay some of the loan and increase his collateral by more than 50% pursuant to a December 19, 2022 margin loan agreement.

14.     The threat of margin calls further coincided with the Company's misclassification of the cash outflows associated with capitalized customer acquisition costs which, as discussed

above, enabled the Company to inflate its cash flows provided by operating activities and triggered a restatement.

15.    The threat of margin calls also coincided with the CEO's December 7, 2022 statements made during a conference in an effort to inflate the Company's share price.  During the UBS TMT Conference on December 7, 2022, a UBS analyst asked Isaacman if he would consider taking the Company private again, particularly if he did not get the valuation he believes the Company to have from the market.  In response, Isaacman stated that "we're incredibly frustrated" that the stock is "very much underappreciated" and that he would "absolutely" consider taking the Company private, offering little rationale aside from his disgust with the Company's stock price. He also stated: "I'm a buyer" (collectively, the "December 7, 2022 Statements").

16.    Isaacman made these statements to inflate the price of the stock. His statements come only two years after the Company went public and smacks of desperation to avoid experiencing further pressure on his pledged shares.  And while Isaacman claims to be a buyer, he last purchased shares on the open market in June 2022 – six months prior to his December 7, 2022 statements and subsequently did not make any open market purchases between the time of his December 7, 2022 Statements and the end of the Class Period.

17.    Additionally, the statements were made just days before he made stock donations on December 13, 2022, and just a few months ahead of his pre-planned sale of up to 2 million shares (as early as February 27, 2023) tied to the settlement of a March 2021 variable prepaid forward contract (discussed below).

18.    The December 7, 2022 Statements did inflate the Company's Class A share price which opened at $44.32 per share on December 7, 2022 and increased over a two-day period to close at $47.73 per share on December 8, 2022.

19.     The looming threat of margin calls also coincided with the Company spending hundreds of millions of dollars in Shift4's third quarter ("Q3") of 2022 on "residual commission buyouts" with certain distribution partners as part of a purported strategic initiative to insource 50% of its sales distribution network.

20.     Shift4's Q3 Form 10-Q, dated November 08, 2022, states (emphasis added):

> During the three and nine months ended September 30, 2022, we completed $298.8 million and $311.7 million, respectively, of ***residual commission buyouts with certain third-party distribution partners***, pursuant to which we acquired their ongoing merchant relationships that subscribe to our end-to-end payments platform. ***These amounts include $298.5 million in residual commission buyouts executed under our mass strategic buyout program completed in the three months ended September 30, 2022 in support of our strategic initiative to insource our sales distribution network.*** Total consideration for the residual commission buyouts was comprised of a combination of cash, shares of our Class A common stock, and contingent liability earnouts.

21.     During Q3 2022, Shift4 also disclosed that it acquired Retail Control Solutions, Inc. ("RCS"), Pinnacle Hospitality Systems LLC, FPOS Group, Inc., and three other restaurant technology partners in separate transactions for $80.3 million of total purchase consideration, net of cash acquired.  The 2022 Form 10-K identified the residual commission buyouts as one of the assets acquired in these transactions.

22.     By engaging in residual commission buyouts, the Company reduced its COGS (cost of goods sold), since the bought-out commissions are no longer included in the COGS and are instead amortized on a separate line as "depreciation and amortization expense," which is excluded from the EBITDA calculation.  The residual commission buyouts therefore enabled Shift4 to flatter its gross profit and EBITDA.

23.     Moreover, residual commission buyouts enabled Shift4 to manipulate its earnings by adjusting the amortization period of the capitalized residual commission buyouts.  The

6

Company increased its 2022 earnings by $6.9 million, or $0.08 per basic and diluted share[1] by simply increasing the amortization period of capitalized residual commission buyouts during a single quarter from three to four years, which lowered its depreciation and amortization expense.

24.    Residual commission buyouts and improved earnings from the manipulation of the depreciation and amortization expense made the stock look more attractive at a time at which the stock was reaching new lows just as the margin loan would have been at high risk for a margin call.

25.    Seeking to hide their true intent, Defendants made a number of materially false and/or misleading statements in late 2022 as to why Shift4 deployed hundreds of millions of dollars in capital for residual commission buyout transactions in Q3 2022.  However, on April 19, 2023, Blue Orca Capital ("BOC") published a report addressing Shift4 (the "BOC Report").[2]  The BOC Report states that "Shift4 engaged in a string of highly questionable and hyper-aggressive accounting maneuvers seemingly designed to keep the stock afloat, from cash flow manipulation to inexplicable distributor acquisitions that enabled it to capitalize a major component of COGS."

26.    As it explained, BOC's research showed that many of the companies involved in Shift4's residual commission buyouts appear to be low quality distributors/resellers.  The report describes the companies as a motley collection of small resellers; and that Shift4 used these deals to inflate EBITDA and increase the share price due to the threat of a margin call for Isaacman. The BOC Report further states, "buying out [low quality] resellers [in Q3 2022] who for years had been part of an almost exclusively independent sales force is likely an instance of financial

---

[1] *See* 2022 10-K at 80.
[2] The full BOC Report is available at:
https://static1.squarespace.com/static/5a81b554be42d6b09e19fc09/t/643fdfa6049cf379b8c4dc58/1681907624047/Blue+Orca+Short+Shift4+Payments+Inc+%28NYSE+FOUR%29.pdf

engineering that inflates gross profit and EBITDA by capitalizing COGS, which the Company kick-started at a moment when its stock dangled precariously near all-time lows, and when the risk of a margin call on the CEO's loan would have been near its highest."

27.     On this news, Shift4's stock price fell $5.95 per share, or 8.68%, to close at $62.59 per share on April 19, 2023.

28.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

29.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

31.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Shift4 is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

32.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

33.     Lead Plaintiff Robert Baer acquired Shift4 securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. *See Baer v. Shift4 Payments, Inc.*, No. 5:23-cv-03969-JFL (ECF Nos. 1-1, 1-2).

34.     Plaintiff Alfred O'Meara acquired Shift4 securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. *See* ECF Nos. 1-1, 1-2.

35.     Defendant Shift4 is a Delaware corporation with principal executive offices located at 2202 N. Irving Street, Allentown, Pennsylvania 18109.  Shift4's Class A common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "FOUR".

36.     Defendant Jared Isaacman ("Isaacman") has served as Shift4's Chief Executive Officer at all relevant times.

37.     Isaacman possessed the power and authority to control the contents of Shift4's SEC filings, press releases, and other market communications.  Isaacman was provided with copies of Shift4's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of his position with Shift4, and his access to material information available to him but not to the public, Isaacman knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  Isaacman is liable for the false statements and omissions pleaded herein.

38.     Shift4 and Isaacman are collectively referred to herein as "Defendants".

## NON-PARTIES

39.     Bradley Herring ("Herring") served as Shift4's CFO from before the start of the Class Period to August 5, 2022.

40.     Nancy Disman ("Disman") has served as Shift4's Chief Financial Officer ("CFO") since August 5, 2022.

## SUBSTANTIVE ALLEGATIONS

### Background

41.     Shift4 provides software and payment processing solutions in the U.S.  The Company provides, among other products and services, integrated and mobile POS solutions; a mobile ordering, countertop POS, and self-service kiosk services; a cloud-based business intelligence tool that includes customer engagement, social media management, online reputation management, scheduling, and product pricing, as well as reporting and analytics; SkyTab POS, a POS workstation pre-loaded with software suites and integrated payment functionality; and SkyTab Mobile, a mobile payment solution.

42.     On May 15, 2020, Shift4 filed a registration statement on Form S-1 with the SEC in connection with its IPO, which, after several amendments, was declared effective by the SEC on June 4, 2020 (the "Registration Statement").

43.     On or about June 5, 2020, Shift4 conducted its IPO and its Class A common stock began publicly trading on the NYSE.

**Isaacman Controls the Company**

44.     As of December 31, 2020, 2021 and 2022, Defendant Isaacman controlled, in the aggregate, approximately 68.0%, 83.3% and 84.2%, respectively, of the voting power represented by all of the Company's outstanding classes of stock.  As a result, Defendant Isaacman continues

to exercise significant influence over all matters requiring stockholder approval, including the election and removal of directors, the size of the board, and any approval of significant corporate transactions, and continues to have significant control over the Company's management and policies.

45.     Because Defendant Isaacman has more than 50% of the voting power for the election of directors, the Company is considered a "controlled company" for purposes of the NYSE.

**The Company Has a Boys' Club Culture Where Nepotism is Rampant**

46.     During the Class Period, Isaacman's friends and family were hired by the Company for various positions, even if unqualified, given preferential treatment, and collectively became known as the "boys' club."

47.     Isaacman's older brother, Michael Isaacman, served (and continues to serve) as Shift4's Chief Commercial Officer.  Isaacman's father, Donald Isaacman, served (and continues to serve) as a member of the Board.

48.     Confidential Witness ("CW")-1 worked at the Company from 2004 to August 2021 and spent the last four years of her employment as Director of Risk and Recovery.[3]  As Director, CW-1 reported to Emily Hess ("Hess") who held a Vice President title and reported directly to Isaacman.  CW-1 stated that the Company was chaotic and attributed the chaos to Isaacman hiring and promoting his unqualified friends to positions of influence and authority and creating a "boys' club."

49.     According to CW-1, from the start, Isaacman maintained an influx of personal friends into the business that were put into positions of leadership.  The terms "boys' club" was

---

[3] When CW-1 started in 2004, Shift4 was a small, private company.

widely known throughout the Company.  For example, CW-1 could not believe that Isaacman's personal pilot, Doug Demko, was promoted to Executive Vice President ("EVP") of Payments and Chief Operating Officer with no experience.  "He was not a credit card guy … he knew nothing about credit cards.  According to CW-1, his only qualification was that he served as Isaacman's personal pilot for several years.

50.    Additionally, Isaacman's "good friend," Brendan Lauber, served as Chief Technology Officer for much of the Class Period.  (He currently serves as Vice Chairman of the Company.)  Taylor Lauber, who appears to be related to Brendan Lauber, has served as the Company's President since February 4, 2022 and Chief Strategy Officer since the Company's formation.  (He currently serves in these positions.)

51.    CW-1 recalled that two other "good old boys" who were brothers – Joe and Anthony Daddona – were put in charge of major departments.  Joe Daddona was in charge of Risk, serving as Vice President of Operations, and Anthony Daddona was the Director of Payment Supports.  (Joe Daddona currently serves as SVP, Operations.)

52.    CW-1 stated that another friend of Isaacman – Tony Bacco – was hired and promoted to a job in CW-1's department.  According to CW-1, Bacco transferred over from Technology to Risk but knew nothing about Risk.  CW-1 recalled that Bacco made some poor decisions and was eventually fired because he missed identifying a significant risk that resulted in a loss to the Company of over a million dollars.

53.    CW-2 echoed CW-1's comments regarding the boys' club.  CW-2 worked at the Company from 2009 to April 2022.  By 2011, CW-2 was Risk Department Manager where she remained until she left the Company in April 2022.  CW-2 reported to Hess and CW-1.

54.     CW-2 stated that Isaacman created several positions primarily for his friends who made up a significant portion of executive management.  According to CW-2, Demko was a pilot and close personal friend of Isaacman.  CW-2 thought Demko exemplified Isaacman's bias in hiring unqualified friends into influential positions.

55.     CW-2 stated that George Chadwick III, EVP of Finance and Brian Downs, SVP of Finance, were also close friends of Isaacman.  CW-2 also recalled that Joe Messina, a sales representative for the Company, was another close friend of Isaacman.  CW-2 stated it was common knowledge at Shift4 that Messina and other friends and family were hired by Isaacman, given preferential treatment, and they collectively became known as the "boys' club."

**In 2022, the Company's CEO Was Under a Threat of a Margin Call from a Large Series of Stock Pledges**

56.     As explained herein, CEO Isaacman faced the threat of a margin call during the 2022 bear market, which could have resulted in him being forced to sell 10 million shares of Shift4 Class A common stock (~12% of diluted shares outstanding).  The threat of a margin call forced Isaacman to repay some of the loan and increase his collateral by more than 50% on December 19, 2022.  The threat of margin calls coincided with (i) the Company's misclassification of cash outflows associated with capitalized customer acquisition costs which enabled the Company to inflate its cash flows provided by operating activities and triggered a restatement, (ii) Isaacman's December 7, 2022 Statements which inflated the stock price, and (iii) Defendants' materially false and/or misleading statements in late 2022 as to why Shift4 deployed hundreds of millions of dollars in capital for residual commission buyout transactions in Q3 2022 to buyout low quality distributors/resellers.

57.     Much of Isaacman's wealth remains tied up in the Company, and he has entered into various financial arrangements to borrow against his ownership and tap into his fortune. As a

result, Isaacman's borrowings have hung over the Company as a unique threat: not only has up to 6.4 million, or 22% of his holdings, been pledged to variable prepaid forward ("VPF") contracts due to liquidate through 2023-2024, but the decline in the Company's stock throughout 2022 has put him at risk of facing a margin call at various points in 2022.[4] Isaacman received, *in effect*, just such a margin call in mid to late-2022, as he increased his collateral by more than 50% (from 10 million to 15 million shares) *and* reduced the size of his margin loan on December 19, 2022 (the 'December 19, 2022 Margin Loan').

58.    A liquidation of Isaacman's margin loan collateral for his December 19, 2022 Margin Loan would be devastating for the stock as the lender would have the right to dispose of up to 15 million shares upon default, a significant 18% of diluted shares outstanding – in addition to the remaining 4.4 million shares tied to other VPF contracts due to be disposed of in 2024. *Id.* The (i) misclassification of cash outflows associated with capitalized customer acquisition costs which inflated its cash flows provided by operating activities; (ii) Isaacman's December 7, 2022 Statements which inflated the stock price, and (iii) Defendants' materially false and/or misleading statements in late 2022 as to why Shift4 deployed hundreds of millions of dollars in capital for residual commission buyout transactions in Q3 2022 to buyout low quality distributors/resellers, must be viewed in the context of Isaacman's margin loan which was in danger at the time, and continued pre-planned insider sales tied to the VPF contracts.

---

[4] A VPF "contract is a technique that stockholders use in market equity transactions to cash in some of their stock to defer the tax liability owed on the capital gains." A VPF "contract allows investors to receive 75% to 90% of the current market value of the stock in prepaid payments in exchange for a variable number of stocks in the future. Since the tax liabilities on capital gains are not due until the transaction is settled, investors preset the price range of shares to cushion against downside loss when turning them over." https://corporatefinanceinstitute.com/resources/wealth-management/variable-prepaid-forward-contract/

59.     According to Isaacman's Schedule 13G/A filed with the SEC on February 14, 2023, as of December 31, 2022, the CEO owned just under 30 million shares of Shift4, representing about a third of diluted shares outstanding.

60.     As per Shift4's SEC filings, Isaacman, through Rook Holdings, Inc. ("Rook"),[5] first entered into a margin loan in September 2020, secured by shares of the Company's Class A and Class B common stock (the "September 2020 Margin Loan"). The September 2020 Margin Loan was repaid and replaced on March 24, 2021 by a new margin loan secured by 10 million Rook Units (which included, among other things, shares of Shift4's Class A and Class B Common Stock) (the "March 2021 Margin Loan"). If Rook were to default, and the default was not cured, the lender would have the right to exchange and sell up to 10 million Rook Units for an equal number of the Company's Class A common stock to satisfy Rook's obligation.  At the time, Class A stock was worth about $80 per share.

61.     Given that the March 2021 Margin Loan was taken out shortly before the Company's April 2021 stock price peak of $101.43, it is likely that, as the Company's stock dropped to *as low as $29.39 in the summer of 2022* and remained in the $30s and $40s at its highest through much of the remainder of 2022, *Isaacman faced the threat of margin calls*.  At the stock's lowest point in July 2022, the pledged shares – once worth almost $806 million on March 24, 2021 – would have been worth about $294 million.

62.     The threat of a margin call forced Isaacman to repay some of the March 2021 Margin Loan and increase his collateral by more than 50%.  According to Shift4's 2022 Form 10-K ("2022 10-K"), Rook's March 2021 margin loan was "repaid and replaced" by the December 19, 2022 Margin Loan "for a lower amount."  The collateral attached to the December 19, 2022

---

[5] As per the 2022 10-K, Isaacman is the sole stockholder of Rook.

Margin Loan was increased from 10 million shares to 15 million shares of Rook Units "in addition to other collateral."  Rook Units includes shares of the Company's Class A and Class B common stock.[6]  The 2022 10-K further states that if Rook were to default on its obligations under the margin loan and fail to cure such default, the lender would have the right to exchange and sell up to 15,000,000 Rook Units to satisfy Rook's obligation. "[S]uch an event could cause our stock price to decline."[7]

63.    The December 19, 2022 Margin Loan, *in effect a margin call*, provides critical context for the Company's actions as described herein.  Defendants would have been heavily incentivized to keep the Company's financials looking strong and the stock as high as possible.

**Isaacman's December 7, 2022 Statements Inflate Share Price**

64.    During the UBS TMT Conference on December 7, 2022, a UBS analyst asked Isaacman if he would consider taking the Company private again, particularly if he did not get the valuation he believes the Company to have from the public market.  In response, Isaacman stated that "we're incredibly frustrated" that the stock is "very much underappreciated" and he would "absolutely" consider taking the Company private, offering little rationale aside from his disgust with the Company's stock price.  He also stated: "I'm a buyer."

65.    Isaacman made these statements to inflate the price of the stock. His statements come only two years after the Company went public and reflected desperation to avoid experiencing further pressure on his pledged shares.  And while Isaacman claims to be a buyer, he last purchased shares on the open market in June 2022 – six months prior to his December 7, 2022

---

[6] "Rook Units" collectively refers to the common units of Shift4 Payments, LLC and shares of the Company's Class A and Class B common stock.

[7] According to the Company's December 4, 2020 SEC filing, transfers of Class B common stock will generally result in those shares converting into shares of Class A common stock.

statements and did not make any open market purchases between the time of his statements and the end of the Class Period.[8]  His December 7, 2022 statements inflated the Company's share price[9] and were made just days before he made stock donations on December 13, 2022,[10] and just a few months ahead of his pre-planned sale of up to 2 million shares (as early as February 27, 2023) tied to his March 2021 VPF contract.

66.    In March and September 2021, Isaacman, via a wholly-owned special purpose vehicle – Rook SPV 1, LLC ("Rook SPV") – entered into VPF contracts covering a total of 6.44 million of the Company's Class A common stock.  These contracts allowed Isaacman to monetize his holdings by committing to deliver shares at a future date without having to formally sell until then, in exchange for a discount on the value of his shares at the date at which the contracts are struck.

67.    The March 2021 VPF Contract, covering approximately 2 million shares of the Company's Class A common stock, *was scheduled to settle on specified dates in February, March and April 2023*, at which time the actual number of shares of the Company's Class A common stock to be delivered by the SPV *would be determined* based on the price of the Company's Class A common stock on such dates relative to the forward floor price of $73.19 per share and the forward cap price of $137.24 per share, with the aggregate number not to exceed

---

[8] Isaacman's March 2, 2023 acquisition of 121,705 shares represents an award of vesting Restrictive Stock Units, not an open market purchase.

[9] On December 7, 2022, Shift4's Class A stock opened at $44.32 per share and increased over a two-day period to close at $47.73 per share on December 8, 2022.

[10] According to his SEC Form 5, Isaacman made a stock donation of Class C common stock on December 13, 2023.  According to the IPO prospectus, shares of Class C common stock are converted into fully paid shares of Class A common stock on a one-to-one basis upon their transfer to any other person.

approximately 2 million shares, which is the number of shares of Company's Class B common stock and LLC units pledged by Rook to secure its obligations under the contract.

68.    The March 2021 VPF Contract also provides critical context for Defendants' actions during the Class Period.  If Shift4's stock price traded below the floor price of $73.19 set out in the contract, all 2 million shares would have to be sold to settle the contract.[11]

**The Company's False Statements Regarding Customer Acquisition Costs Misled Investors to Believe that the Company Generated More Cash from Operating Activities than It Actually Did, Which Triggered a Restatement of the Company's Financials**

69.    The statement of cash flows is a central component of an entity's financial statements. It provides key information about an entity's financial health and its capacity to generate cash.  The objective of a statement of cash flows is to describe the sources and uses of cash.  The information provided in a statement of cash flows allows financial statement users to do all of the following:

    a.     Assess the entity's ability to generate positive future net cash flows;

    b.     Assess the entity's ability to meet its obligations, its ability to pay dividends, and its needs for external financing;

    c.     Assess the reasons for differences between net income and associated cash receipts and payments; and

    d.     Assess the effects on an entity's financial position of both its cash and noncash investing and financing transactions during the period.

ASC 230-10-10-2.

70.    Cash flows are classified in the statement of cash flows as either operating, financing or investing activities, depending on their nature.  ASC 230-10-45-24.  ASC Topic 230,

---

[11] On February 27, 2023, Isaacman sold 2 million shares of Shift4 Class A stock (through Rook SPV) tied to his March 2021 VPF contract.

*Statement of Cash Flows*, contains guidance on reporting cash flows in an entity's financial statements.

> "Investing activities include making and collecting loans and acquiring and disposing of debt or equity instruments and property, plant, and equipment and other productive assets, that is, assets held for or used in the production of goods or services by the entity (other than materials that are part of the entity's inventory)." ASC 230-10-20.

> "Financing activities include obtaining resources from owners and providing them with a return on, and a return of, their investment; … borrowing money and repaying amounts borrowed, or otherwise settling the obligation; and obtaining and paying for other resources obtained from creditors on long-term credit." ASC 230-10-20.

> "Operating activities include all transactions and other events that are not defined as investing or financing activities…. Operating activities generally involve producing and delivering goods and providing services. Cash flows from operating activities are generally the cash effects of transactions and other events that enter into the determination of net income." ASC 230-10-20.

71.      In other words, cash flows from operating activities is the residual category in the cash flow statement.  If a cash inflow (receipt) or outflow (payment) does not result from an investing or financing activity, it is classified as operating.  However, investors pay close attention to cash flows from operating activities in assessing a company's financial performance.  Ideally, a company's cash from operating activities should routinely exceed its net income because a positive cash flow speaks to a company's ability to remain solvent and grow its operations.

72.      GAAP requires entities to capitalize (i.e., record as an asset) the incremental costs of obtaining a contract with a customer if the costs are expected to be recovered.  ASC 340-40-25-1.  Incremental costs of obtaining a contract are those "costs that an entity incurs to obtain a contract with a customer that it would not have incurred if the contract had not been obtained (for example, a sales commission)." ASC 340-40-25-2.  GAAP does <u>not</u> describe the capitalized costs of obtaining a contract with a customer as assets held for or used in the production of goods or

services.  The capitalized costs of obtaining a contract with a customer must be amortized (i.e.,

expensed) "on a systematic basis that is consistent with the transfer to the customer of the goods

or services to which the asset relates." ASC 340-40-35-1

73.    Prior to Q3 2022, Shift4 Payments periodic filings disclosed only that its

Capitalized Acquisition Costs, which the Company presented separately from its Other Intangible

Assets, consisted of "upfront processing bonuses" that were amortized over a period of three years.

The Company classified cash payments associated with the capitalized customer acquisition costs

*as an investing activity on the statement of cash flows*, rather than cash flows used in operations,

which enabled Shift4 to inflate its cash flows from operating activities on the statement of cash

flows.

74.    Starting on May 11 2022, the SEC questioned Shift4 Payments' classification of

customer acquisition costs (and residual commission buyouts) on its statement of cash flows.

75.    In a June 3, 2022 letter to the SEC, the Company provided an expanded explanation

of what it included in the capitalized acquisition costs and explained its position for classifying

cash outflows for capitalized acquisition costs as an investing activity:

> Capitalized acquisition costs: The Company pays a one-time upfront payment to
> third-party distribution partners for each new merchant relationship they acquire
> for Shift4, representing the initial investment to secure the end-to-end processing
> relationship between Shift4 and the merchant. These customer relationship assets
> will produce revenue for Shift4 over a multi-year period. The total upfront payment
> is recorded on the balance sheet as a separate line item, "Capitalized acquisition
> cost, net" and subsequently amortized on a straight-line basis over the estimated
> life of the merchant relationship within cost of sales on our statement of income.

> \* \* \*

> Shift4 believes the capitalized acquisition costs represent customer relationship
> intangible assets which represent long-term productive assets that generate
> revenues over the expected life of the merchant relationships. Accordingly, Shift4
> capitalizes those amounts, consistent with other intangible assets and property,

plant and equipment, and therefore classifies related cash flows as investing activities.

* * *

Shift4 respectfully advises the Staff that it believes its capitalized acquisition costs and residual commission buyouts are properly classified as investing activities on the statements of cash flows.

76.     The Company received follow-up questions from the SEC in a second letter dated June 21, 2022 regarding Shift4's treatment of customer acquisition costs (and residual commission buyouts), and the Company took more than a month to respond.

77.     Prior to submitting its response to the SEC's second letter (and the day before the Company disclosed its Q2 2022 financial results), CFO Herring abruptly resigned from the Company.  According to the Company's August 3, 2022 Form 8-K ("August 3, 2022 8K"), on August 3, 2022, CFO Herring and the Company agreed that Herring would no longer serve as the Company's CFO, effective August 5, 2022."  The disclosure was silent as to the reason for the sudden and almost immediate departure of the CFO.  (The August 3, 2022 8-K also disclosed that Nancy Disman was appointed as Herring's replacement as CFO, and that Disman would receive a one-time signing cash bonus of $3 million.)

78.     On August 8, 2022, Shift4 submitted its response to the SEC's additional questions/comments in further defense of its treatment of customer acquisition costs.  Given the timing, it is more likely than not that Herring's sudden departure from the Company was related to the Company's aggressive accounting maneuver regarding its treatment of customer acquisition costs.

79.     Notwithstanding its August 8, 2022 response to the SEC, the Company shortly thereafter abandoned its arguments in its response and restated its previously issued financial statements.  On October 21, 2022, the Company announced in a Form 8-K that its Q3 2021, full

year 2021, Q1 2022 and Q2 2022 financial statements should no longer be relied upon because the Company identified an error in these financial statements "related to the classification of customer acquisition costs within the Company's statement of cash flows. Specifically, the Company determined that 'customer acquisition costs' should be treated as cash used in operating activities rather than cash used in investing activities, and that the misclassification of cash flow related to customer acquisition costs should be restated through the amendments of the Prior Financial Statements." It also disclosed that in connection with the restatement, it had concluded that "there is a material weakness in the design of a control activity with respect to the classification of customer acquisition costs within the statement of cash flows and has determined that the Company's disclosure controls and procedures and internal control over financial reporting was not effective."

80.     On this news, Shift4's stock price fell $1.21 per share or 2.67% to close at $44.16 per share on October 24, 2022.

81.     On November 8, 2022, Shift4 Payments filed a Form 10-Q for the third quarter of 2022, which included a restated statement of cash flows for the nine months ended September 30, 2021 (originally reported in the Form 10-Q for Q3 2021). On the same day, the Company also filed amended forms 10-Q for Q1 and Q2 2022 and amended Form 10-K for 2021. The aforementioned filings contained amendments to the statements of cash flows for full year 2019, 2020, and 2021 as well for Q1 – Q3 2021 and Q1 – Q2 2022:

|  | Year Ended December 31, 2019 | | |
|  | As Originally Reported | Restatement | As Restated |
|---|---|---|---|
| Net Income (loss) | $ (56.6) | $ - | $ (56.6) |
| Net cash (used in) provided by operating activities | 26.7 | (18.7) | 8.0 |
| Net cash (used in) provided by investing activities | (98.8) | 18.7 | (80.1) |
| Net cash (used in) provided by financing activities | 71.0 | - | 71.0 |
| Change in cash and cash equivalents | $ (1.1) | $ - | $ (1.1) |

|  | Year Ended December 31, 2020 | | |
|  | As Originally Reported | Restatement | As Restated |
|---|---|---|---|
| Net Income (loss) | $ (111.4) | $ - | $ (111.4) |
| Net cash (used in) provided by operating activities | 23.4 | (19.4) | 4.0 |
| Net cash (used in) provided by investing activities | (102.1) | 19.4 | (82.7) |
| Net cash (used in) provided by financing activities | 1,002.8 | - | 1,002.8 |
| Change in cash and cash equivalents | $ 924.1 | $ - | $ 924.1 |

| | Three Months Ended March 31, 2021 | | |
| --- | --- | --- | --- |
| | As Originally Reported | Restatement | As Restated |
| Net Income (loss) | $ (51.0) | $ - | $ (51.0) |
| Net cash (used in) provided by operating activities | (1.7) | (5.4) | (7.1) |
| Net cash (used in) provided by investing activities | (77.5) | 5.4 | (72.1) |
| Net cash (used in) provided by financing activities | (3.7) | - | (3.7) |
| Change in cash and cash equivalents | $ (82.9) | $ - | $ (82.9) |

| | Six Months Ended June 30, 2021 | | |
| --- | --- | --- | --- |
| | As Originally Reported | Restatement | As Restated |
| Net Income (loss) | $ (46.5) | $ - | $ (46.5) |
| Net cash (used in) provided by operating activities | 5.0 | (12.7) | (7.7) |
| Net cash (used in) provided by investing activities | (115.5) | 12.7 | (102.8) |
| Net cash (used in) provided by financing activities | (117.6) | - | (117.6) |
| Change in cash and cash equivalents | $ (228.1) | $ - | $ (228.1) |

| | Nine Months Ended September 31, 2021 | | |
| --- | --- | --- | --- |
| | As Originally Reported | Restatement | As Restated |
| Net Income (loss) | $ (60.3) | $ - | $ (60.3) |
| Net cash (used in) provided by operating activities | 25.6 | (19.3) | 6.3 |
| Net cash (used in) provided by investing activities | (162.0) | 19.3 | (142.7) |
| Net cash (used in) provided by financing activities | 496.7 | - | 496.7 |
| Change in cash and cash equivalents | $ 360.3 | $ - | $ 360.3 |

| | Year Ended December 31, 2021 | | |
| --- | --- | --- | --- |
| | As Originally Reported | Restatement | As Restated |
| Net Income (loss) | $ (74.0) | | $ (74.0) |
| Net cash (used in) provided by operating activities | 29.2 | (26.2) | 3.0 |
| Net cash (used in) provided by investing activities | (196.7) | 26.2 | (170.5) |
| Net cash (used in) provided by financing activities | 471.2 | | 471.2 |
| Change in cash and cash equivalents | $ 303.7 | $ - | $ 303.7 |

|  | Three Months Ended March 31, 2022 | | | | | |
|---|---|---|---|---|---|---|
|  | As Originally Reported | | Restatement | | As Restated | |
| Net Income (loss) | $ | (13.2) | $ | - | $ | (13.2) |
| Net cash (used in) provided by operating activities | | 37.1 | | (6.3) | | 30.8 |
| Net cash (used in) provided by investing activities | | (43.9) | | 6.3 | | (37.6) |
| Net cash (used in) provided by financing activities | | (35.7) | | - | | (35.7) |
| Change in cash and cash equivalents | $ | (42.5) | $ | - | $ | (42.5) |

|  | Six Months Ended June 30, 2022 | | | | | |
|---|---|---|---|---|---|---|
|  | As Originally Reported | | Restatement | | As Restated | |
| Net Income (loss) | $ | 1.8 | $ | - | $ | 1.8 |
| Net cash (used in) provided by operating activities | | 85.0 | | (14.2) | | 70.8 |
| Net cash (used in) provided by investing activities | | (87.1) | | 14.2 | | (72.9) |
| Net cash (used in) provided by financing activities | | (211.0) | | - | | (211.0) |
| Change in cash and cash equivalents | $ | (213.3) | $ | - | $ | (213.3) |

82.     As shown above, the misclassification of the cash outflows associated with capitalized customer acquisition costs ***enabled the Company to inflate its cash flows provided by operating activities***, which is a key financial metric investors use in assessing a company's performance.  The chart below includes the percentages by which cash flows from operations was overstated:

### Year Ended December 31, 2019

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (56.6) | $ - | $ (56.6) | |
| Net cash (used in) provided by operating activities | 26.7 | (18.7) | 8.0 | 234% |
| Net cash (used in) provided by investing activities | (98.8) | 18.7 | (80.1) | |
| Net cash (used in) provided by financing activities | 71.0 | - | 71.0 | |
| Change in cash and cash equivalents | $ (1.1) | $ - | $ (1.1) | |

### Year Ended December 31, 2020

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (111.4) | $ - | $ (111.4) | |
| Net cash (used in) provided by operating activities | 23.4 | (19.4) | 4.0 | 485% |
| Net cash (used in) provided by investing activities | (102.1) | 19.4 | (82.7) | |
| Net cash (used in) provided by financing activities | 1,002.8 | - | 1,002.8 | |
| Change in cash and cash equivalents | $ 924.1 | $ - | $ 924.1 | |

### Three Months Ended March 31, 2021

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (51.0) | $ - | $ (51.0) | |
| Net cash (used in) provided by operating activities | (1.7) | (5.4) | (7.1) | 76% |
| Net cash (used in) provided by investing activities | (77.5) | 5.4 | (72.1) | |
| Net cash (used in) provided by financing activities | (3.7) | - | (3.7) | |
| Change in cash and cash equivalents | $ (82.9) | $ - | $ (82.9) | |

### Six Months Ended June 30, 2021

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (46.5) | $ - | $ (46.5) | |
| Net cash (used in) provided by operating activities | 5.0 | (12.7) | (7.7) | ** |
| Net cash (used in) provided by investing activities | (115.5) | 12.7 | (102.8) | |
| Net cash (used in) provided by financing activities | (117.6) | - | (117.6) | |
| Change in cash and cash equivalents | $ (228.1) | $ - | $ (228.1) | |

** - changed from cash "provided by" operating activities to cash "used by" operating activities.

### Nine Months Ended September 31, 2021

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (60.3) | $ - | $ (60.3) | |
| Net cash (used in) provided by operating activities | 25.6 | (19.3) | 6.3 | 306% |
| Net cash (used in) provided by investing activities | (162.0) | 19.3 | (142.7) | |
| Net cash (used in) provided by financing activities | 496.7 | - | 496.7 | |
| Change in cash and cash equivalents | $ 360.3 | $ - | $ 360.3 | |

### Year Ended December 31, 2021

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (74.0) | $ - | $ (74.0) | |
| Net cash (used in) provided by operating activities | 29.2 | (26.2) | 3.0 | 873% |
| Net cash (used in) provided by investing activities | (196.7) | 26.2 | (170.5) | |
| Net cash (used in) provided by financing activities | 471.2 | - | 471.2 | |
| Change in cash and cash equivalents | $ 303.7 | $ - | $ 303.7 | |

### Three Months Ended March 31, 2022

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (13.2) | $ - | $ (13.2) | |
| Net cash (used in) provided by operating activities | 37.1 | (6.3) | 30.8 | 20% |
| Net cash (used in) provided by investing activities | (43.9) | 6.3 | (37.6) | |
| Net cash (used in) provided by financing activities | (35.7) | - | (35.7) | |
| Change in cash and cash equivalents | $ (42.5) | $ - | $ (42.5) | |

### Six Months Ended June 30, 2022

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ 1.8 | $ - | $ 1.8 | |
| Net cash (used in) provided by operating activities | 85.0 | (14.2) | 70.8 | 20% |
| Net cash (used in) provided by investing activities | (87.1) | 14.2 | (72.9) | |
| Net cash (used in) provided by financing activities | (211.0) | - | (211.0) | |
| Change in cash and cash equivalents | $ (213.3) | $ - | $ (213.3) | |

83. ASC Topic 250, *Accounting Changes and Error Corrections*, addresses accounting and disclosures required when a company discovers errors in its previously filed financial statements. ASC 250 distinguishes errors from accounting changes (such as a change in an accounting principle, an accounting estimate, or the reporting entity), and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." ASC 250-10-20.

84. ASC 250 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements including the following:

(a) The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

(b) An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

(c) Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

ASC 250-10-45-23

85. ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error[,]" including "the effect of the correction on each financial statement line item… for each prior period presented" and "the cumulative effect of the change on retained earnings …as of the beginning of the earliest period presented." ASC 250-10-50-7.

86.    In addition, Item 4.02 of Form 8-K requires specific disclosures when "the registrant's board of directors … concludes that any previously issued financial statements … should no longer be relied upon because of an error in such financial statements."[12]  The Company made these disclosures in its October 21, 2022 Form 8-K, but only with respect to the Q3 2021, full year 2021, Q1 2022 and Q2 2022 financial statements.

87.    Such disclosure of "non reliance on previously issued financial statements" is associated with what is colloquially called by the accounting profession a "Big R restatement."  A Big R restatement occurs when the error is *material* to the prior period financial statements.  When the error is material, the entity is required to alert the users of these financial statements that they, and the related auditor's report, can no longer be relied upon.

88.    The restatement impacted the statements of cash flows and the "liquidity and capital resources" section of the MD&A[13] for the related periods, among other things.  Investors were misled to believe the Company generated more cash from operating activities than it actually did.  This is important given the Company's disclosure in its originally filed 2021 Form 10-K (at 70) and Q1 2022 Form 10-Q (at 37) that: "We have historically sourced our liquidity requirements *primarily with flows from operations* and, when needed, with borrowings under our Credit Facilities or equity transactions."  (Emphasis added.)

89.    The restatement by the Company is an acknowledgement that its previous financial statements were *materially* misstated.  Although the Company retracted only its Q3 2021, full year 2021, Q1 2022 and Q2 2022 financial statements, the actual restatements of prior periods included statements of cash flows for full year 2019 and 2020 as well as Q1 – Q2 2021.   The restatements

---

[12] https://www.sec.gov/files/form8-k.pdf.
[13] "MD&A" refers to Management's Discussion & Analysis.

in the financial statements which were not restated by the Company were clearly material as cash flows from operations were overstated by 234% for full year 2019 and 485% for full year 2020. The cash flows expended in operations were understated by 76% for Q1 2021. For the six months ended June 20, 2021, the Company disclosed that it generated $5 million from operations when, in fact, it used $7.7 million in operating activities.

90.     Had the Company disclosed the truth at the time, investors would have understood that the Company was less viable than it purported to be, putting pressure on the CEO's pledged shares.

**The Company Entered into Residual Commission Buyout Transactions with Low Quality Distributors/Resellers in Q-3 2022 to Inflate Gross Profit and EBITDA in an Effort to Increase Share Price Due to the Threat of a Margin Call for Isaacman**

91.     Prior to Q3 2022, the Company relied primarily on a third-party distribution network for its POS sales. In addition to being responsible for marketing the Company's products and services, distributors are responsible for managing the relationship between the Company and the merchants over the course of each deal for which they earn a residual commission. As a result, costs associated with distribution that might have otherwise been allocated to SG&A[14] were instead run through Shift4's income statement via COGS, as its third-party sales force was paid primarily through commissions which were expensed as COGS.

92.     In Q3 2022, the Company spent hundreds of millions of dollars on "residual commission buyouts" with select distribution partners as part of a purported strategic initiative to insource its sales distribution network. Shift4's November 8, 2022 Q3 Form 10-Q states (emphasis added):

> During the three and nine months ended September 30, 2022, we completed $298.8 million and $311.7 million, respectively, of ***residual commission buyouts with***

---

[14] "SG&A" refers to selling, general, and administrative expenses.

*certain third-party distribution partners*, pursuant to which we acquired their ongoing merchant relationships that subscribe to our end-to-end payments platform. *These amounts include $298.5 million in residual commission buyouts executed under our mass strategic buyout program completed in the three months ended September 30, 2022 in support of our strategic initiative to insource our sales distribution network.* Total consideration for the residual commission buyouts was comprised of a combination of cash, shares of our Class A common stock, and contingent liability earnouts.

93.     During Q3 2022, Shift4 also disclosed that it acquired Retail Control Solutions, Inc ("RCS"), Pinnacle Hospitality Systems LLC, FPOS Group, Inc., and three other restaurant technology partners in separate transactions for $80.3 million of total purchase consideration, net of cash acquired.  The 2022 10-K identified the residual commission buyouts as one of the assets acquired in these transactions.

94.     During the Q3 2022 earnings call on November 7, 2022, Isaacman stated that "at the beginning of Q3, nearly all of our POS sales relied upon third-party distribution.  At the conclusion of the quarter, we are now more evenly balanced and ramping towards 50% direct sales and 50% third-party.  You will now find most of our third-party partners operating in the more sparsely populated area … while our direct sales presence is in the more desirable markets."

95.     A November 7, 2022 RBC Capital Markets report explained that "[a]s it pertains to Shift4's insourcing distribution strategy, [the Company] is pivoting more toward direct distribution for its SkyTab POS product vs. historically utilizing third party distribution[.] [S]pecifically in Q2/22[,] third party distribution was ~100% of its go-to-market and in Q3/22 is now ~50%.  In the process of making this pivot, [Shift4] added ~350 new employees from these third party distributors…."

96.     By engaging in residual commission buyouts, COGS is reduced because the bought-out commissions are no longer included in the COGS and are instead amortized on a separate line as "depreciation and amortization expense," which is excluded from the EBITDA

calculation. Thus, utilizing residual commission buyouts enabled Shift4 to increase its reported gross profit and EBITDA.

97.     Moreover, residual commission buyouts enabled Shift4 to manipulate its earnings by adjusting the amortization period of the capitalized residual commission buyouts. The Company increased its 2022 earnings by $6.9 million, or $0.08 per basic and diluted share[15] by simply increasing the amortization period of capitalized residual commission buyouts from three to four years during a single quarter, which lowered its depreciation and amortization expense.

98.     Residual commission buyouts and improved earnings from the manipulation of the depreciation and amortization expense made the stock look more attractive at a time at which the stock was reaching new lows just as the margin loan would have been at high risk for a margin call.

99.     During the November 7, 2022 earnings call, CFO Disman had the following exchange with a Credit Suisse analyst (emphasis added):

> [Analyst]  A couple of things I just wanted to recap in terms of mechanics…. [I]n terms of the residual commission buyouts, the in-sourcing that you were referring to. So, my understanding would be that there is no end-to-end volume impact from that, and no gross revenue impact. ***However, there would be a reduced pay-away, i.e. the cost of good sold would be lower, therefore, gross profit higher and EBITDA higher***. If you could just quantify and just confirm if those mechanics are roughly accurate and what the impact to gross profit or EBITDA would be either for Q4 or in the out years on an annualized basis? That would be very helpful….

> [Disman]  Yes. Hi, it's Nancy. ***You've got that exactly right.*** I mean, we're not going to, kind of pick that apart as we think about Q4. The one thing I would, kind of add into that mechanics is what Jared just talked about. Obviously, we do have some offset because we just grossed up this wasn't – I wouldn't call this simply a residual buyout mechanism, right? This was really in-sourcing of distribution for us. So, we did see an offset on the SG&A side as we build-out the internal sales force, but ***generally, I think the mechanics as you've justified them are appropriate***.

---

[15] *See* 2022 10-K at 80.

100.    The BOC Report disclosed that many third-party distributors involved in Shift4's residual commission buyouts appear to be low quality distributors.  As such, the quality of their customer accounts is thereby called into question.  Shift4 used these deals with low quality distributors to inflate EBITDA and increase the share price due to the threat of a margin call for Isaacman.

101.    CW-3 was employed by Shift4 as a Financial Analyst in the Finance Department from February 2020 through December 2022.  He reported to Jorida Kryemadhi, Finance Manager for Billing and Compensation.  In his role as a Financial Analyst, CW-1 calculated commissions for salespersons, designed and presented dashboards/databases that automated compensation calculations, analyzed payouts/costs to the sales teams and compiled cost/benefit analysis.  CW-3 did this across the entire sales force.

102.    CW-3 recalled Isaacman outlining the mass strategic buyout program at one of the quarterly "all hands" meetings.  Isaacman made a statement at the meeting that this was part of Shift4's progression and the Company was going forward with the plan.  CW-3 recalled performing some basic financial functions in connection with the transactions; however, throughout the deals, CW-3 remained perplexed with the Company's decision to move forward with the mass strategic buyout.  CW-3 thought it made no sense because Shift4 did not need to do the transactions to gain a larger market share.  CW-3 stated, "our products and service were much better…they [the distributors] were not a must have." CW-3 thought buying out the distributors made little sense because the companies would inevitably fold under the pressure to compete with Shift4.  For example, CW-3 recalled that Shift4 bought out a struggling, somewhat problematic father and son business.  CW-3 stated there was no real value in buying out this company and/or other "mom and pop" companies. CW-3 stated "we had the winning product and company, [so]

no need to do it. These [companies] would eventually . . . go belly up. The clients would all . . . eventually come to us….."

103.    Defendants made a number of materially false and/or misleading statements as to why Shift4 deployed hundreds of millions of dollars in capital for residual commission buyout transactions with many low quality distributors/resellers in Q3 2022, including: (i) to improve control over the customer experience;[16] (ii) to improve the Company's "unit economics";[17] (ii) to "motivate[] and energize[]" the Company's sales force to sell its SkyTab solution system to more customers;[18] and (iii) to "enable the boarding of the restaurant technology partners' customers on the Company's end-to-end acquiring solution and empower the Company's distribution partners to sign the restaurant technology partners' customer accounts and leverage the combined expertise to handle all aspects of installation, service, and support."[19]

104.    However, the truth is that Shift4 used these Q3 2022 deals to inflate gross profit and EBITDA in an effort to increase the share price due to the threat of a margin call for Isaacman.

**Materially False and Misleading Statements Issued During the Class Period**

105.    The Class Period begins on June 5, 2020, when Shift4's Class A common stock began publicly trading on the NYSE pursuant to the Registration Statement. The Registration Statement contained purported historical financial results of the Company, recording, *inter alia*, $18.7 million of customer acquisition costs in the investing activities section of its Consolidated

---

[16] November 7, 2022 Shareholder Letter.
[17] *See id.*; Q3 2022 Earnings Call Transcript. As indicated on a slide attached to a November 7, 2022 Form 8-K filing with the SEC (and highlighted by management during a November 7, 2022 business update event), management expected improved profitability per merchant from insourcing 50% of distributors and eliminating residual commissions to those distributors, compared to a 26% increase in customer acquisition costs, and (unexplained) faster payback periods.
[18] Q3 2022 Earnings Call Transcript.
[19] Q3 2022 10-Q at 28.

Statements of Cash Flows, as well as $26.7 million in net cash provided by operating activities, for the year ended December 31, 2019.

106.    On August 12, 2020, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2020 (the "Q2 2020 10-Q"). The Q2 2020 10-Q contained purported historical financial results of the Company, recording, *inter alia*, $9.8 million of customer acquisition costs in the investing activities section of its Condensed Statements of Cash Flows, as well as $6.7 million in net cash provided by operating activities, for the six months ended June 30, 2020. The Q2 2020 10-Q's MD&A section similarly states $6.7 million in net cash provided by operating activities, for the six months ended June 30, 2020.

107.    In addition, the Q2 2020 10-Q represented, in relevant part, "that, as of June 30, 2020, our disclosure controls and procedures were effective at the reasonable assurance level."

108.    Appended as exhibits to the Q2 2020 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX certification"), wherein Defendant Isaacman and Herring certified that they reviewed the Q2 2020 10-Q report, and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading…" and that "[t]he financial statements, and other financial information included in [the] report[], fairly present in all material respects the financial condition, results of operations and cash flows of [Shift4.]"

109.    On November 6, 2020, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2020 (the "Q3 2020 10-Q"). The Q3 2020 10-Q contained purported historical financial results of the Company, recording, *inter alia*, $14.4 million of customer acquisition costs in the investing

activities section of its Condensed Statements of Cash Flows, as well as $17.0 million in net cash provided by operating activities, for the nine months ended September 30, 2020.  The Q3 2020 10-Q's MD&A section similarly states $17.0 million in net cash provided by operating activities, for the nine months ended September 30, 2020.

110.    In addition, the Q3 2020 10-Q represented, in relevant part, "that, as of September 30, 2020, our disclosure controls and procedures were effective at the reasonable assurance level."

111.    Appended as exhibits to the Q3 2020 10-Q were substantively the same SOX certifications as referenced in ¶ 108, *supra*, signed by Defendant Isaacman and Herring.

112.    On March 8, 2021, Shift4 filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K reiterated certain of the Company's purported historical financial results as originally reported in the Registration Statement, again recording $18.7 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $26.7 million in net cash provided by operating activities, for the year ended December 31, 2019.  The 2020 10-K's MD&A section similarly states $26.7 million in net cash provided by operating activities, for the year ended December 31, 2019.

113.    The 2020 10-K also recorded $19.4 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $23.4 million in net cash provided by operating activities, for the year ended December 31, 2020.  The 2020 10-K's MD&A section similarly states $23.4 million in net cash provided by operating activities, for the year ended December 31, 2020.

114.    In addition, the 2020 10-K represented "that, as of December 31, 2020, our disclosure controls and procedures were effective at the reasonable assurance level."

115.    Appended as exhibits to the 2020 10-K were substantively the same SOX certifications as referenced in ¶ 108, *supra*, signed by Defendant Isaacman and Herring.

116.    On May 7, 2021, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2021 (the "Q1 2021 10-Q"). The Q1 2021 10-Q recorded $5.4 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $1.7 million in net cash used in operating activities, for the three months ended March 31, 2021. The Q1 2021 10-Q's MD&A section similarly states $1.7 million in net cash used in operating activities, for the three months ended March 31, 2021.

117.    In addition, the Q1 2021 10-Q represented "that, as of March 31, 2021, our disclosure controls and procedures were effective at the reasonable assurance level."

118.    Appended as exhibits to the Q1 2021 10-Q were substantively the same SOX certifications as referenced in ¶ 108, *supra*, signed by Defendant Isaacman and Herring.

119.    On August 6, 2021, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2021 (the "Q2 2021 10-Q"). The Q2 2021 10-Q recorded $12.7 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $5 million in net cash provided by operating activities, for the six months ended June 30, 2021. The Q2 2021 10-Q's MD&A section similarly states $5 million in net cash provided by operating activities, for the six months ended June 30, 2021.

120.    In addition, the Q2 2021 10-Q represented "that, as of June 30, 2021, our disclosure controls and procedures were effective at the reasonable assurance level."

121.    Appended as exhibits to the Q2 2021 10-Q were substantively the same SOX certifications as referenced in ¶ 108, *supra*, signed by Defendant Isaacman and Herring.

122.    On November 10, 2021, Shift4 issued a shareholder letter announcing the Company's Q3 2021 financial results.  In the shareholder letter, the Company recorded $19.3 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $25.6 million in net cash provided by operating activities, for the nine months ended September 30, 2021.

123.    On November 12, 2021, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2021 (the "Q3 2021 10-Q").  The Q3 2021 10-Q recorded $19.3 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $25.6 million in net cash provided by operating activities, for the nine months ended September 30, 2021.  The Q3 2021 10-Q's MD&A section similarly states $25.6 million in net cash provided by operating activities, for the nine months ended September 30, 2021.

124.    In addition, the Q3 2021 10-Q represented "that, as of September 30, 2021, our disclosure controls and procedures were effective at the reasonable assurance level."

125.    Appended as exhibits to the Q3 2021 10-Q were substantively the same SOX certifications as referenced in ¶ 108, *supra*, signed by Defendant Isaacman and Herring.

126.    On March 1, 2022, Shift4 issued a shareholder letter announcing the Company's fourth quarter ("Q4") and full year 2021 financial results.  In the shareholder letter, the Company recorded $26.2 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $29.2 million in net cash provided by operating activities, for the year ended December 31, 2021.

127.    Also on March 1, 2022, Shift4 filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K recorded $26.2 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $29.2 million in net cash provided by operating activities, for the year ended December 31, 2021. The 2021 10-K's MD&A section similarly states $29.2 million in net cash provided by operating activities, for the year ended December 31, 2021.

128.    In addition, the 2021 10-K represented "that, as of December 31, 2021, our disclosure controls and procedures were effective at the reasonable assurance level" and "that as of December 31, 2021, the Company's internal control over financial reporting was effective."

129.    Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 108, *supra*, signed by Defendant Isaacman and Herring.

130.    On May 5, 2022, Shift4 issued a shareholder letter announcing the Company's Q1 2022 financial results. In the shareholder letter, the Company recorded $6.3 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $37.1 million in net cash provided by operating activities, for the three months ended March 31, 2022.

131.    On May 6, 2022, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2022 (the "Q1 2022 10-Q"). The Q1 2022 10-Q recorded $6.3 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $37.1 million in net cash provided by operating activities, for the three months ended

March 31, 2022. The Q1 2022 10-Q's MD&A section similarly states $37.1 million in net cash provided by operating activities, for the three months ended March 31, 2022.

132.    In addition, the Q1 2022 10-Q represented "that, as of March 31, 2022, our disclosure controls and procedures were effective at the reasonable assurance level."

133.    Appended as exhibits to the Q1 2022 10-Q were substantively the same SOX certifications as referenced in ¶ 108, *supra*, signed by Defendant Isaacman and Herring.

134.    On August 4, 2022, Shift4 issued a shareholder letter announcing the Company's Q2 2022 financial results. In the shareholder letter, the Company recorded $14.2 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $85 million in net cash provided by operating activities, for the six months ended June 30, 2022.

135.    On August 5, 2022, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2022 (the "Q2 2022 10-Q"). The Q2 2022 10-Q recorded $14.2 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $85 million in net cash provided by operating activities, for the six months ended June 30, 2022. The Q2 2022 10-Q's MD&A section similarly states $85 million in net cash provided by operating activities, for the six months ended June 30, 2022.

136.    In addition, the Q2 2022 10-Q represented "that, as of June 30, 2022, our disclosure controls and procedures were effective at the reasonable assurance level."

137.    Appended as exhibits to the Q2 2022 10-Q were substantively the same SOX certifications as referenced in ¶ 108, *supra*, signed by Defendant Isaacman and Herring.

138.     The statements referenced in ¶¶ 105-110, 112-114, 116-117, 119-120, 122-24, 126-128, 130-132, and 134-136 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Shift4 had inadequate disclosure controls and procedures and internal control over financial reporting; (ii) as a result, Shift4 failed to properly account for customer acquisition costs, thereby artificially inflating its net cash provided by operating activities; (iii) accordingly, Shift4 would likely be forced to restate one or more of its previously issued financial statements; and (iv) all the foregoing, once revealed, was likely to negatively impact Shift4's reputation and business.

**The Truth Begins to Emerge**

139.     On October 21, 2022, after markets closed, Shift4 filed a current report on Form 8-K with the SEC, disclosing that the Company's Q3 2021, full year 2021, Q1 2022, and Q2 2022 financial statements should no longer be relied upon and would need to be restated because of a material weakness in the Company's financial controls, which had caused it to incorrectly treat "customer acquisition costs" as cash used in investing activities rather than cash used in operating activities in its Consolidated Statements of Cash Flows.   Specifically, the Form 8-K stated, in relevant part:

> On October 17, 2022, the Audit Committee ("Audit Committee") of the Board of Directors of Shift4 Payments, Inc. (the "Company"), after discussion with management, concluded that the Company's (i) previously filed Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and (ii) previously filed Quarterly Reports on Form 10-Qs for each of the quarterly periods ended September 30, 2021, March 31, 2022 and June 30, 2022 (collectively the "Prior Financial Statements"), and any reports, related earnings releases, investor presentations or similar communications of the Company's Prior Financial Statements should no longer be relied upon.

40

The determination resulted from an error in the Prior Financial Statements identified by the Company related to the classification of customer acquisition costs within the Company's statement of cash flows. Specifically, the Company determined that "customer acquisition costs" should be treated as cash used in operating activities rather than cash used in investing activities, and that the misclassification of cash flow related to customer acquisition costs should be restated through the amendments of the Prior Financial Statements.

* * *

The Company intends to restate the Prior Financial Statements on or about November 9, 2022, at the time of the intended filing of its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2022. In connection with such restatement, the Company has concluded that there is a material weakness in the design of a control activity with respect to the classification of customer acquisition costs within the statement of cash flows and has determined that the Company's disclosure controls and procedures and internal control over financial reporting was not effective.

140.    On this news, Shift4's stock price fell $1.21 per share, or 2.67%, to close at $44.16 per share on October 24, 2022. Despite this decline in the Company's stock price, Shift4 securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' misstatements and omissions regarding Shift4's residual commission buyout transactions.

141.    For example, on November 7, 2022, Shift4 issued a shareholder letter announcing the Company's Q3 2022 financial results (the "Q3 2022 Shareholder Letter"). The Q3 2022 Shareholder Letter also highlighted the insourcing of several of the Company's best distribution partners for greater control over the customer experience and reduced expenses:

Throughout the quarter we have been quite busy:

• High growth core: In addition to signing many notable hotels and restaurants, we fully released our next generation restaurant product SkyTab POS. As a component of this initiative, **we insourced several of our best distribution partners located in key markets**. As a result, we are now able to go to market with equal strength in both 'direct sales' and through third-party dealers. **The result is greater control over the customer experience and significantly reduced expenses driving superior**

*unit economics.* Overall, we anticipate a steady increase in new customer production.

142.     During a November 7, 2022 Q-3 2022 earnings call, Isaacman stated (emphasis

added):

> We are taking advantage of the SkyTab POS modern cloud architecture, intuitive features, and market positioning to improve our control over the customer experience and *further enhance our unit economics by in-sourcing distribution*.
>
> For example, at the beginning of Q3, nearly all of our POS sales relied upon third-party distribution. At the conclusion of the quarter, we are now more evenly balanced and ramping towards 50% direct sales and 50% third-party. You will now find most of our third-party partners operating in the more sparsely populated areas where while our direct sales presence is in the more desirable markets.
>
> ***
>
> *So, retiring legacy POS software brands and products and focusing energies on our new SkyTab solution with a balanced distribution strategy are great examples of the Shift4 way. As a result, we now have a highly motivated and energized [SkyTab] direct sales team and a game plan to target the over 100,000 existing restaurants using one of our many legacy restaurant POS brands.*

143.     On November 7, 2022, the Company filed a Form 8-K with the SEC which included

slides indicating that the purported rationale for insourcing distribution was that management

expected improved profitability per merchant from insourcing 50% of distributors and eliminating

residual commissions to those distributors, compared to a 26% increase in customer acquisition

costs, and (unexplained) faster payback periods.

144.     On November 8, 2022, Shift4 filed an amendment to its 2021 10-K on Form 10-

K/A (the "2021 10-K/A"), an amendment to its Q1 2022 10-Q on Form 10-Q/A (the "Q1 2022 10-

Q/A"), and an amendment to its Q2 2022 10-Q on Form 10-Q/A (the "Q2 2022 10-Q/A") with the

SEC, to properly account for customer acquisition costs in the Company's historical financial

statements. The 2021 10-K/A negatively revised Shift4's net cash provided by operating activities

to $8 million (down from its originally reported $26.7 million), $4 million (down from its

42

originally reported $23.4 million), and $3 million (down from its originally reported $29.2 million)

for the years ended December 31, 2019, 2020, and 2021, respectively. The Q1 2022 10-Q/A

negatively revised Shift4's net cash used in operating activities to $7.1 million (down from its

originally reported $1.7 million) and net cash provided by operating activities to $30.8 million

(down from its originally reported $37.1 million) for the three months ended March 31, 2021 and

2022, respectively. The Q2 2022 10-Q/A negatively revised Shift4's originally reported $5 million

of net cash **provided by** operating activities to $7.7 million of net cash **used in** operating activities

for the six months ended June 30, 2021, as well as negatively revised net cash provided by

operating activities to $70.8 million (down from its originally reported $85 million) for the six

months ended June 30, 2022.

145. Also on November 8, 2022, Shift4 filed a quarterly report on Form 10-Q with the

SEC, reporting the Company's financial and operational results for the quarter ended September

30, 2022 (the "Q3 2022 10-Q"). The Q3 2022 10-Q also contained revisions to Shift4's historical

financial statements to properly account for customer acquisition costs, negatively revising the

Company's net cash provided by operating activities to $6.3 million (down from its originally

reported $25.6 million) for the nine months ended September 30, 2021.

146. With respect to Shift4's distribution insourcing and residual commission buyouts

in the quarter, the Q3 2022 10-Q stated, *inter alia* (emphasis added):

> ### Distribution Insourcing and Residual Commission Buyouts
>
> During the three and nine months ended September 30, 2022, we completed $298.8 million and $311.7 million, respectively, of residual commission buyouts with certain third-party distribution partners, pursuant to which we acquired their ongoing merchant relationships that subscribe to our end-to-end payments platform. These amounts include $298.5 million in residual commission buyouts executed under our mass strategic buyout program completed in the three months ended September 30, 2022 in support of our strategic initiative to insource our sales distribution network.

***

### Restaurant Technology Partners

During the three months ended September 30, 2022, the Company acquired Pinnacle Hospitality Systems LLC ("Pinnacle"), FPOS Group, Inc. ("FPOS"), Retail Control Solutions, Inc. ("RCS"), and three other restaurant technology partners in separate transactions for $80.3 million of total purchase consideration, net of cash acquired. The Company acquired 100% of each entity's ownership interests. *These acquisitions enable the boarding of the restaurant technology partners' customers on the Company's end-to-end acquiring solution and empower the Company's distribution partners to sign the restaurant technology partners' customer accounts and leverage the combined expertise to handle all aspects of installation, service, and support.*

147.    On February 28, 2023, Shift4 issued a shareholder letter announcing the Company's Q4 and full year 2022 financial results (the "Q4/FY 2022 Shareholder Letter"). In the Q4/FY 2022 Shareholder Letter, Defendant Isaacman stated, in relevant part (emphasis added):

[W]e completed another reasonably strong quarter and closed out the year above our initial 2022 guidance, which we raised during the year. In addition to the following results, we recognized gross profit of $441.8 million in 2022, up from gross profit of $256.6 million in 2021, and net income of $86.7 million in 2022, up from net loss of ($74.0) million in 2021.

* * *

Aside from the advantages we possess within our 'High Growth Core', *I believe our outperformance can be attributed to a disciplined focus on true 'needle moving' initiatives like our gateway sunset program, the release of our new restaurant POS product 'SkyTab', and the associated insourcing of our go-to-market distribution.* Additionally, our well-timed investments in late 2021 have begun delivering considerable volume across our new verticals, such as Sports & Entertainment, Gaming, Sexy Tech, Non-Profits, International and from strategic enterprise relationships. These important investments and initiatives are proving to be timely and prescient.

148.    The statements referenced in ¶¶ 141-143 and 146-147 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's residual commission buyout transactions in

Q3 2022. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) in Q3 2022, Shift4 entered into residual commission buyout transactions with low quality distributors/resellers to inflate gross profit and EBITDA in an effort to increase the share price due to the threat of a margin call for Isaacman; and (ii) the foregoing, once revealed, was likely to negatively impact Shift4's reputation and business.

## The Truth Fully Emerges

149. On April 19, 2023, BOC published a report addressing Shift4. The BOC Report alleged, among other things, that "Shift4 [is], in reality, a roll-up of low-tech POS systems and payment processors which is substantially less profitable, generates far less cash, and is materially more levered than investors are led to believe." The BOC Report further alleged that as Shift4's share price "tumbled through 2022, we believe that [Isaacman] faced the threat of a margin call from an unusually large stock of stock pledges, creating an existential threat that he would be forced to liquidate up to 10 million shares (12% of diluted shares outstanding)." "With the specter of a margin call hanging over the stock, we think that Shift4 engaged in a string of highly questionable and hyper-aggressive accounting maneuvers seemingly designed to keep the stock afloat, from cash flow manipulation to inexplicable distributor acquisitions that enabled it to capitalize a major component of COGS."

150. For example, the Blue Orca Report stated, *inter alia*:

We estimate that, in total, Shift4's aggressive accounting games and M&A [merger and acquisition] activity inflated 2022 gross profit by 13%, Adj. EBITDA by 34%, and operating income by close to 3x, while its buyout of 50% of its independent distributors and Q4 2022 cash account withdrawal together inflated operating cash flow by 61%. We believe that, as a result, Shift4's true leverage stands at 5.3x Net Debt / Adj. EBITDA, far higher than reported by the Company. **Ultimately, we believe that Shift4's aggressive financial maneuvers mask a company that is far less profitable and less cash generative, and far more levered, than investors are led to believe.**

(Emphasis in original.)

151.    With respect to the Company's residual commission buyout transactions in Q3 2022, the Blue Orca Report stated, *inter alia*:

> In Q3 FY22, Shift4 took the unusual step of acquiring distributors representing roughly 50% of its independent sales force, after having employed third-party resellers almost exclusively throughout its existence to that point. These distributors are responsible not only for marketing Shift4's products and services, but for managing the relationship between Shift and merchants over the life of each deal, for which they receive a "residual commission." As a consequence, costs associated with distribution that might have otherwise been allocated to SG&A [selling, general, and administrative expenses] are instead run through Shift4's income statement via COGS, as its independent sales force is paid primarily through commissions which are expensed as a cost of goods sold.
>
> **By buying out its distributors, Shift4 effectively moves costs from its income statement into cash flow from investing, flattering gross profit and EBITDA by paying acquired resellers a sum of cash up front equal to their outstanding commission balances.** In our view, this is a back-handed way of capitalizing COGS, giving the appearance of stronger gross profit and EBITDA without improving the underlying economics or earnings power of the business whatsoever.
>
> Critically, while the sell-side has some awareness of the directional impact of the accounting around these deals on earnings, we believe that both analysts and the investing public are ignorant of the relative magnitude of residual commissions as a share of COGS – and, consequently, of the dramatic effect of Shift4's distributor acquisitions on Company financials. Shift4 has been coy about the weight of these costs, and has not, to our knowledge, openly quantified them when asked about the financial implications of its distributor acquisitions.
>
> However, buried in a letter from Shift4 to the SEC regarding its accounting practices, we observe that residual commissions have accounted for a massive 40-45% of non-network fee COGS each year since FY19 ($115M in FY21). Removing this cost of sales from the income statement in its entirety would have permitted Shift4 to report an Adj. EBITDA by 60-70% between FY19-21.
>
> * * *
>
> **Thus, by bringing ~50% of its independent resellers in-house, we estimate that Shift4 eliminates ~20-25% of its non-network fee COGS, immediately increasing its pro-forma Adj. EBIDTA on paper by 30-35% without, in our view, changing the underlying quality or earnings power of the business in any way.**

(Emphasis in original.)

152.    With respect to how these acquisitions created an unduly rosy view of Shift4's

performance and ability to increase its gross profits, adjusted EBITDA, operating income, and cash

flow in Q4 and full year 2022, the Blue Orca Report stated, *inter alia*:

> The financial impact of Shift4's actions took full effect in Q4 2022, the first quarter
> during which the acquired resellers were fully integrated into the Company. Shift4
> reported non-network fee COGS of $61.1 million, inclusive of depreciation of
> equipment under lease, in Q4 2022. We estimate that, by acquiring distributors and
> wiping out ~23% of COGS (excluding network fees), Shift4 eliminated $18.3
> million of residual commissions from its income statement, flattering gross profit
> (using its new methodology) by 15% and Adj. EBITDA by 24%.
>
> * * *
>
> Critically, sell-side consensus around Shift4's Q4 Adj. EBITDA was $81.9 million
> going into earnings. **We estimate that, by removing $18.3 million of COGS from
> the income statement, Shift4 turned what would have been a $5.8 million Adj.
> EBITDA miss into a significant $12.5 million Adj. EBITDA beat.** And, given
> the public's ignorance of the magnitude of residual commissions removed via the
> distributor acquisitions, we don't think that the impact of these accounting
> machinations was accounted for by analysts in their pre-earnings estimates.

(Emphasis in original.)

153.    The BOC Report disclosed that many third-party distributors involved in Shift4's

residual commission buyouts appear to be low quality distributors.  It describes the distributors as

a motley collection of small resellers; and that Shift4 used these deals to inflate EBITDA and

increase the share price due to the threat of a margin call for Isaacman.

154.    For example, Retail Control Solutions, Inc. ("RCS") was one of resellers acquired

by the Company in the third quarter of 2022.  With respect to RCS, the BOC Report states:

> Among those large enough to be named in [Shift4's SEC] filings was Retail Control
> Solutions, Inc. ("RCS"). Its homepage looks straight out of 1995, best viewed in
> Netscape. It was still live just weeks before the publication of this report. While
> Shift4     was     wise     enough     to     redirect     from     http://rcs-usa.com/     to
> https://www.skytab.com/ after the deal was done, as it did with its other
> acquisitions, it until recently failed to kill RCS's actual home page, http://rcs-

usa.com/helpdesk.html, leaving its antediluvian website up for all to see. While it is no longer live, you can find a recently cached version of the site without images here, and a fully navigable version on the Wayback Machine here (from 2017, but we can confirm that this is exactly how the site appeared until as recently as March 2023. Below is a screenshot of how it appeared until just weeks ago.



*RCS website as of March 2023. Archived at the Wayback Machine.*

155.　　The BOC Report also included "an actual screenshot from the reseller's website, giving the appearance of a low-tech late 90s RadioShack enthusiast."



156.    The BOC Report also stated: "Hilariously, RCS proudly reported that POSitouch, one of the Shift4 POS systems offered by RCS, "uses an open architecture hardware platform running on Microsoft Windows® NT, 2000, CE, or XP."



*POSitouch is a hospitality point of sale system* that automates and integrates every aspect of your establishment offering a total solution to your operational challenges. The system was developed by Restaurant Data Concepts (RDC), who also own Gregg's Restaurants, a chain of high volume dinner houses located in Rhode Island. RDC has operated these restaurants for over 20 years and therefore has tremendous industry knowledge of the features that a point of sale system should provide.

POSitouch is a fully integrated Point of Sale and Back Office system. POSitouch uses an open architecture hardware platform running on Microsoft Windows® NT, 2000, CE, or XP

POSitouch addresses the Table Service, Quick Service and Country Club industries. Following are just a few of the system highlights:

- Touchscreen order entry terminals

**Placing an order on a VGA Touchscreen**

157. With respect to *other* "selectively in-sourced" distributors which were not specifically identified by Shift4, BOC states that, through its research, it has identified a number of low-quality distributors that were included in the residual commission buyouts. "We find that many of the distributors … appear to be businesses run by just one or two people, and sometimes by family members, with minimal IP" and have little to offer as a target "except the ability to capitalize a major component of COGS." BOC Report at 16.

158. Other low quality distributors identified in the BOC Report include: (i) "Southern Point of Sale LLC out of Hammond, LA, which appears to have been manned by two people – both now Shift4 salesmen, per their LinkedIn pages" (ii) "Long Beach Cash Register Co., for which we can find neither a website nor even business records, but whose sole member self-reports as a Local Sales Manager for Shift4 as of September 2022"; (iii) "Apex Solutions of Toledo, whose President and Owner became a Local Manager for Shift4 in July 2022, per his LinkedIn page. Its former website appears [to be of poor quality], not unlike RCS's and it linked to ancient POS demo YouTube videos"; (iv) "Gibbs Retail Systems, whose website is still up, but which was bought out by Shift4 per the former owner's retirement announcement on his business' recently removed

Facebook page…. At least one of its employees now self-reports as a Shift4 employee on his LinkedIn page; and (v) "Data Control Systems, Inc. of N.C., which was registered to its founders from 1994-2022, and is now registered to Shift4s CEO and GC. Formed as a small father-son business in 1994, it failed to file annual reports between 1998 and 2017. It was suspended by the state of North Carolina in 2003 and forcibly dissolved in 2011. This was rectified only in 2018, when the company filed outstanding reports dated back to 1998."

159.    On this news, Shift4's stock price fell $5.95 per share, or 8.68%, to close at $62.59 per share on April 19, 2023.

160.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

161.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Shift4 securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

162.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Shift4 securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or

thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Shift4 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

163.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

164.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

165.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Shift4;

- whether Defendants caused Shift4 to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Shift4 securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

166. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

167. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Shift4 securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Shift4 securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

168. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

169. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated
Thereunder Against All Defendants)**

170.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

171.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

172.    During the Class Period, Defendants knowingly or recklessly made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Such false and misleading statements was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Shift4 securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Shift4 securities at artificially inflated prices.

173.    The Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Shift4 securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Shift4's finances and operations.

174.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth

in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said statements and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

175.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As CEO of Shift4, Defendant Isaacman had knowledge of the details of Shift4's internal affairs.

176.    Defendant Isaacman is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, Defendant Isaacman was able to and did, directly or indirectly, control the content of the statements of Shift4. As CEO of a publicly-held company, Defendant Isaacman had a duty to disseminate timely, accurate, and truthful information with respect to Shift4's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Shift4 securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Shift4's financial condition and operations which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Shift4 securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

177.    During the Class Period, Shift4 securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Shift4 securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Shift4 securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Shift4 securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

178.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

179.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants)**

180.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

181.    This count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiffs need not allege in the count nor prove in this case that Defendants made any misrepresentations or omissions of material fact for which they may also be liable under

Rule 10b-5(b).  Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

182.    During the Class Period, Defendants carried out a common plan, scheme and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the market price of Shift4 securities; and (iii) cause Plaintiff and the Class to purchase Shift4 securities at artificially inflated prices.

183.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchase of Shift4 stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

184.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included Defendant Isaacman's December 7, 2022 Statements as well as the separate and distinct false and misleading statements relating to customer acquisition costs and residual commission buyouts

185.    Plaintiffs and the Class reasonably relied upon the integrity of the market in which Shift4 securities traded.

186.    During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Shift4 securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

187.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Shift4 securities during the Class Period.

188.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of Shift4 securities during the Class Period.

## COUNT III

**(Violations of Section 20(a) of the Exchange Act Against Defendant Isaacman)**

189.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

190.    During the Class Period, Defendant Isaacman participated in the operation and management of Shift4, and conducted and participated, directly and indirectly, in the conduct of Shift4's business affairs.  Because of his position at the Company, he knew the adverse non-public information about Shift4's materially false and misleading statements.

191.    As CEO of a publicly owned company, Defendant Isaacman had a duty to disseminate accurate and truthful information with respect to Shift4's financial condition and results of operations, and to correct promptly any public statements issued by Shift4 which had become materially false or misleading.

192.    Because of his position of control and authority, Defendant Isaacman was able to, and did, control the contents of the various reports, press releases and public filings which Shift4 disseminated in the marketplace during the Class Period concerning Shift4's results of operations. Throughout the Class Period, Defendant Isaacman exercised his power and authority to cause Shift4 to engage in the wrongful acts complained of herein. Defendant Isaacman, therefore, was a

"controlling person" of Shift4 within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Shift4 securities.

193.    Defendant Isaacman, therefore, acted as a controlling person of Shift4. By reason of his position as CEO of Shift4, he had the power to direct the actions of, and exercised the same to cause, Shift4 to engage in the unlawful acts and conduct complained of herein. Defendant Isaacman exercised control over the general operations of Shift4 and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

194.    By reason of the above conduct, Defendant Isaacman is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Shift4.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  January 5, 2024                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brenda Szydlo* (admitted *pro hac vice*)
Jeremy A. Lieberman (admitted *pro hac vice*)
Emily C. Finestone (SBN 323709)
Dean P. Ferrogari (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bszydlo@pomlaw.com
efinestone@pomlaw.com
dferrogari@pomlaw.com

**THE SCHALL LAW FIRM**
Rina Restaino (admitted *pro hac vice*)
Angus F. Ni (admitted *pro hac vice*)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
rina@schallfirm.com
angus@schallfirm.com

*Co-Lead Counsel for Plaintiffs and the
Proposed Class*

**HOLZER & HOLZER, LLC**
Corey D. Holzer
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

*Additional Counsel for Plaintiff Alfred
O'Meara*