**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT BAER and ALFRED O'MEARA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> SHIFT4 PAYMENTS, INC., and JARED ISAACMAN, <br><br> Defendants. | Case No.  5:23-cv-03206-JFL <br><br> Hon. Joseph F. Leeson, Jr. |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
Emily C. Finestone (SBN 323709)
Dean P. Ferrogari (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bszydlo@pomlaw.com
efinestone@pomlaw.com
dferrogari@pomlaw.com

**THE SCHALL LAW FIRM**
Rina Restaino (admitted *pro hac vice*)
Angus F. Ni (admitted *pro hac vice*)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
rina@schallfirm.com
angus@moni.law

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

**HOLZER & HOLZER, LLC**
Corey D. Holzer
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

*Additional Counsel for Plaintiff Alfred O'Meara*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 1

    A.    Defendant Isaacman, with Total Control of Shift4, Fostered a "Boys' Club" of Friends and Family at the Top of the Company ....................................................... 1

    B.    Isaacman's Margin Loan Faced the Threat of a Margin Call during 2022 Due to Declines in Shift4's Stock Price, Incentivizing Him to Inflate Shift4's Stock Price ......................................................................................................................... 2

    C.    Isaacman's Variable Prepaid Forward Contracts Incentivized Him to Inflate the Company's Stock Price.......................................................................................... 2

    D.    Defendant Isaacman's December 7, 2022 False Statement .................................... 3

    E.    Shift4 Wrongly Classified Customer Acquisition Costs as Expenditures on "Investing Activities," Resulting in the Restatement ............................................. 3

    F.    Shift4 Entered into "Residual Commission Buyout Transactions" with Low Quality Distributors/Resellers in Q3 2022 to Inflate Gross Profit and EBITDA ... 5

    G.    The Truth Emerges Regarding Residual Commission Buyouts ............................. 6

STATEMENT OF QUESTIONS INVOLVED.................................................................... 6

SUMMARY OF ARGUMENT ............................................................................................ 6

ARGUMENT......................................................................................................................... 10

    I.    PLAINTIFFS ADEQUATELY ALLEGE MATERIALLY FALSE AND MISLEADING STATEMENTS.............................................................................. 10

    II.    PLAINTIFFS ADEQUATELY PLEAD SCIENTER ......................................... 18

    III.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ........................... 21

    IV.    PLAINTIFFS SUFFICIENTLY ALLEGE SCHEME LIABILITY..................... 24

    V.    PLAINTIFFS STATE A CLAIM UNDER SECTION 20(a) .............................. 25

CONCLUSION...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alberici v. Recro Pharma, Inc.*,
2020 WL 806719 (E.D. Pa. Feb. 14, 2020) ...........................................................................22

*Alberici v. Recro Pharma, Inc.*,
2021 WL 798299 (E.D. Pa. Mar. 1, 2021)..............................................................................22

*Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. Apr. 6, 2021).................................................................18, 21

*Bush v. Blink Charging Co.*,
2023 WL 8263037 (S.D. Fla. Nov. 27, 2023).......................................................................17

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)...................................................................................13

*Hemmer Grp. v. Sw. Water Co.*,
527 F. App'x 623 (9th Cir. 2013) .........................................................................................14

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)..................................................................................................14

*In re Allergan Generic Drug Pricing Sec. Litig.*,
2019 WL 3562134 (D.N.J. Aug. 6, 2019) ............................................................................23

*In re Amarin Corp. PLC Sec. Litig.*,
689 F. App'x 124 (3d Cir. 2017) .......................................................................................6, 14

*In re Banc of Cal. Sec. Litig.*,
2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) .......................................................................17

*In re Bio-Tech. Gen. Corp. Sec. Litig.*,
380 F. Supp. 2d 574 (D.N.J. 2005) ..................................................................................11, 15

*In re Bradley Pharms., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006) ..........................................................................15, 16, 23

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2020 WL 3026564 (D.N.J. June 5, 2020).......................................................................20, 24

*In re Discovery Labs. Sec. Litig.*,
2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) .........................................................................20

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
   2017 WL 1536223 (D.N.J. Apr. 27, 2017),
   *aff'd on other grounds sub nom.,*
   *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018) ...............................................13

*In re Ocugen, Inc. Sec. Litig.*,
   659 F. Supp. 3d 572 (E.D. Pa. 2023) ...............................................................................24, 25

*In re Par Pharm. Sec. Litig.*,
   2009 WL 3234273 (D.N.J. Sept. 30, 2009) ..........................................................................23

*In re Ravisent Techs., Inc. Sec. Litig.*,
   2004 WL 1563024 (E.D. Pa. July 13, 2004)....................................................................11, 14

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011)...................................................................................17

*In re WageWorks, Inc., Sec. Litig.*,
   2020 WL 2896547 (N.D. Cal. June 1, 2020) ........................................................................23

*In re Wilmington Tr. Sec. Litig.*,
   29 F. Supp. 3d 432 (D. Del. 2014).........................................................................................13

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
   620 F. Supp. 3d 167 (D.N.J. 2022) .......................................................................................17

*Inst'l Invs. Grp. v. Avaya, Inc.*
   564 F.3d 242 (3d Cir. 2009)..................................................................................................17

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
   363 F. Supp. 3d 476 (D. Del. 2019).......................................................................................17

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019)...........................................................................................................24

*Martin v. GNC Holdings, Inc.*,
   2017 WL 3974002 (W.D. Pa. Sept. 8, 2017),
   *aff'd*, 757 F. App'x 151 (3d Cir. 2018) .................................................................................21

*McIntire v. China MediaExpress Holdings, Inc.*,
   927 F. Supp. 2d 105 (S.D.N.Y. 2013)...................................................................................17

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019).....................................................................................18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)......................................................................................................7, 13, 17

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013)..................................................................................................17

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ...................................................................................21

*SEC v. Lucent Techs., Inc.*,
    610 F. Supp. 2d 342 (D.N.J. 2009) ....................................................................................24

*Strougo v. Lannett Co., Inc.*,
    2019 WL 1172992 (E.D. Pa. Mar. 13, 2019).............................................................21, 22, 25

*Tanaskovic v. Realogy Holdings Corp.*,
    2021 WL 211049 (D.N.J. Jan. 21, 2021) .............................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................................18

*Underland v. Alter*,
    2012 WL 2912330 (E.D. Pa. July 16, 2012)........................................................................13

*United States ex rel. Budike v. Peco Energy*,
    2013 WL 5890650 (E.D. Pa. Nov. 4, 2013) ........................................................................25

*United States v. Reyes*,
    660 F.3d 454 (9th Cir. 2011) ..............................................................................................21

*Vanderhoef v. China Auto Logistics Inc.*,
    2021 WL 3260849 (D.N.J. July 30, 2021)...........................................................................24

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
    672 F. Supp. 2d 596 (S.D.N.Y. 2009)..................................................................................23

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2015 WL 3755218 (E.D. Pa. June 16, 2015) .......................................................................18

*Wu v. GSX Techedu Inc.*,
    2023 WL 2207422 (D.N.J. Feb. 24, 2023) ..........................................................................23

## Statutes

15 U.S.C. § 78j(b) ...................................................................................................... *passim*

15 U.S.C. § 78u-4 ................................................................................................................18, 21

15 U.S.C. § 78t(a) ...............................................................................................................1, 25

## Rules & Regulations

17 C.F.R. § 240.10b-5(a) ...........................................................................................................24

17 C.F.R. § 240.10b-5(b)........................................................................................................1, 10

iv

17 C.F.R. § 240.10b-5(c) ................................................................................................24

Fed. R. Civ. P. 8(a)(2)....................................................................................................21

## **Other Authorities**

ASC 105-10-05-6.............................................................................................................15

ASC 230-10-20 ...........................................................................................................11,12

ASC 230-10-45 ...............................................................................................................12

ASC 230-10-45-24...........................................................................................................11

Lead Plaintiff Robert Baer and Plaintiff Alfred O'Meara ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Amended Class Action Complaint.[1] This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Shift4 securities between June 5, 2020 and April 18, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and its Chief Executive Officer ("CEO"), Jared Isaacman.

## STATEMENT OF FACTS

### A. Defendant Isaacman, with Total Control of Shift4, Fostered a "Boys' Club" of Friends and Family at the Top of the Company

Shift4 sells point-of-sale ("POS") systems, or payment machines, to primarily small businesses like restaurants. ¶2. Defendant Isaacman is "the majority shareholder" and controls the composition of its board and business generally. MTD at 20; ¶¶44-45. Exercising such control, Isaacman hired friends and family into senior Company positions. As one former longtime senior executive explained to Plaintiffs' investigators, the Company's senior ranks consisted of a "boys' club" of Isaacman's intimates. ¶48. Isaacman's personal pilot became EVP of Payments and Chief Operating Officer. ¶49. Isaacman's personal friend, Brendan Lauber, became Chief Technology Officer. ¶50. Numerous other personal friends were placed in charge of major departments, including Risk, Payment Supports, and Operations. ¶¶51-55.

---

[1] Unless otherwise defined or stated, all capitalized terms used herein have the meanings as provided in the Amended Complaint (the "Complaint" or "¶_") (ECF No. 35). All internal citations and quotation marks are omitted and emphasis is added. "MTD" refers to Defendants' memorandum of law in support of their motion to dismiss the Complaint (ECF No. 39-2). "Defs. Ex." refers to the exhibits to Defendants' motion to dismiss the Complaint (ECF Nos. 39-6 – 39-20).

**B.      Isaacman's Margin Loan Faced the Threat of a Margin Call during 2022 Due to Declines in Shift4's Stock Price, Incentivizing Him to Inflate Shift4's Stock Price**

In September 2020, Isaacman took out a margin loan, secured by his Shift4 stock, that allowed him to "cash out" of his valuable ownership stake without actually selling stock or paying capital gains taxes. ¶60. As of March 24, 2021, this loan was secured by 10 million shares of Shift4 stock (the "March 2021 Loan"); but if the value of the stock declines, the lender can issue a margin call, which would force Isaacman to put up more stock as collateral, or pay down the loan. The March 2021 Loan was taken out a month before Shift4's Class Period stock price peak of $101.43 per share, declining over 60%, into the $30-40 per share range by the early summer of 2022 and through much of the remainder of 2022. ¶61. This subjected Isaacman to the threat of a margin call and collateral liquidation. ¶¶57-58, 62. On December 19, 2022, Isaacman *did* pay down the March 2021 Loan; and increased his collateral by 50% from 10 million shares to 15 million shares. ¶62. This meant that throughout the preceding year, as the stock tanked and Isaacman negotiated these new terms, he was under enormous pressure to arrest Shift4's stock price decline. ¶63.

**C.      Isaacman's Variable Prepaid Forward Contracts Incentivized Him to Inflate the Company's Stock Price**

In addition to a margin loan, Isaacman also put 6.4 million shares, or 22% of his holdings of Shift4 stock, at risk in Variable Prepaid Forward contracts ("VPFs") in March and September of 2021. ¶¶57, 66-67. Through these, Isaacman was immediately paid the vast majority of the current value of the pledged stock but did not have to deliver stock until later. ¶57n.4. But, while a price range for the handover of stock is pre-set, and the amount capped to protect against outsize losses, Isaacman stood to lose all of his pledged shares if the stock declined in value dramatically between the initial payment date and the handover date. ¶¶57, 66-67 Here, Isaacman's March 2021 VPF was due to be settled in early 2023, in a price range of between $73.19 and $137.24. ¶67. Thus, if

2

the stock fell below $73.19 per share on the due date, Isaacman would lose all 2 million shares.[2] ¶67. Because the stock was indeed below this level in the months leading to the due date, the VPFs were an additional risk that, along with the above-described threat of being margin-called, compounded Isaacman's incentive to inflate Shift4's stock price over the course of 2022.

### D.    Defendant Isaacman's December 7, 2022 False Statement

On December 7, 2022, 12 days *before* entering the December 19, 2022 revised margin loan agreement in which he had to put up more collateral while paying down the loan, and a mere two months *before* he was forced to deliver 2 million shares pursuant to his March 2021 VPF, Isaacman told investors: "I'm a buyer." ¶64. However, he had not bought Shift4 stock for six months, and did not thereafter make any purchases of Shift4 stock for the rest of the Class Period. ¶65.

### E.    Shift4 Wrongly Classified Customer Acquisition Costs as Expenditures on "Investing Activities," Resulting in the Restatement

In the statement of cash flows, a core part of any company's financial statements, cash flows are classified as either operating, financing or investing activities, depending on their nature. ¶¶69-71.[3] "Investing activities," "Financing activities" and "Operating activities" are to be classified separately. *Id.* Shift4 spent tens of millions of dollars on costs in acquiring customers but instead of classifying these costs as cash expended in operating activities, it classified these costs as cash used in "investing activities." ¶¶73-74. As explained herein, the Company lacked a reasonable basis for the misclassification. *See infra* at 11-13.

In May 2022, when the threat of a margin call was very high for Isaacman, the SEC began to question this accounting treatment for customer acquisition costs. ¶75. In the midst of this, Shift4's CFO abruptly resigned with no explanation, just five days before the Company submitted its

---

[2] And this is in fact what occurred. ¶68 n.11.

[3] The statement of cash flows "provides key information about an entity's financial health and its capacity to generate cash and "investors pay close attention to cash flows from operating activities in assessing a company's financial performance." ¶¶69-71.

response to the SEC's second letter to the Company. Given the timing, Herring's sudden departure from the Company was likely related to the Company's continued defense of its aggressive accounting maneuver. ¶¶76-79. Two months later, the Company abandoned its arguments. On October 21, 2022, the Company disclosed in an SEC filing that the Company's Q3 2021, full year 2021, Q1 2022, and Q2 2022 financial statements should no longer be relied upon and would need to be restated because of a material weakness in the Company's internal control over financial reporting, which had caused it to incorrectly treat customer acquisition costs as cash used in investing activities rather than cash used in operating activities in its consolidated statements of cash flows. ¶79. On this news, Shift4's stock price fell $1.21 per share, or 2.67%, to close at $44.16 per share on October 24, 2022. ¶80.

The restatement impacted the statements of cash flows and the "liquidity and capital resources" section of Management's Discussion & Analysis for the related periods.[4] Investors were misled to believe the Company generated more cash from operating activities than it actually did. This is important given the Company's disclosure in its originally filed 2021 Form 10-K and Q1 2022 Form 10-Q that: "We have historically sourced our liquidity requirements *primarily with flows from operations* and, when needed, with borrowings under our Credit Facilities or equity transactions." ¶88. And the Company admitted in its correspondence with the SEC that "'grouping cash flows into operating, investing, and financing activities 'links cash flows that are often perceived to be related…. *Those relationships and trends in them provide information useful to investors and creditors.*'" Defs. Ex. 8 (quoting Financial Accounting Standard No. 95).

---

[4] Although Shift4 retracted only its Q3 2021, full year 2021, Q1 2022 and Q2 2022 financial statements, the actual restatements of prior periods included statements of cash flows for full year 2019 and 2020 as well as Q1-Q2 2021. ¶89. Net cash provided by operating activities was overstated by **234%** for the year ended December 31, 2019, **485%** for the year ended December 31, 2020, **76%** for the three months ended March 31, 2021, **306%** for the nine months ended September 31, 2021, **873%** for the year ended December 31, 2021, and **20%** for both the three months ended March 31, 2022 and the six months ended June 30, 2022. ¶82.

4

**F.     Shift4 Entered into "Residual Commission Buyout Transactions" with Low Quality Distributors/Resellers in Q3 2022 to Inflate Gross Profit and EBITDA**

Prior to Q3 2022, the Company relied primarily on a third-party distribution network for its POS sales. Distributors were entitled to "residual commissions." ¶91. In the quarter leading up to its restatement, the Company suddenly spent $298.8 million on "residual commission buyouts" to buy out many of its distributors and their commission entitlements. In Q3 2022, Shift4 also disclosed that it acquired six other resellers in separate transactions for $80.3 million of total purchase consideration, net of cash acquired. The 2022 10-K identified the residual commission buyouts as one of the assets acquired in these transactions as well. ¶¶92-94.

By engaging in residual commission buyouts, Cost of Goods Sold ("COGS") is reduced because the bought-out commissions are no longer included in the COGS and are instead amortized on a separate line as "depreciation and amortization expense," which is excluded from the EBITDA calculation. Thus, utilizing residual commission buyouts enabled Shift4 to increase its reported gross profit and EBITDA. Residual commission buyouts and improved earnings from the manipulation of the depreciation and amortization expense made the stock look more attractive at a time when the stock was reaching new lows, and just as Isaacman's margin loan would have been at high risk for a margin call. ¶¶96-98.

As Confidential Witness ("CW")-3 (a former Financial Analyst at the Company) explained, these mass residual commission buyouts made little sense because the companies would inevitably fold under the pressure to compete with Shift4 and Shift4 did not need to do these transactions to gain a larger market share. CW-3 remained perplexed with the Company's decision to move forward with these transactions. For example, CW-3 recalled that Shift4 bought out a struggling, somewhat problematic father and son business. CW-3 stated there was no real value in buying out this company and/or other "mom and pop" companies. CW-3 stated "we had the winning product

5

and company, [so] no need to do it. These [companies] would eventually . . . go belly up. The clients would all . . . eventually come to us…." ¶102. Yet Defendants made numerous false statements justifying the move. ¶103. In truth, the buyouts were designed to inflate gross profit and EBITDA at a time when Isaacman desperately needed the stock price to go up as he fought back a margin call and negotiated a new margin loan. ¶104. It also blunted the "sting" of an anticipated restatement that would show the extent to which the Company misled investors regarding cash generated from operating activities. *See supra* at 3-4.

### G.    The Truth Emerges Regarding Residual Commission Buyouts

On April 19, 2023, Blue Orca Capital ("BOC") published a report (the "BOC Report") stating that all of the above-described conduct by Defendants was calculated to pump up the stock price. ¶149. It also disclosed for the first time that based on its research, many third-party distributors/resellers involved in Shift4's residual commission buyouts were outdated and low-quality companies, just as CW-3 had explained. As such, the quality of their customer accounts was called into question. Shift4 used these deals with low quality distributors/resellers to inflate EBITDA and increase the share price due to the threat of a margin call for Isaacman. ¶¶100, 153-58. On this news, Shift4's stock price fell $5.95 per share, or 8.68%, on April 19, 2023. ¶159.

### STATEMENT OF QUESTIONS INVOLVED

Whether the Court should deny Defendants' motion to dismiss the Complaint for failure to state a claim.

### SUMMARY OF ARGUMENT

To state a Section 10(b) claim, a complaint must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a nexus between the misrepresentation or omission and the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation." *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 129 (3d Cir. 2017). Defendants contend that Plaintiffs fail adequately

to allege three elements – a materially false or misleading statement, scienter and loss causation. *See* MTD at 6-7. Defendants are wrong.

Plaintiffs adequately allege materially false and/or misleading statements in connection with the Company's misclassification of the cash outflows associated with customer acquisition costs. In the Third Circuit, a restatement is sufficient to show that an earlier statement was false when made. Defendants also contend that these statements are opinions, but Plaintiffs' allegations raise issues of objective fact that are not protected as opinion statements. Moreover, even if they were opinions – which they are not – they are actionable under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). The restatement also established the materiality of the misstatements because under GAAP, previously issued financial statements should be restated only to correct *material* accounting errors. Furthermore, the Complaint describes significant changes in key financial data and reproduces a chart from the Company's SEC filings that identifies the numbers as originally stated, that amount it was restated by, and the restated amount. This is sufficient for alleging materiality. *See infra* at 10-15.

Plaintiffs also adequately allege that Defendants made materially false and/or misleading statements as to why Shift4 deployed hundreds of millions of dollars in capital for residual commission buyout transactions with distributors/resellers in Q3 2022. Defendants argue that the BOC report should not be credited but many courts have found that at the pleading stage, falsity may be based on short seller reports. Defendants also contend the Court need not credit CW-3's statements for purposes of falsity but Plaintiffs adequately describe the duration of CW-3's employment, when CW-3 acquired the relevant information, and how CW-3 had access to such information. In the Third Circuit, this is sufficient to credit CW-3's allegations. *See infra* at 15-17.

Plaintiffs also adequately allege scienter based on Isaacman's strong motive which is imputed to the Company. In 2022, Isaacman faced the threat of a margin call during the downturn of the

7

stock market which could have resulted in him being forced to sell 10 million shares of Shift4 Class A common stock. The threat of a margin call coincided with the Company's misclassification of cash outflows associated with capitalized customer acquisition costs which enabled the Company to inflate its cash flows provided by operating activities and triggered a restatement. While the Company defended its classification in response to two SEC letters, *it was indefensible* and CFO Herring abruptly resigned from the Company on August 3, 2022, just five days before the Company submitted its response to the SEC's second letter to the Company. Given the timing, Herring's sudden departure from the Company was likely related to the Company's continued defense of its aggressive accounting maneuver. *See infra* at 18-20.

The threat of a margin call *also* coincided with Isaacman's December 7, 2022 statements made during a conference in an effort to inflate the Company's share price. Isaacman stated: "I'm a buyer" but he last purchased shares on the open market in June 2022 – six months prior to his December 7, 2022 statements and subsequently did not make any open market purchases between the time of his December 7, 2022 statements and the end of the Class Period. Additionally, the December 7, 2022 statements were made just a few months ahead of Isaacman's pre-planned sale of up to 2 million shares (as early as February 27, 2023) tied to the settlement of a March 2021 VPF. The VPFs were an additional risk that, along with the above-described threat of being margin-called, compounded Isaacman's incentive to inflate Shift4's stock price over the course of 2022. *See infra* at 19-20.

The threat of a margin call *also* coincided with the Company spending hundreds of millions of dollars on residual commission buyouts with certain low-quality distributors/resellers in Q3 2022. CW-3, who recalled Isaacman outlining the mass strategic buyout program at an all hands meeting and remained perplexed with the Company's decision to move forward with these transactions in Q3 2022, explained that the transactions made "no sense." But residual commission buyouts and

8

improved earnings from the manipulation of the depreciation and amortization expense made the stock look more attractive at a time when the stock was reaching new lows and just as the margin loan would have been at high risk for a margin call. *See infra* at 18-19.

Additionally, Isaacman is the CEO and "majority shareholder" of the Company and controls the composition of its board and business generally. He therefore had access to material information that was not available to the public. Exercising such control, Isaacman also hired friends and family into senior Company positions. CW-1, a former longtime senior executive, explained that the Company's senior ranks consisted of a "boys' club" of Isaacman's friends. An inference of scienter is bolstered by these additional facts. Taken collectively, all of these alleged facts give rise to a strong inference of scienter. *See infra* at 20-21.

Loss causation is also sufficiently alleged. Plaintiffs alleged that Defendants' actions caused investors to purchase Shift4 securities at inflated prices. After the alleged corrective disclosures on October 21, 2022 and April 19, 2023, the stock price fell. This satisfied Plaintiffs' burden for loss causation because Plaintiffs have adequately alleged a causal nexus between the false and misleading statements and the stock drop. This is all that is required in the Third Circuit. Defendants argue that the October 21, 2022 disclosure was not corrective because when the actual restatement was published weeks later on November 8, 2022, the stock price increased. But this is not the alleged corrective disclosure date and by November 8, 2022, the market had already incorporated that the previously released financial statements could not be relied upon. They also contend that the BOC Report cannot be considered a corrective disclosure because it didn't reveal any new information. However, as the BOC Report explained, BOC's research showed that many of the companies involved in Shift4's residual commission buyouts were low quality distributors/resellers. This information was not previously disclosed. *See infra* at 21-24.

Plaintiffs also sufficiently allege scheme liability (Count II). Defendant Isaacman made a false

9

and/or misleading statement at the December 7, 2022 UBS TMT Conference to inflate the Company's stock price. Specifically, on December 7, 2022, 12 days *before* entering into the December 19, 2022 revised margin loan agreement in which he had to put up more collateral while paying down the loan, and a mere two months *before* he was forced to deliver 2 million shares pursuant to his March 2021 VPF, Isaacman told investors: "I'm a buyer." However, he had not bought Shift4 stock for six months, and did not thereafter make any purchases of Shift4 stock for the rest of the Class Period. This statement is *independent* of the materially false and/or misleading statements underlying the 10b-5(b) claim in Count I. Defendants' claim that this statement is opinion, but whether Isaacman was a buyer is clearly a statement of objective fact. *See infra* at 24-25.

Finally, Plaintiffs also adequately allege a claim under Section 20(a) (Count III). Defendants contend that because Plaintiffs have failed to adequately plead a predicate Section 10(b) violation, Plaintiff's claim under Section 20(a) should be dismissed. However, because Plaintiffs have adequately pled a Section 10(b) claim, their argument fails. *See infra* at 25.

## ARGUMENT

## I.   PLAINTIFFS ADEQUATELY ALLEGE MATERIALLY FALSE AND MISLEADING STATEMENTS

Under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Plaintiffs adequately allege materially false and/or misleading statements in connection with the Company's misclassification of the cash outflows associated with customer acquisition costs. *See* ¶¶105-38. Defendants contend that the restatement alone cannot serve as the basis for pleading material falsity. MTD at 10. But in the Third Circuit, a restatement is sufficient to show that an earlier statement was false when made.

10

*See*, *e.g.*, *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 586 (D.N.J. 2005); *In re Ravisent Techs., Inc. Sec. Litig.*, 2004 WL 1563024, at *5 (E.D. Pa. July 13, 2004).

Defendants argue that the restatement was done to conform to "new SEC guidance" (MTD at 10) or "new information" (*id.* at 6), but Defendants do not point to any changes to the SEC's guidance or accounting standards during the relevant period related to the classification of cash outflows for customer acquisition costs. The SEC correspondence cited by Defendants clearly shows that the SEC did not advise, express a view, or issue any "new guidance" about the proper classification of capitalized acquisition costs. *See* Defs. Exs. 7, 8. While SEC comments may constitute "SEC guidance" in certain instances, in this case, the SEC was merely asking questions and not directing the Company to change its reporting practices or expressing any view about the Company's reporting practices. *Id.* Likewise, a comment letter *with questions* from the SEC is not "new information." *See id.* As explained in the Complaint, restatements correct errors in previously issued financial statements which are a result of "mathematical mistakes, *mistakes in the application of [GAAP]*, or oversight or misuse of *facts that existed at the time the financial statements were prepared*." ¶¶83-84. Thus, it would not have been appropriate for the Company to restate its financial statements "based on new information" or "new SEC guidance," as Defendants now argue.

Defendants also contend that their alleged false statements are inactionable opinions but they do not cite any caselaw to support their argument that cash flow misstatements are opinions. MTD at 10-12. Cash flows are classified in the statement of cash flows as either operating, financing or investing activities, depending on their nature. ¶70 (ASC 230-10-45-24).[5] The criteria for distinguishing between the three types of activities is clearly set forth in GAAP (ASC 230-10-20

---

[5] "ASC" or Accounting Standards Codification is the current single source of authoritative U.S. Generally Accepted Accounting Principles ("GAAP") maintained by the Financial Accounting Standards Board, available at https://asc.fasb.org/Home.

and ASC 230-10-45) and making a distinction between the types of cash flows is objective. *See* ¶¶70-71. At the simplest level, determining whether to classify cash outflows as operating or investing involves answering a question: did the Company acquire an income producing asset (i.e., invest in a property or equipment) or incur an ordinary business expense (e.g., sales commission)? ¶70.

Here, the key question is whether the outflow of cash for customer acquisitions involves typical operating activity or represents an acquisition of *income producing assets*? ¶70. Customer acquisition costs gave Shift4 access to new merchant relationships. Defs. Ex. 7, 8. They were akin to sales commissions or performance bonuses which companies typically incur while "producing and delivering goods and providing services." *See* ¶70 (ASC 230-10-20 (defining operating activities)). Such costs do *not* generate income but could be recouped in the future in the ordinary course. *See* ¶72. Indeed, the Company's May 15, 2020 Registration Statement described these costs as "*deal bonuses.*" (Defs. Ex. 2 at F-57), and prior to Q3 2022, the Company's SEC periodic filings described them as "*upfront processing bonuses.*" ¶73. Shift4 accounted for capitalized acquisition costs as recoverable costs rather than income producing assets. The Company's financial statements disclosed that it "recognizes as an asset [i.e., capitalizes] the incremental costs of obtaining a contract with a customer [because] it expect[ed] *to recover these costs*" and not because these capitalized acquisition costs would somehow generate future income for the Company. *See*, *e.g.*, Defs. Ex. 6 at 94. Therefore, the Company's statement in its correspondence with the SEC that "the capitalized acquisition costs represent customer relationship intangible assets which represent long-term productive assets that generate revenue over the expected life of the merchant relationships" (Defs. Ex. 7 at 5) was nothing more than a hollow justification to the SEC to substantiate beneficial treatment of capitalized customer acquisition costs on the Company's statement of cash flows. Due to the nature of these costs, the Company *lacked any*

*basis* to classify cash outflows for customer acquisitions as investing activity within its statement of cash flows. As such, "[t]his is not a case where a restatement can plausibly be attributed to mere errors in accounting judgment." *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 545 (S.D.N.Y. 2017). Plaintiffs' allegations raise issues of objective fact that are not protected as opinion statements. *See*, *e.g.*, *Underland v. Alter*, 2012 WL 2912330, at *5 (E.D. Pa. July 16, 2012) (finding misstatements related to loan loss reserves were actionable as objective facts and stating "unlike a subjective evaluation that a loan reserve is adequate or not, *non-conformance to a stated methodology ... is a measurable objective fact*."); *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 452-53 (D. Del. 2014) (finding plaintiff adequately alleged falsity where company claimed to use objective standard for setting loan loss reserves and plaintiff alleged company's application of such methodologies violated GAAP).[6]

Moreover, treating any of these alleged misstatements as subjective opinions pursuant to *Omnicare*, 575 U.S. at 184-86, would not aid Defendants. Applying *Omnicare* in the 10(b) context, an opinion statement can be actionable under Section 10(b) if the opinion was subjectively false, *i.e.*, was not sincerely held, *or* the opinion was embedded with statements of untrue facts; *or* the speaker omitted material facts about the basis for the opinion, thereby rendering the opinion misleading to a reasonable person. *Id.* at 176. The allegations here satisfy the last prong. Defendants failed to disclose that the Company had inadequate disclosure controls and procedures and internal control over financial reporting which caused the Company to improperly account for customer acquisition costs – *even when it lacked any basis for doing so*[7] – which thereby inflated

---

[6] Defendants rely on *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017), *aff'd on other grounds sub nom. In re Hertz Glob. Holdings Inc*, 905 F.3d 106 (3d Cir. 2018), which is consistent with Plaintiffs' argument. In that case, the court acknowledged that "certain GAAP rules have objective application such that compliance would be a statement of fact." In *Hertz*, as opposed to this case, Plaintiffs failed to identify any objective rules. *Id.*

[7] *See supra* at 11-13. Plaintiffs "point to specific facts that demonstrate that Defendants lacked a reasonable basis for their opinions." *Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at

its net cash provided by operating activities, a key financial metric used by investors. ¶¶4, 82, 138.

Materiality is also adequately alleged. "A statement or omission is materially misleading if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor." *Amarin*, 689 F. App'x at 129. "Only if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable …." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275 (3d Cir. 2004) (emphasis in original).

Here, the restatement established materiality because under GAAP, previously issued financial statements should be restated only to correct *material* accounting errors that existed at the time the statements were originally issued. *Ravisent*, 2002 WL 1563024, at *5. Additionally, the Complaint describes significant changes in financial data and reproduces a chart from the Company's SEC filings that identifies the numbers as originally stated, that amount it was restated by, and the restated amount. ¶81. The chart shows that the misclassification of the cash outflows associated with capitalized customer acquisition costs enabled the Company to inflate its cash flows provided by operating activities (¶82), which is a key financial metric investors used in assessing a company's performance (¶¶69-71). The Complaint also includes a second chart which includes the percentages by which cash flows from operations was overstated. ¶83. "Net cash (used in) provided by operating activities" was overstated by **234%** for the year ended December 31, 2019, **485%** for the year ended December 31, 2020, **76%** for the three months ended March 31, 2021, **306%** for the nine months ended September 31, 2021, **873%** for the year ended December 31, 2021, and **20%** for both the three months ended March 31, 2022l and the six months ended June 30, 2022. ¶82. These allegations are sufficient to plead materiality. *Hemmer Grp. v. Sw. Water*

---

*20 (D.N.J. Jan. 21, 2021).

*Co.*, 527 F. App'x 623, 626 (9th Cir. 2013); *Bio-Tech.*, 380 F. Supp. 2d at 586.

Defendants contend that the restatement did not affect any key financial metric, but the Complaint alleges that the statement of cash flows "provides key information about an entity's financial health and its capacity to generate cash" and "investors pay close attention to cash flows from operating activities in assessing a company's financial performance." ¶¶69-71. Here, investors were misled to believe the Company generated more cash from operating activities than it actually did. This is important given the Company's disclosure in its originally filed 2021 Form 10-K and Q1 2022 Form 10-Q that: "We have historically sourced our liquidity requirements *primarily with flows from operations* and, when needed, with borrowings under our Credit Facilities or equity transactions." ¶ 88. Moreover, Defendants' argument conflicts with the Company's August 8, 2022 response to the SEC which stated that "grouping cash flows into operating, investing, and financing activities 'links cash flows that are often perceived to be related…. *Those relationships and trends in them provide information useful to investors and creditors.*'" Defs. Ex. 8. Furthermore, GAAP does not apply to immaterial items. ASC 105-10-05-6. Therefore, if cash flows from operating activities did not represent a key financial metric which was materially misstated, a restatement would not have been necessary.

Defendants also contend that materiality is lacking because the stock price did not decline upon the publication of the restated financials on November 8, 2022. MTD at 13. But this is not the alleged corrective disclosure date and by November 8, 2022, "the market had already incorporated [the news disclosed on October 21, 2022] that the previously released financial statements could not be relied upon." *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006).

Defendants also contend that Plaintiffs have not adequately alleged a false or misleading statement in connection with residual commission buyout transactions. MTD at 13-16. Plaintiffs

15

alleged that Defendants made materially false and/or misleading statements as to why Shift4 deployed hundreds of millions of dollars in capital for residual commission buyout transactions (executed under its mass strategic buyout program) with distributors/resellers in Q3 2022. ¶¶91-104. Plaintiffs' allegations are drawn from two sources. The BOC Report disclosed that, based on its research, many third-party distributors involved in Shift4's residual commission buyouts were low quality distributors. As such, the quality of their customer accounts is thereby called into question. Shift4 used these deals with low quality distributors to inflate EBITDA and increase the share price due to the threat of a margin call for Isaacman. ¶100.

The allegations regarding CW-3 also support Plaintiffs' claims. CW-3 was employed by Shift4 as a Financial Analyst in the Finance Department from February 2020 through December 2022. In his role as a Financial Analyst, CW-1 calculated commissions for salespersons, designed and presented dashboards/databases that automated compensation calculations, analyzed payouts/costs to the sales teams and compiled cost/benefit analysis. CW-3 did this across the entire sales force. ¶101. CW-3 recalled Isaacman outlining the mass strategic buyout program at one of the quarterly "all hands" meetings. Isaacman made a statement at the meeting that this was part of Shift4's progression and the Company was going forward with the plan.[8] CW-3 recalled performing some basic financial functions in connection with the transactions; however, throughout the deals, CW-3 remained perplexed with the Company's decision to move forward with the buyouts. CW-3 thought it made no sense because Shift4 did not need to do the transactions to gain a larger market share. CW-3 stated, "our products and service were much better…they [the distributors] were not a must have." ¶102. CW-3 thought buying out the distributors made little sense because the companies would inevitably fold under the pressure to compete with Shift4. *Id.* For example, CW-

---

[8] The quarterly meeting had to take place in either Q1 or Q2 2022 prior to the start of the buyouts in Q3 2022. *See* ¶¶91-95, 102.

3 recalled that Shift4 bought out a struggling, somewhat problematic father and son business. *Id.* CW-3 stated there was no real value in buying out this company and/or other "mom and pop" companies. *Id.* CW-3 stated "we had the winning product and company, [so] no need to do it. *Id.* These [companies] would eventually . . . go belly up. The clients would all . . . eventually come to us…." *Id.*

Defendants argue that the BOC report should not be credited but many courts have found that at the pleading stage, falsity may be based on short seller reports. *See*, *e.g.*, *Bush v. Blink Charging Co.*, 2023 WL 8263037, at *3, 8 (S.D. Fla. Nov. 27, 2023); *In re Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *7 (C.D. Cal. Sept. 6, 2017); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013). Defendants also contend the Court need not credit CW-3 for purposes of falsity because CW-3 is not alleged to have interacted with Isaacman and does not allege that Isaacman *believed* that the acquired distributors were of low quality. MTD at 16. But this is not required. *See*, *e.g.*, *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 492-93 (D. Del. 2019) (finding complaint described each CW with sufficient particularity to support probability that CWs had personal knowledge even though there were no allegations any defendant interacted with CWs). MTD at 16.[9] Here, Plaintiffs adequately describe the duration of CW-3's employment, when CW-3 acquired the relevant information, and how CW-3 had access to such information. *See* ¶¶91-102. In the Third Circuit, this is sufficient to credit CW-3's allegations. *Inst'l Invs. Grp. v. Avaya, Inc.* 564 F.3d 242, 263 (3d Cir. 2009).[10]

---

[9] Defendants' reliance on *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244-45 (3d Cir. 2013), *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 198 (D.N.J. 2022), and *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011), is misplaced as these cases focus on CW allegations in the context of scienter, rather than falsity.

[10] In a footnote, Defendants state that "some" of the buyout statements are opinions. They only point to two – ¶¶141, 147. MTD at 16 n.5. But the quoted language in ¶141 is not alleged to be false or misleading. And the statement in ¶147 is actionable under *Omnicare* because Isaacman omitted material facts about the basis for his statement. 575 U.S. at 176. He failed to disclose that Shift4 entered into residual commission buyout transactions with low quality distributors/resellers

## II.   PLAINTIFFS ADEQUATELY PLEAD SCIENTER

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A "strong inference" of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter . . . at least as compelling as any opposing inference one could draw from the facts alleged. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324-26 (2007). The inference "need not be irrefutable, … or even the most plausible of competing inferences." *Id.* at 324. In evaluating the strength of an inference of scienter, "courts must consider the complaint in its entirety" because the "inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in insolation, meets that standard." *Id.* at 322-23 (emphasis in original). Moreover, at the motion to dismiss stage, a tie on scienter goes to the plaintiff. *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc*. 367 F. Supp. 3d 16, 38-39 (S.D.N.Y. 2019). "To plead scienter properly, a plaintiff must allege facts that constitute circumstantial evidence of either reckless or conscious behavior." *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *15 (E.D. Pa. June 16, 2015). In the securities context, recklessness means conduct that is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*

Here, the Complaint adequately alleges Isaacman's very strong motive which is imputed to the Company. *Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 234 (E.D. Pa. Apr. 6, 2021). In 2022, Isaacman faced the threat of a margin call during the downturn of the stock market which could have resulted in him being forced to sell 10 million shares of Shift4

to inflate gross profit, EBITDA, and the share price due to the threat of a margin call. ¶¶153-58.

18

Class A common stock. ¶¶56-63. The threat of a margin call coincided with the Company spending hundreds of millions of dollars on residual commission buyouts with certain low-quality distributors/resellers in Q3 2022, as disclosed in the BOC Report. ¶¶56, 103-04. CW-3 recalled Isaacman outlining the mass strategic buyout program at one of the quarterly "all hands" meetings. During the meeting, Isaacman stated that this was part of Shift4's progression and the Company was going forward with the plan. ¶102. CW-3, who remained perplexed with the Company's decision to move forward with these transactions, explained that the transactions made "no sense." *Id.* But by engaging in residual commission buyouts, COGS is reduced because the bought-out commissions are no longer included in the COGS and are instead amortized on a separate line as "depreciation and amortization expense," which is excluded from the EBITDA calculation. Thus, utilizing residual commission buyouts enabled Shift4 to increase its reported gross profit and EBITDA. Residual commission buyouts and improved earnings from the manipulation of the depreciation and amortization expense made the stock look more attractive at a time at which the stock was reaching new lows just as the margin loan would have been at high risk for a margin call. ¶¶96-98.

The threat of a margin call also coincided with Isaacman's December 7, 2022 statements made in an effort to inflate the Company's share price. During a December 7, 2022 conference, a UBS analyst asked Isaacman if he would consider taking the Company private again. In response, Isaacman stated that "we're incredibly frustrated" that the stock is "very much underappreciated" and that he would "absolutely" consider taking the Company private, offering little rationale aside from his disgust with the Company's stock price. He also stated: *"I'm a buyer"* but he last purchased shares on the open market in June 2022 – six months prior to his December 7, 2022 statements and subsequently did not make any open market purchases between the time of his December 7, 2022 statements and the end of the Class Period. Additionally, the December 7, 2022

19

statements were made just a few months ahead of Isaacman's pre-planned sale of up to 2 million shares (as early as February 27, 2023) tied to the settlement of a March 2021 VPF. Isaacman's March 2021 VPF was due to be settled in a price range of between $73.19 and $137.24. ¶67. Thus, if the stock fell below $73.19 per share on the due date, Isaacman would lose all 2 million shares. ¶61. Because the stock was below this level in the months leading to the due date, the VPFs were an additional risk that, along with the above-described threat of being margin-called, compounded Isaacman's incentive to inflate Shift4's stock price over the course of 2022. ¶¶64-68.[11]

The threat of a margin call coincided with the Company's misclassification of cash outflows associated with capitalized customer acquisition costs which enabled the Company to inflate its cash flows provided by operating activities and triggered a restatement. ¶56. While the Company defended its classification in response to two SEC letters, *it was indefensible* and CFO Herring abruptly resigned from the Company on August 3, 2022, just five days before the Company submitted its response to the SEC's second letter to the Company. Given the timing, Herring's sudden departure from the Company was likely related to the Company's continued defense of its aggressive accounting maneuver. *See ¶¶*76-78. This is yet another fact bolstering scienter. *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *22 (D.N.J. June 5, 2020).

Additionally, Isaacman is the CEO and "majority shareholder" of the Company and controls the composition of its board and business generally. MTD at 20; ¶¶44-45. He had access to material information that was not available to the public. ¶37. Exercising such control, Isaacman also hired friends and family into senior Company positions. CW-1, a former longtime senior executive, explained that the Company's senior ranks consisted of a "boys' club" of Isaacman's friends. *See*

---

[11] This case is distinguishable from in *In re Discovery Labs. Sec. Litig.*, 2006 WL 3227767, at *13-14 (E.D. Pa. Nov. 1, 2006), where the court rejected scienter allegations based mostly on a VPF contract. Plaintiffs here allege a number of facts which compounded Isaacman's incentive to inflate the stock price over the course of 2022. ¶¶56-104.

¶¶48-55; *supra* at 1, 9. An inference of scienter is bolstered by these additional facts. *See SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906-07 (E.D. Pa. 2018) (considering individual defendants' positions, the information available to them, and their public statements, in finding scienter).

Taken collectively, all of these alleged facts give rise to a strong inference of scienter. *Allegheny*, 532 F. Supp. 3d at 233-34. Defendants argue that if Isaacman feared a margin call, it would make no sense for the Company to announce a restatement in October 2022 before renegotiating the margin loan in December 2022. MTD at 20. But this argument is unpersuasive because the Company only restated its financials in response to the SEC's questions regarding its classification of customer acquisition costs in June 2022. ¶¶74-79. The restatement was something that had to be done as the Company lacked any reasonable basis for its misclassification. *See supra* 11-13. Defendants also contend that Isaacman could not have been motivated to commit securities fraud *because he is a wealthy man*. *See* MTD at 20. However, this argument carries no weight as "[a] rich man's greed is as much a motive to steal as a poor man's poverty." *United States v. Reyes*, 660 F.3d 454, 464 (9th Cir. 2011).

## III.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

"The PSLRA does not impose a heightened pleading requirement for loss causation. Thus, to survive a motion to dismiss challenging loss causation, a plaintiff need only satisfy the requirements of [Rule] 8(a)(2) that the complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at \*18 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018). "To establish loss causation in a typical § 10(b) case, a plaintiff must show that its losses are related specifically to the market's discovery of the misrepresentation and the corresponding decrease in price due to that misrepresentation." *Strougo v. Lannett Co., Inc.*, 2019 WL 1172992, at \*16 n.143 (E.D. Pa.

Mar. 13, 2019). Additionally, "[o]ur Court of Appeals has stated that loss causation is ordinarily an issue for the trier of fact." *Id.*

Here, Plaintiffs alleged that Defendants' actions caused investors to purchase Shift4 securities at inflated prices. ¶177. After the alleged corrective disclosures on October 21, 2022 and April 19, 2023, the stock price fell. ¶¶139-40; 149-59. "This satisfied Plaintiffs['] burden for loss causation" (*Alberici v. Recro Pharma, Inc.*, 2021 WL 798299, at *10 (E.D. Pa. Mar. 1, 2021)) "because Plaintiff[s] ha[ve] adequately alleged a causal nexus between [the false and misleading statements] and the stock drop." (*Alberici v. Recro Pharma, Inc.*, 2020 WL 806719, at *12 (E.D. Pa. Feb. 14, 2020)). "The Third Circuit has squarely held that where the claimed loss involves the purchase of a security at a price that is inflated due to an alleged misrepresentation, there is sufficient causal nexus between the loss and the alleged misrepresentation to satisfy the loss causation requirement." *Id.* at *13. "Paragraph [177 of the Complaint] fits within the scope of this holding, because it alleged that Plaintiff[s] purchased [Shift4's] stock at a price that was artificially inflated due to the [misrepresentations and] omissions, and that Plaintiff[s were] injured by the stock price decline when the [truth] was subsequently disclosed." *Id.* This is all that's required.

On October 21, 2022, the Company disclosed that the Company's Q3 2021, full year 2021, Q1 2022, and Q2 2022 financial statements should no longer be relied upon and would need to be restated because of a material weakness in the Company's internal control over financial reporting, which had caused it to incorrectly treat customer acquisition costs as cash used in investing activities rather than cash used in operating activities in its consolidated statements of cash flows. ¶139. On this news, Shift4's stock price fell $1.21 per share, or 2.67%, to close at $44.16 per share on October 24, 2022. ¶140.

Defendants argue that the October 21, 2022 disclosure was not corrective because when the actual restatement was published weeks later on November 8, 2022, the stock price increased.

22

MTD at 22. But this is not the alleged corrective disclosure date and by November 8, 2022, "the market had already incorporated that the previously released financial statements could not be relied upon." *Bradley Pharms.*, 421 F. Supp. 2d at 829. Thus, Defendants' argument may be ignored. They also contend with respect to both alleged corrective disclosure dates that the stock price's "quick recovery negates an inference of loss causation." MTD at 23. However, Defendants' arguments carry no weight on a motion to dismiss in this Circuit. *See In re Par Pharm. Sec. Litig.*, 2009 WL 3234273 (D.N.J. Sept. 30, 2009); *see also In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *14 (D.N.J. Aug. 6, 2019). Defendants also contend that the October 21, 2022 Corrective Disclosure is not corrective because it merely revealed a "technical correction" as opposed to any fraudulent accounting practice, and "'disclosures that reveal only negative financial information about a company … cannot serve as corrective disclosures.'" MTD at 22 (quoting *Wu v. GSX Techedu Inc.*, 2023 WL 2207422, at *15 (D.N.J. Feb. 24, 2023)). But disclosures that financial statements should no longer be relied upon due to accounting errors and would be restated have long been held to be corrective disclosures. *See*, *e.g.*, *Par*, 2009 WL 3234273, at *10; *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 603, 609 (S.D.N.Y. 2009). And Defendants omit key language from the quoted language in *GSX*. In that case, the court stated that "disclosures that reveal only negative financial information about a company, *without connecting those negative financials to the alleged fraud*, cannot serve as corrective disclosures." *GSX*, 2023 WL 2207422, at *15. Here, Plaintiffs' allegations connect the negative financials to the alleged fraud. *See supra* at 18-21.

Defendants also contend that the BOC Report, which was published on April 19, 2023 (¶149), cannot be considered a corrective disclosure because it didn't reveal any new information. MTD at 23. However, as the BOC Report explained, BOC's research showed that many of the companies

23

involved in Shift4's residual commission buyouts were low quality distributors/resellers. ¶¶153-58; *see* Defs. Ex. 1 at 14-18. This information was not previously disclosed. The report goes on to explain that Shift4 used these deals to inflate EBITDA and increase the share price due to the threat of a margin call for Isaacman. ¶153. Because the BOC Report disclosed new information, it may serve as a corrective disclosure. *Vanderhoef v. China Auto Logistics Inc.*, 2021 WL 3260849, at *5 (D.N.J. July 30, 2021).

## IV.    PLAINTIFFS SUFFICIENTLY ALLEGE SCHEME LIABILITY

To state a claim pursuant to Rule10b-5(a) and (c), plaintiffs "must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 350 (D.N.J. 2009). Liability under "Rules 10b-5(a) and (c) may attach despite dismissing a 10b-5(b) claim, [and] as a baseline[,] the conduct supporting [Rule] 10b-5(a) or (c) claims must involve statements that qualify as false or misleading *or* must involve entirely separate conduct apart from the statements supporting a 10b-5(b) claim." *In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. 3d 572, 597-98 (E.D. Pa. 2023). In *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100-01 (2019), the Supreme Court held that "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5," and "under *Lorenzo*, unlike prior [Third Circuit] precedent, a plaintiff need not … allege deceptive conduct that extends beyond the alleged misstatement itself." *Cognizant*, 2020 WL 3026564, at *17.

Here, Defendant Isaacman made a false and/or misleading statement at the December 7, 2022 conference to inflate the Company's stock price. ¶¶64-65. Specifically, on December 7, 2022, 12 days *before* entering into the December 19, 2022 revised margin loan agreement in which he had to put up more collateral while paying down the loan, and a mere two months *before* he was forced to deliver 2 million shares pursuant to his March 2021 VPF, Isaacman told investors: "I'm a

24

buyer." ¶¶62-68. However, he had not bought Shift4 stock for six months, and did not thereafter make any purchases of Shift4 stock for the rest of the Class Period. ¶65. This statement is *independent* of the materially false and/or misleading statements underlying the 10b-5(b) claim in Count I. *See Ocugen*, 659 F. Supp. at 597-98. Defendants claim that this statement is opinion (MTD at 24), but whether Isaacman was a buyer is clearly a statement of objective fact. They also argue that scienter is not adequately pled *but see supra* Point II at 18-21. Defendants contend that Plaintiffs fail to allege factual allegations suggesting there was any reason for Isaacman to be concerned about a margin call (MTD at 25), but they are wrong. The March 2021 Loan was taken out a month before Shift4's Class Period stock price peak of $101.43 per share, declining over 60%, into the $30-40 per share range by the early summer of 2022 and through much of the remainder of 2022. ¶61. This subjected Isaacman to the threat of a margin call and collateral liquidation. ¶¶57-58, 62. On December 19, 2022, Isaacman *did* pay down the March 2021 Loan; and increase his collateral by 50% from 10 million shares to 15 million shares. ¶62. This meant that, throughout the preceding year, as the stock tanked and Isaacman negotiated these new terms, he was under enormous pressure to arrest Shift4's stock price decline. ¶63.

## V.    PLAINTIFFS STATE A CLAIM UNDER SECTION 20(a)

Defendants contend that because Plaintiffs have failed to adequately plead a predicate Section 10(b) violation, Plaintiffs' claim under Section 20(a) should also be dismissed. MTD at 25. However, because Plaintiffs have adequately pled a Section 10(b) claim, their argument fails. *See Strougo*, 2019 WL 1172992, at *16.

### CONCLUSION

For all the above reasons, Defendants' motion should be denied in its entirety.[12]

---

[12] If the Complaint contains pleading deficiencies, Plaintiffs request leave to amend, which shall be freely given. *See United States ex rel. Budike v. Peco Energy*, 2013 WL 5890650, at *4 (E.D. Pa. Nov. 4, 2013).

Dated: March 20, 2024

Respectfully submitted,

**POMERANTZ LLP**

 */s/ Brenda Szydlo*
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
Emily C. Finestone (SBN 323709)
Dean P. Ferrogari (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bszydlo@pomlaw.com
efinestone@pomlaw.com
dferrogari@pomlaw.com

**THE SCHALL LAW FIRM**
Rina Restaino (admitted *pro hac vice*)
Angus F. Ni (admitted *pro hac vice*)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
rina@schallfirm.com
angus@moni.law

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

**HOLZER & HOLZER, LLC**
Corey D. Holzer
211 Perimeter Center Parkway, Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

*Additional Counsel for Plaintiff Alfred O'Meara*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

Dated:  March 20, 2024

*/s/ Brenda Szydlo*
Brenda Szydlo

1