UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

ROBERT BAER and ALFRED O'MEARA,                :
Individually and on Behalf of All Others Similarly :
Situated,                                        :
                            Plaintiffs,          :        No.   5:23-cv-3206
                                                 :
            v.                                   :
                                                 :
SHIFT4 PAYMENTS, INC., and JARED                 :
ISAACMAN,                                        :
                            Defendants.          :

_____

**O P I N I O N**
**Defendants' Motion to Dismiss, ECF No. 39 – Granted**

**Joseph F. Leeson, Jr.**                                      **August 14, 2024**
**United States District Judge**


## I.      INTRODUCTION

This is a class action securities case.  Plaintiffs allege that as Shift4's share price fell in 2022, the company's CEO faced substantial personal financial pressure.  To relieve the pressure, the company engaged in a series of questionable accounting and business maneuvers designed to keep the company's share price afloat.  When the impropriety of these maneuvers came to light, the share price dipped, and this lawsuit ensued.  This Court previously consolidated like actions and appointed Baer as Lead Plaintiff.  Baer then filed an Amended Complaint which Defendants now move to dismiss.  For the reasons that follow, the Motion is granted.


## II.     BACKGROUND

### A.      Allegations in the First Amended Complaint

The following facts are taken from the Amended Complaint.  *See* Am. Compl., ECF No. 35.

*Shift4 Payments, Inc.*

Shift4 is a publicly traded technology company which provides, among other things, "integrated and mobile point-of-sale ("POS") solutions." *Id.* ¶ 2.  For example, the terminal in which a restaurant guest inserts their credit card at the end of a meal may be Shift4's.  The company's founder and CEO is Jared Isaacman.  *Id.* ¶ 36.  Isaacman controls a substantial portion of the company, affording him "significant influence over all matters requiring stockholder approval including the election and removal of directors, the size of the board, and any approval of significant corporate transactions, and continues to have significant control over the company's management and policies." *Id.* ¶ 44.

Plaintiffs paint an unflattering portrait of Shift4's innerworkings and how Isaacman uses this control.  Plaintiffs allege Shift4 is a veritable "boys' club" where nepotism is rampant.  *Id.* ¶ 46.  Isaacman's older brother Michael serves as Shift4's CCO, his father serves on the Board of Directors, his personal pilot was promoted to Executive Vice President of Payments and COO, and his friends serve in roles ranging from CTO to President.  *Id.* ¶¶ 47–55.  This boys' club culture was known throughout the company.  *Id.* ¶ 49.

*Isaacman's Margin Call & Share Price Pressure*

The motivating force behind the purportedly fraudulent conduct underlying this litigation is Shift4's falling share price in 2022.  This decline pressured Isaacman from two directions.  First, Isaacman has borrowed against his holdings in Shift4.  *Id.* ¶ 57.  As the share price fell in

2022[1], Isaacman faced a looming margin call. *Id.* ¶ 56. Indeed, Plaintiffs allege that, in effect, Isaacman received "such a margin call in mid to late-2022" when "[Isaacman] increased his collateral by more than 50% . . . *and* reduced the size of his margin loan on December 19, 2022." *Id.* ¶ 57 (emphasis in original).

Second, this pressure was compounded by Isaacman's Variable Prepaid Forward ("VPF") contracts. In March and September of 2021, Isaacman entered into VPF contracts consisting of 6.44 million of Shift4's Class A common stock. *Id.* ¶ 66. The March 2021 contract, consisting of 2 million shares, was set to settle in February, March, and April of 2023. *Id.* ¶ 67. The number of shares to be delivered "*would be determined* based on the price of the Company's Class A common stock on such dates relative to the forward floor price of $73.19 per share and the forward cap price of $137.24 per share." *Id.* ¶ 67 (emphasis in original). This floor price ratcheted up the pressure because, had "Shift4's stock price traded below the floor price of $73.19 set out in the contract, all 2 million shares would have to be sold to settle the contract." *Id.* ¶ 68. These pressures coincided with several purportedly suspect actions designed to bolster the stock price and relieve the pressure of the margin call and VPF contracts.

*Accounting Maneuvers, Business Decisions, and Statements in Question*

The first of these suspect actions concerns the "misclassification of cash outflows associated with capitalized customer acquisition costs which inflated [Shift4's] cash flows provided by operating activities." *Id.* ¶ 58. On this point, some further insight into Shift4's business is required.

---

[1]    Shift4's share price fell as low as $29.39 in the summer of 2022 from a high of $101.43 in April of 2021. Am. Compl. ¶ 61.

To grow its business, Shift4 must establish new merchant relationships.  In the past, to accomplish that end, Shift4 has relied on third parties to find new relationships on its behalf.  *Id.* ¶ 91.  After establishing the relationship, these third-party distributors are responsible for maintaining the relationship over the course of the deal.  *Id.*  For each deal sold, the third party was paid commission in two forms.  First, the third-party distributor was paid an upfront processing bonus.  *Id.* ¶ 75.  Second, the third party received a residual commission over the life of the deal.  *Id.* ¶¶ 75, 91.  That first upfront payment was "recorded on the balance sheet as a separate line item, 'Capitalized acquisition cost, net' and subsequently amortized on a straight-line basis over the estimated life of the merchant relationship within cost of sales on [Shift4's] statement of income."  *Id.* ¶ 75.  Plaintiffs contend that this practice was incorrect and misrepresented Shift4's statement of cash flows.

An accurate statement of cash flows helps an analyst, *inter alia*:

a. Assess the entity's ability to generate positive future net cash flows;
b. Assess the entity's ability to meet its obligations, its ability to pay dividends, and its needs for external financing;
c. Assess the reasons for differences between net income and associated cash receipts and payments; and
d. Assess the effects on an entity's financial position of both its cash and noncash investing and financing transactions during the period.

*Id.* ¶ 69.  However, Shift4's practice distorted this picture where it "classified cash payments associated with the capitalized customer acquisition costs *as an investing activity on the statement of cash flows*, rather than cash flows used in operations, which enabled Shift4 to inflate its cash flows from operating activities on the statement of cash flows."  *Id.* ¶ 73.  On May 11, 2022, the SEC began to question this method of classification.  *Id.* ¶ 74.  Shift4 initially defended the practice, explaining that these upfront payments "represent[] the initial investment to secure the end-to-end processing relationship between Shift4 and the merchant."  *Id.* ¶ 75.  Thus, the

company reasoned, "Shift4 believes the capitalized acquisition costs represent customer relationship intangible assets which represent long-term productive assets that generate revenues over the expected life of the merchant relationships." *Id*.

Several weeks later, the SEC responded with follow up questions. *Id.* ¶ 76. However, before submitting a response to the second letter, CFO Herring resigned from Shift4. *Id.* ¶ 77. Plaintiffs surmise that Herring's resignation was related to the accounting maneuver and the regulatory attention it drew. *Id.* ¶ 78. Not long after, Shift4 "abandoned its arguments in its [second] response and restated its previously issued financial statements." *Id.* ¶ 79. In particular, Shift4 announced that its:

> Q3 2021, full year 2021, Q1 2022 and Q2 2022 financial statements should no longer be relied upon because the Company identified an error in these financial statements "related to the classification of customer acquisition costs within the Company's statement of cash flows. Specifically, the Company determined that 'customer acquisition costs' should be treated as cash used in operating activities rather than cash used in investing activities, and that the misclassification of cash flow related to customer acquisition costs should be restated through the amendments of the Prior Financial Statements." It also disclosed that in connection with the restatement, it had concluded that "there is a material weakness in the design of a control activity with respect to the classification of customer acquisition costs within the statement of cash flows and has determined that the Company's disclosure controls and procedures and internal control over financial reporting was not effective."

*Id*. Shift4's stock fell $1.21 per share (2.67%) on this news. *Id.* ¶ 80. "On November 8, 2022, Shift4 Payments filed a Form 10-Q for the third quarter of 2022, which included a restated statement of cash flows for the nine months ended September 30, 2021 (originally reported in the Form 10-Q for Q3 2021)." *Id.* ¶ 81. Shift4 also filed amended 10-Q forms for Q1 and Q2 for 2022 and amended its 10-K for 2021. *Id.* These filings also "contained amendments to the statements of cash flows for full year 2019, 2020, and 2021 as well for Q1 – Q3 2021 and Q1 – Q2 2022." *Id.* The effect of the restatement was substantial. *Id.* ¶ 82. As Plaintiffs summarize:

[1] For the years ended December 31, 2019, 2020, and 2021, respectively, Shift4 negatively revised its net cash provided by operating activities to $8 million (down from its originally reported $26.7 million), $4 million (down from its originally reported $23.4 million), and $3 million (down from its originally reported $29.2 million).

[2] For the three months ended March 31, 2021 and 2022, respectively, it negatively revised its net cash used in operating activities to $7.1 million (down from its originally reported $1.7 million) and net cash provided by operating activities to $30.8 million (down from its originally reported $37.1 million);

[3] For the six months ended June 30, 2021, it negatively revised its originally reported $5 million of net cash ***provided by*** operating activities to $7.7 million of net cash ***used in*** operating activities;

[4] For the six months ended June 30, 2022, it negatively revised net cash provided by operating activities to $70.8 million (down from its originally reported $85 million); and

[5] For the nine months ended September 30, 2021, it negatively revised its net cash provided by operating activities to $6.3 million (down from its originally reported $25.6 million).

*Id.* ¶ 11 (emphasis in original).

*Strategic Buyout Initiative*

The second, but related, practice concerned Shift4's purportedly misleading statements explaining its expensive strategic initiative to insource its sales distribution network. *Id.* ¶ 58. Where the customer acquisition costs concerned the upfront payments, the strategic buyout initiative concerns the residual commissions. In Q3 of 2022, Shift4 spent hundreds of millions of dollars to buyout these residual commissions as part of a strategic initiative to bring these third parties in house and shift toward direct sales. *Id.* ¶ 92. As stated by the company:

During the three and nine months ended September 30, 2022, we completed $298.8 million and $311.7 million, respectively, of ***residual commission buyouts with certain third-party distribution partners***, pursuant to which we acquired their ongoing merchant relationships that subscribe to our end-to-end payments platform. ***These amounts include $298.5 million in residual commission buyouts executed under our mass strategic buyout program completed in the three months ended September 30, 2022 in support of our strategic initiative to insource our sales distribution network.***

*Id.* ¶ 92 (emphasis in original). The stated objects of the effort were to:

> (i) to improve control over the customer experience;[] (ii) to improve the Company's "unit economics";[] (ii) to "motivate[] and energize[]" the Company's sales force to sell its SkyTab solution system to more customers; and (iii) to "enable the boarding of the restaurant technology partners' customers on the Company's end-to-end acquiring solution and empower the Company's distribution partners to sign the restaurant technology partners' customer accounts and leverage the combined expertise to handle all aspects of installation, service, and support.

*Id.* ¶ 103.  Isaacman stated that the effort worked in the sense that as of the start of Q3 2022, Shitft4 was "ramping towards 50% direct sales and 50% third-party."  *Id.* ¶ 94.  This effort also had the effect of reducing cost of goods sold ("COGS") and in turn, increasing EBITDA because the bought-out residual commissions were "amortized on a separate line as 'depreciation and amortization expense,' which is excluded from EBITDA."  *Id.* ¶ 96.  The initiative also had the effect of increasing gross profit.  *Id.*  On a November 7, 2022, earnings call, Shift4's CFO confirmed the same.  *Id.* ¶ 99.

However, the Blue Orca Report (addressed later) purportedly demonstrated that "many" of these third-party distributors were of "low quality."  *Id.* ¶ 100.  The implication is that the boost to EBITDA and gross profit was not incidental but rather the sole object of the maneuver because a boost to EBITDA and gross profit would in turn boost the share price and relieve Isaacman's financial pressures.  This implication is supposedly bolstered by the impressions of Confidential Witness 3 ("CW-3").  "CW-3 was employed by Shift4 as a Financial Analyst in the Finance Department from February 2020 through December 2022."  *Id.* ¶ 101.  Of note, the Amended Complaint details an "all hands" meeting, attended by CW-3, in which Isaacman outlined the thought behind the mass strategic buyout program.  *Id.* ¶ 102.  CW-3 was puzzled by this as Shift4 had superior technology and service and would thus naturally overtake the smaller companies Shift4 had opted to acquire.  *Id.* ¶ 102.

*Public Statements*

These actions also coincide with certain statements of Isaacman which Plaintiffs single out as suspect.  These statements took place at the UBS TMT conference on December 7, 2022. *Id.* ¶ 64.  When an analyst asked Isaacman if he would consider taking Shift4 private if he did not get the valuation he wanted, Isaacman said "we're incredibly frustrated" that the stock is "very much underappreciated" and that he would "absolutely" consider taking the Company private.  *Id*.  Isaacman also stated: "I'm a buyer."  *Id*.  The problem is that in reality, Isaacman had "last purchased shares on the open market in June 2022 – six months prior to his December 7, 2022, statements and did not make any open market purchases between the time of his statements and the end of the Class Period."  *Id.* ¶ 65.

*Blue Orca Report*

Much of the above was fleshed out in a report issued by Blue Orca Capital, a short seller, on April 19, 2023.  *Id.* ¶ 25.  The report offered a more detailed and more damning picture of Isaacman's margin loan, its strategic buyout initiative, and its "aggressive accounting games." *Id.* ¶ 150–152.  More particularly, the report opined on the quality of some of the third-party distributors acquired, dubbing them "low quality."  *Id.* ¶¶ 153, 158.  The report also detailed the extent to which the initiative "flattered" financial metrics such as adjusted EBITDA.  *Id.* ¶ 152. Upon release of the Blue Orca report, Shift4's share price "fell $5.95 per share, or 8.68%, to close at $62.59 per share on April 19, 2023."  *Id.* ¶ 159.

### B.    Procedural History

On November 3, 2023, this Court consolidated the related actions, appointed Robert Baer Lead Plaintiff, and appointed Pomerantz LLP and The Schall Law Firm as Co-Lead Counsel. *See* ECF No. 17.  On January 5, 2024, an Amended Complaint was filed.  *See* ECF No. 35.  In Count I, Plaintiffs assert violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and

Rule 10b-5(b) promulgated thereunder, against Defendants.  In Count II, Plaintiffs assert

Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated

thereunder, against all Defendants.  In Count III, Plaintiffs assert violations of Section 20(a) of

the Exchange Act against Isaacman.

On February 19, 2024, Shift4 filed the instant Motion to Dismiss.  *See* ECF No. 39.  The

matter is now fully briefed and ready for disposition.

## III.    LEGAL STANDARDS

### A.    PSLRA and Heightened Pleading Standards – Review of Applicable Law

"Section 10(b) of the Securities Exchange Act makes it unlawful for any person to 'use or

employ, in connection with the purchase or sale of any security . . . any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 15 U.S.C.

§ 78j(b)).  Rule 10b-5, which implements § 10(b), renders it unlawful to:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material
> fact necessary in order to make the statements made, in the light of the
> circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would
> operate as a fraud or deceit upon any person, in connection with the purchase or
> sale of any security.

17 C.F.R. § 240.10b-5.  Section 10(b) provides a private cause of action much like the one

brought here.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318 (2007).

"To adequately allege a § 10(b) securities fraud claim, a plaintiff must plead '(1) a

material misrepresentation or omission, (2) scienter, (3) a connection between the

misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the

misrepresentation or omission, (5) economic loss, and (6) loss causation.'" *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014)).  "[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322.  However, the claimant must also comport with the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA.

Under Rule 9(b), the "party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  "Under that standard, the complaint must describe the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity." *City of Warren Police & Fire Ret. Sys. V. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023).  Further, "if allegations of falsity are based on information and belief, instead of on 'evidentiary support,' Fed. R. Civ. P. 11(b)(3), the PSLRA requires the complaint to plead, with particularity, facts 'sufficient to support a reasonable belief as to the misleading nature of the statement or omission' before the allegations can be accepted as true." *Id.*  For its part, the PSLRA imposes a higher pleading standard on the material misrepresentation/omission and scienter elements.

## 1. Material Misrepresentation

The PSLRA's heightened pleading standards require that the claimant "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  "[T]his materiality requirement is satisfied when there is 'a substantial

likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Matrixx*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). "[T]o plead falsity, a plaintiff must 'identify each statement alleged to have been misleading and … specify the reason or reasons why the statement is misleading.'" *Connor v. Unisys Corp.*, No. CV 22-4529, 2024 WL 387633, at *5 (E.D. Pa. Feb. 1, 2024) (quoting *City of Warren*, 70 F.4th at 680).

### 2.   Scienter

The PSLRA's heighted pleading standard also requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  The Third Circuit has expounded on the state of mind requirement as one "'embracing [an] intent to deceive, manipulate, or defraud,' either knowingly or recklessly."  *Hertz*, 905 F.3d at 114 (quoting *Institutional I'nv'rs Grp. v. Avaya, Inc*., 564 F.3d 242, 252 (3d Cir. 2009)).  "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.

### 3.      Loss Causation

Loss causation requires that the plaintiff prove "that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C.A. § 78u-4 (b)(4).  "A plaintiff must show both: (1) 'transaction causation' (or 'reliance'), i.e., that but for the fraudulent misrepresentation or omission, the investor would not

have purchased or sold the security; and (2) 'loss causation,' i.e., that the fraudulent misrepresentation or omission actually caused the economic loss suffered." *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 425 (3d Cir. 2007) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172–73 (3d Cir.2001)). "As the Third Circuit has repeatedly warned, loss causation is a fact-sensitive inquiry often reserved for the trier of fact." *Roofer's Pension Fund v. Papa*, No. CV 16-2805, 2023 WL 5287783, at *22 (D.N.J. Aug. 17, 2023) (citing *EP Medsystems, Inc. v. EchoCath, Inc*., 235 F.3d 865, 886 (3d Cir. 2000)). "Importantly, as to loss causation there is not a heightened standard of pleading." *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 239 (E.D. Pa. 2021)

### B.    Scheme Liability

Claims brought pursuant to Sections 10b–5(a) and (c) are often referred to as "scheme liability" claims. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159–60 (2008). "A party can incur liability for employing a fraudulent scheme or engaging in any fraudulent act in connection with the purchase or sale of any security, even without making an oral or written statement." *U.S. Sec. & Exch. Co'mm'n v. Mintz*, No. CV 23-3201, 2024 WL 1173096, at *15 (D.N.J. Mar. 18, 2024). "To succeed under the claims that were brought pursuant to Sections 10b–5(a) and (c), plaintiffs must establish that each defendant (1) committed a manipulative or deceptive act; (2) in furtherance of a scheme and artifice to defraud, (3) with scienter; that (4) caused the class to suffer damages." *In re PNC Fin. Servs. Grp., Inc*., 440 F. Supp. 2d 421, 434 (W.D. Pa. 2006).

### C.    Control Person Liability

Section 20(a) of the Exchange Act imposes joint and several liability for "controlling persons." *In re Merck & Co., Inc. Sec. Litig*., 432 F.3d 261, 275 (3d Cir. 2005). "The elements

of a § 20(a) claim, or a 'control person' claim, are: (1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud." *Howard v. Arconic Inc.*, 2021 WL 2561895, at *29 (W.D. Pa. June 23, 2021) (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006)). "Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252.

## IV.   ANALYSIS

Shift4 argues that Plaintiffs have failed to state a claim arising under Section 10(b) and SEC Rule 10b-5(b) because they have failed to plead: 1) a material misrepresentation; 2) scienter; and/or 3) loss causation. Shift4 also argues that Plaintiffs have failed to establish scheme liability under SEC Rule 10b-5(a) or (c). Finally, Shift4 argues that because Plaintiffs have failed to establish a primary violation of securities law, their Section 20(a) control person claim fails as well. The Court addresses each in turn.

### A.   Count I - Section 10(b) and SEC Rule 10b-5(b)

#### 1. Material Misrepresentation

As noted, "[t]he PSLRA's heightened pleading standards require a private securities fraud complaint alleging false or misleading statements to 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation ... is made on information and belief, ... state with particularity all facts on which that belief is formed.'" *City of Edinburgh*, 754 F.3d at 166 (quoting 15 U.S.C. § 78u–4(b)(1)). Here, Plaintiffs have singled out two statements as materially misleading: 1) the classification of customer acquisition costs; and 2) those regarding the purpose of the third-party distributor acquisitions.

    *a. Classification of Customer Acquisition Costs*

As its name might suggest, a customer acquisition cost is the money spent obtaining new customers.  For instance, marketing and advertising efforts aimed at drawing new customers to the business.  In this context, the costs at issue are the "upfront processing bonuses" paid to third-party distribution partners for the new merchant relationships they establish on behalf of Shift4. Am. Compl. ¶¶ 73–75.  These payments must be recorded and classified somewhere in Shift4's statement of cash flows.  How Shift4 opted to classify these payments forms a large part of this litigation.

A cash flow statement is broken down into three categories: operating, financing, and investing activities.[2]  The aggregate of this data enables an investor to assess the company's ability to "generate positive future net cash flows," "meet its obligations," "pay dividends," and "its needs for external financing."  ASC 230-10-10-2.  Further, it enables an investor to "[a]ssess the reasons for differences between net income and associated cash receipts and payments" and

---

[2] The Accounting Standards Codification ("ASC") offers a glossary and guidance on these categories as follows:

> Financing activities include obtaining resources from owners and providing them with a return on, and a return of, their investment; receiving restricted resources that by donor stipulation must be used for long-term purposes; borrowing money and repaying amounts borrowed, or otherwise settling the obligation; and obtaining and paying for other resources obtained from creditors on long-term credit.
> . . .
> Investing activities include making and collecting loans and acquiring and disposing of debt or equity instruments and property, plant, and equipment and other productive assets, that is, assets held for or used in the production of goods or services by the entity (other than materials that are part of the entity's inventory).
> . . . .
> Operating activities include all transactions and other events that are not defined as investing or financing activities []. Operating activities generally involve producing and delivering goods and providing services. Cash flows from operating activities are generally the cash effects of transactions and other events that enter into the determination of net income.

ASC 230-10-20.

"the effects on an entity's financial position of both its cash and noncash investing and financing transactions during the period." *Id.* Plaintiffs single out operating activities as particularly relevant to "assessing a company's financial performance." Am. Compl. ¶ 71. This is because "a company's cash from operating activities should routinely exceed its net income because a positive cash flow speaks to a company's ability to remain solvent and grow its operations." *Id.* More specific to Shift4, the company has stated that it has "historically sourced [its] liquidity requirements *primarily with flows from operations* and, when needed, with borrowings under [its] Credit Facilities or equity transactions." *Id.* ¶ 88 (quoting Shift4's originally filed 2021 Form 10-K (at 70) and Q1 2022 Form 10-Q (at 37)) (emphasis in original).

Plaintiffs allege that Shift4 "classified cash payments associated with the capitalized customer acquisition costs *as an investing activity on the statement of cash flows*, rather than cash flows used in operations, which enabled Shift4 to inflate its cash flows from operating activities on the statement of cash flows." *Id.* ¶ 73 (emphasis in original). Plaintiffs argue this is both materially false and misleading within the meaning of the PSLRA. Plaintiffs are not the only ones who have probed Shift4's classification. In lettered correspondence dated May 11th and June 21st of 2022, the SEC questioned this practice. While Shift4 initially defended its position, it eventually announced a forthcoming restatement.

Shift4 disagrees, arguing that Plaintiffs have failed to satisfy the material misrepresentation element for three reasons. First, Shift4 argues that a restatement made in response to new SEC guidance cannot be materially misleading. Next, it argues that the classification is a subjective accounting judgment — in other words, an opinion — which may only form the basis of a material misrepresentation where it is both objectively and subjectively false under the framework handed down in *Omnicare*. Mot. at 10. Finally, insofar as the

statement was a misrepresentation, it was not material because the share price did not fall upon the publishing of the restatement.

For their part, Plaintiffs begin by arguing, and this Court agrees, that the restatement was not made to conform to new SEC *guidance* but rather correspondence.[3]  Next, Plaintiffs argue that the restatement, by its very nature, establishes material falsity.  Finally, to the extent the classification constitutes an opinion, Shift4 "lacked any basis to classify cash outflows for customer acquisitions as investing activity." Resp., ECF No. 40 at 12–13. Thus, the statements are indeed actionable under the framework in *Omnicare*.

Plaintiffs are correct as to their second argument.  The Court holds that here, the misclassification of the customer acquisition costs was materially misleading.  In response to the SEC's questions, Shift4 announced that its Q3 2021, full year 2021, Q1 2022, and Q2 2022 financial statements could no longer be relied upon and needed to be restated.

> "Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y.2004)
>
> . . .
>
> "A restatement is proper if based on 'mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared.'" *In re Interpool, Inc. Sec. Litig.*, CA No. 04–321, 2005 WL 2000237, *5, 2005 U.S. Dist. LEXIS 18112, *15 (D.N.J. Aug. 17, 2005), quoting Accounting Principles Board ("APB") Opinion No. 20. "A restatement is specifically not proper for 'new information or subsequent developments' or for 'better insight or improved judgment.'" *Id*. APB 20

---

[3]    Guidance is ordinarily a written statement by the SEC or its staff on accounting or legal matters of public interest.  *See e.g.* Securities and Exchange Commission, *Staff Guidance*, https://www.sec.gov/rules-regulations/staff-guidance/selected-staff-accounting-bulletins (last visited August 14, 2024).

*Payne v. DeLuca*, 433 F. Supp. 2d 547, 577 (W.D. Pa. 2006); *see also Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596 (S.D.N.Y. 2009); *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 549 (S.D.N.Y. 2017) (quoting *S.E.C. v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) ("The very fact of the restatement and thus [the defendant's] conclusion that the financials were materially misstated at the time [the defendant's CFO] made alleged misrepresentations 'belies any suggestion that any misstatement or omission was not material.'")  Here, Shift4 issued what is referred to as a "Big R restatement," which "occurs when the error is material to the prior period financial statements." Am. Compl. ¶ 87.  Thus, by its very nature, the restatement rendered the prior classification of customer acquisition costs misleading.

Shift4 argues that, notwithstanding, Plaintiffs have not shown that the statements were *materially* misleading because there was no effect on any key financial metric and had little to no negative effect on Shift4's share price.  The Court disagrees.  First, Shift4 wrongfully pinpoints the date of the restatement's publishing as the relevant date to judge the statement's effect on the share price.  Here, the restatement was published on November 8, 2022, a day in which the share price actually rose.  However, the Court agrees with Plaintiffs in that "by November 8, 2022, 'the market had already incorporated [the news disclosed on October 21, 2022] that the previously released financial statements could not be relied upon." Resp. at 15 (quoting *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006).  Further, whether a misstatement is material is "an inherently fact-specific finding" which the Court finds more properly reserved for the trier of fact.  *Matrixx*, 563 U.S. at 39 (quoting *Basic*, 485 U.S. at 236).

        b.       *Strategic Buyout Initiative*

Plaintiffs allege that Shift4 "made materially false and/or misleading statements as to why Shift4 deployed hundreds of millions of dollars in capital for residual commission buyout transactions (executed under its mass strategic buyout program) with distributors/resellers in Q3 2022." Resp. at 7. As noted, the stated objects of the initiative were to:

> (i) to improve control over the customer experience;[] (ii) to improve the Company's "unit economics";[] (ii) to "motivate[] and energize[]" the Company's sales force to sell its SkyTab solution system to more customers;18 and (iii) to "enable the boarding of the restaurant technology partners' customers on the Company's end-to-end acquiring solution and empower the Company's distribution partners to sign the restaurant technology partners' customer accounts and leverage the combined expertise to handle all aspects of installation, service, and support.

Am. Compl. ¶ 103. In essence, Plaintiffs allege that these stated reasons are subterfuge and that the actual object was to inflate gross profit and EBITDA, thereby keeping the share price afloat.

To assess whether these statements are materially misleading, the Court must first determine how to evaluate them. This turns on whether they are stated as a fact or an opinion. "As the Supreme Court has explained, 'an opinion is "a belief, a view," or a "sentiment which the mind forms of persons or things,"' whereas a fact is a "'thing done or existing' or '[a]n actual happening."' *City of Warren*, 70 F.4th at 684 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)). Given that framework, the Court finds that the justifications for the strategic buyout initiative are opinions because they reflect the beliefs and views that Shift4's decision-makers hold as to what the buyout program would bring to their company.

Under *Omnicare*, "an opinion statement is misleading if it: (i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren*, 70 F.4th at 686. Plaintiffs' theory appears to be that Shift4 and Isaacman "omitted material facts about the

basis" of these statements by "fail[ing] to disclose that Shift4 entered into residual commission buyout transactions with low quality distributors/resellers to inflate gross profit, EBITDA, and the share price due to the threat of a margin call."  Resp. at 17 n.10.  On this, Plaintiffs offer little to support their claim.

First, they contend that the Blue Orca Report "disclosed" that many of the third-party distributors bought out were of "low quality."  Resp. at 16.  The report is harsh, characterizing Shift4 as, "in reality, a roll-up of low-tech POS systems and payment processors which is substantially less profitable, generates far less cash, and is materially more levered than investors are led to believe." Am. Compl. ¶ 149 (quoting the Blue Orca Report).  Plaintiffs seek to draft behind Blue Orca's report, alleging that the distributors are "a motley collection of small resellers" and singling out roughly six of these distributors as "low quality." *Id*. ¶¶ 26, 158.  Further, this motley crew typically had antiquated technology, minimal IP, and few employees.

However, the purported omission that Shift4 bought out "low quality distributors" rests on a false premise because the Blue Orca Report is far from a comprehensive summary of the distributors acquired.  Further, Plaintiffs' attempt to draw a picture of fraud on the threadbare characterization of six distributors falls far, far short of the heightened showing the PSLRA requires.  The acquisitions may have bolstered gross profit and EBITDA (Shift4's CFO publicly said as much, *see* Am. Compl. ¶ 99) but that does not make the statements *misleading*.  Nor does it show that Shift4's stated reasons were not sincerely believed or otherwise actionable under *Omnicare*.

Second, Plaintiffs offer the impressions of CW-3, a previous financial analyst of Shift4.  This individual was also skeptical of the buyout initiative because these distributors "would inevitably fold under the pressure to compete with Shift4" by virtue of the company's superior

products and service. *Id.* ¶ 102.  CW-3 likewise threw doubt on the rationale to bring some of these "mom and pop" companies into Shift4's fold.  *Id.*

However, the testimony of CW-3 does little if anything to close the gap.  In assessing confidential witness statements, courts must assess the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263 (quoting *Cal. Pub. Employees' Ret. Sys. V. Chubb Corp.*, 394 F.3d 126, 147).  Here, CW-3 offers no personal insight into the thinking of those who offered the statements justifying the strategic buyout initiative.  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) ("confidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements.") CW-3 merely offers their own cursory impression of a select few vendors. One need not look far and wide to find an employee scratching their head at management's strategic decisions.

Accordingly, the Court finds that while the classification of customer acquisition costs satisfies the material misrepresentation element of the Section 10b claim, those statements justifying the strategic buyout initiative do not.

### 2.  Scienter

Plaintiffs must now show that the classification of customer acquisition costs, the remaining material misstatement, was made with the requisite scienter.  To reiterate, that is a "'mental state embracing intent to deceive, manipulate, or defraud,' and requires a knowing or reckless state of mind." *Avaya*, 564 F.3d at 252 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)) (internal citations omitted).

Plaintiffs' theory of scienter rests upon Isaacman's motive to inflate Shift4's share price. Indeed, "motive . . . can be persuasive when conducting a holistic review of the evidence" supporting the inference of scienter. *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013). Here, Plaintiffs draw that inference from much of the same points, nearly all of which are colored by the pressure of the margin call and VPF contracts. In particular, Plaintiffs proffer five circumstances: 1) the restatement of customer acquisition costs; 2) the resignation of Shift4's CFO; 3) Isaacman's December 7, 2022, statements during a Company Conference Presentation; 4) Shift4's strategic buyout initiative; and 5) the company's "boys' club" culture.

The Court addresses each and then weighs the sum of these circumstances.

### a.   *Customer Acquisition Costs: Restatement & CFO Departure*

The essential contention is that the pressure of the margin loan manifested itself into an accounting maneuver designed to inflate the cash flow of Shift4's operating activities and, in turn, the share price. The unraveling of the accounting practice resulted in the resignation of Shift4's CFO and the issuance of a substantial restatement. From the Amended Complaint:

> The restatement by the Company is an acknowledgement that its previous financial statements were materially misstated. Although the Company retracted only its Q3 2021, full year 2021, Q1 2022 and Q2 2022 financial statements, the actual restatements of prior periods included statements of cash flows for full year 2019 and 2020 as well as Q1 – Q2 2021. The restatements in the financial statements which were not restated by the Company were clearly material as cash flows from operations were overstated by 234% for full year 2019 and 485% for full year 2020. The cash flows expended in operations were understated by 76% for Q1 2021. For the six months ended June 20, 2021, the Company disclosed that it generated $5 million from operations when, in fact, it used $7.7 million in operating activities.

Am. Compl. ¶ 89. At first glance, this is somewhat compelling as courts often consider "[t]he size and scope of a company's restatement of prior financial statements . . . when conducting a scienter analysis." *Hertz*, 905 F.3d at 116. The logic of this assessment is that the further the departure from accounting norms, the more likely the prior practice moves away from a mere

mistake or reasonable difference of opinion and ventures into the realm of fraud.

Notwithstanding, "[a] company's admission even to significant accounting errors . . . 'is

insufficient by itself to give rise to a strong inference of scienter.'" *Id.* (quoting *Podraza v.*

*Whiting*, 790 F.3d 828, 838 (8th Cir. 2015)).  Rather, the restatement must add to the strong

inference of the requisite scienter.

Here, that is lacking because the chronology of the customer acquisition cost

classification does not fit into Plaintiffs' theory of motive where the complained of accounting

practice *substantially predates that threat*.  Plaintiffs' theory relates to the March 2021 Margin

Loan which "was taken out shortly before the Company's April 2021 stock price peak of

$101.43."  Am. Compl. ¶ 61.  Thus, "it is likely that, as the Company's stock dropped to *as low*

*as $29.39 in the summer of 2022* and remained in the $30s and $40s at its highest through much

of the remainder of 2022, *Isaacman faced the threat of margin calls*."  *Id.* (emphasis added).

However, the accounting practice in question dates back as far as 2019.  *Id.* ¶ 89.  This severs the

causal chain between accounting practice and share price pressure Isaacman faced, thereby

substantially discounting the relevance of the restatement with regard to scienter.  Just the same,

the pressure brought by the March 2021 VPF Contract does not fit into a timeline from which

one might infer fraud.  While the pressure of those contracts grew as the share price fell in Q3 of

2022, that pressure is substantially predated by the accounting practice in question.

Nor does the CFO's resignation add meaningfully to the inference of scienter.  "[F]or

corporate departures to strengthen an inference of scienter, there must be particularized

allegations connecting the departures to the alleged fraud*." Hertz*, 905 F.3d at 118 (3d Cir.

2018); *cf In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564 (D.N.J. June 5, 2020)

(finding that a corporate executive resigning in the wake of an improper bribery scheme, in

conjunction with a public statement tying the executive to the bribery, was probative of scienter.)

While Herring's resignation coincided with the restatement of Shift4's financials, the above

analysis shows that Plaintiffs have not imputed fraud to that restatement.  Accordingly, Herring's

resignation does not support a strong inference of scienter.  *See In re Great Atl. & Pac. Tea Co.

Sec. Litig.*, 103 F. App'x 465, 470 (3d Cir. 2004) (holding that the plaintiffs failed to show

personnel changes at the company were related to the restatement.)

> b.    *Isaacman's December 7, 2022, Statements*

Next, Plaintiffs point to Isaacman's comments during the UBS TMT Conference held on

December 7, 2022.  There, when asked if he would consider taking the Company private "if he

did not get the valuation he believes the Company to have from the market," Isaacman "stated

that 'we're incredibly frustrated' that the stock is 'very much underappreciated' and that he

would 'absolutely' consider taking the Company private." Am. Compl. ¶ 15.  Most importantly,

Isaacman stated, "I'm a buyer." *Id.*

Plaintiffs argue that these statements are probative of scienter for the simple fact that they

are untrue.  As noted, Isaacman had "last purchased shares on the open market in June 2022 – six

months prior to his December 7, 2022, statements and did not make any open market purchases

between the time of his statements and the end of the Class Period." *Id.* ¶ 65.  These statements,

Plaintiffs aver, thus "smack[] of desperation" and were instead designed to keep the stock price

afloat so that Isaacman could "avoid experiencing further pressure on his pledged shares." *Id.* ¶

16.

However, context and content of such statements are relevant to the scienter inquiry.  *See

Avaya*, 564 F.3d at 269.  For instance, *Avaya* was a securities action that likewise concerned the

propriety of certain statements made by the defendant corporation's leadership team.  In

particular, Avaya's CEO and CFO made public statements "den[ying] unusual price competition . . . during the class period, despite knowing there was price competition that was hurting profit margins." *Id.* at 245.  The CFO, for his part, on three separate occasions was "specifically asked, directly and repeatedly, whether the company's pricing has held steady despite the competitiveness of the market."  *Id.* 270.  His repeated "flat[] deni[als]" that "Avaya engaged in massive discounting" in the face of such "focused questions" created a strong inference of scienter. *Id.*

Here, the statements at issue lack the sort of context and content considered in *Avaya*. First, Plaintiffs claim that when Isaacman was asked about turning the company private, he responded, "I'm a buyer."  Am. Compl. ¶ 15.  However, unlike *Avaya*, where the plaintiffs offered the "specific . . . queries" and context of the CFO's statements, Plaintiffs only offer an isolated statement from which they attempt to draw fraud. *Avaya*, 564 F.3d at 270.  More simply, without the fuller context of Isaacman's statement, the Court is unable to infer the statement's falsity, what it is asserting, and most importantly, its relevance to scienter.  Second, unlike *Avaya*, where plaintiffs alleged the defendant made multiple false statements across multiple calls, here, Plaintiffs allege Isaacman made just one false statement about being a buyer. As such, Plaintiffs' averments lack the "consistent denials" that made the false statements in *Avaya* probative of scienter. *Id*. at 270.[4]

       c.     *Strategic Buyout Initiative*

---

[4]    Defendants urge this Court to take judicial notice of the entirety of the transcript to realize the context of the statement.  Plaintiffs take no position.  Because the paucity of Plaintiffs' pleading prevents the Court from inferring scienter whatsoever, the Court declines to judicial notice of the cited materials at this time.

The strategic buyout initiative aligns more closely with the timeline of the margin call. Q3 of 2022 saw Shift4's share price reach its low point.  At that time, the company undertook the previously noted strategic buyout, spending hundreds of millions of dollars on residual commission buyouts of many of its third-party distributors.  However, to support an inference of scienter, this initiative still has to lend itself to *fraud*, not simply an unwise business maneuver. In support, Plaintiffs point to the information revealed by the Blue Orca Report as well as the statements and impressions of CW-3.  This argument fails largely for the same reasons the statements justifying the strategic buyout initiative do not constitute material misrepresentations.

Again, the theory is that the strategic buyout initiative was a short-term measure designed to inflate EBITDA and gross profit.  To lend itself to a finding of scienter, Plaintiffs would have to plead facts tending to show that the initiative was *subterfuge*.  To do that, Plaintiffs simply parrot the findings of the Blue Orca Report that the third parties Shift4 bought out were "low quality distributors."  Am. Compl. ¶ 100.  However, neither the Amended Complaint nor the Blue Orca Report says as much.  Instead, Plaintiffs aver that six distributors (out of a several hundred million dollar buyout initiative) were of low technology, limited quality, and limited IP. This does not lend itself to an inference of scienter. Nor do the averments of CW-3 support an inference of scienter because their statements offer no insight into the reasoning of strategic buyout initiative.

####       d.      *Boys' Club*

From there, Plaintiffs' theories only get weaker.  Much is discussed in the Amended Complaint and Response, on the veritable "boys' club" that purportedly exists at Shift4.  This allegation stems from the role Isaacman's family and friends play in the company.  However, Plaintiffs fail to flesh out a theory as to how these details figure into the "fraudulent" conduct

alleged and the Court declines to do so for them.  *See Hertz*, 905 F.3d at 117 ("Allegations of mismanagement will only support a securities fraud claim if they are coupled with allegations that the defendants were aware, or recklessly disregarded, that their mismanagement created an environment in which fraud was occurring.")

     e.     *Tellabs Holistic Review*[5]

Having considered the allegations of the Amended Complaint, the Court finds that the inference of scienter is far less compelling than the opposing inference: Shift4 believed the classification of customer acquisition costs in the financial statement was correct.  In particular, the Court finds it difficult to square Plaintiffs' theory of motive with the facts averred because the suspect practice long predates the financial pressure caused by the falling share price.  Further, Plaintiffs have failed to plead any facts connecting Herring's departure, the "boy's club" culture, or the strategic buyout initiative to any *fraudulent* conduct.

Accordingly, the Court finds that Plaintiffs have failed to plead scienter.  Because Plaintiffs have failed to establish an element of the claim, the Court dismisses Count I, albeit without prejudice.[6]

    **3.**    **Loss Causation**[7]

---

[5]    *Tellabs*, 551 U.S. at 326 ("the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?")

[6]    *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that "if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile").

[7]    While the lack of scienter is dispositive, the Court nevertheless addresses Shift4's arguments regarding loss causation in an effort to streamline the litigation in the event Plaintiffs wish to amend their complaint.

In a typical § 10(b) case, like the one at bar[8], "the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *McCabe*, 494 F.3d at 425. "One way to establish loss causation is by means of a corrective-disclosure theory." *Zhengyu He v. China Zenix Auto Int'l Ltd.*, No. 18-15530, 2020 WL 3169506, at *11 (D.N.J. June 12, 2020). "After a misrepresentation has been made, a corrective disclosure reveals 'the falsity of the alleged misrepresentation, and [introduces] ... new information to the market,' generally resulting in a price correction." *Id.* (quoting *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *6, (E.D. Pa. Sep. 3, 2010)).

Plaintiffs point to two corrective disclosures: 1) the October 21, 2022, disclosure that its prior financial statements should no longer be relied upon and would need to be restated; and 2) Blue Orca's April 19, 2023, short seller report. Each were followed by a drop in share price. The Court addresses each in turn.

> a.   *October 21, 2022, Disclosure*

The October 21, 2022, disclosure satisfies loss causation. "[O]n October 21, 2022, [Shift4] disclosed in an SEC filing that the Company's Q3 2021, full year 2021, first quarter ("Q1") 2022, and second quarter ("Q2") 2022 financial statements should no longer be relied upon and would need to be restated because of a material weakness in the Company's internal control over financial reporting, which had caused it to incorrectly treat customer acquisition costs as cash used in investing activities rather than cash used in operating activities in its

---

[8]     "In a typical § 10(b) case, the plaintiff's reliance is on a misstatement that is made to artificially inflate the pricing of a security in the public markets." *Pure Earth, Inc. v. Call*, 531 F. App'x 256, 260 (3d Cir. 2013). In contrast, a "a non-typical § 10(b) claim, private misrepresentations are made to induce a particular individual to buy or sell securities." *Id*.

Consolidated Statements of Cash Flows." Am. Compl. ¶ 9.  In the wake of this news, Shift4's

share price fell 2.67%.

Shift4 argues that this statement cannot serve as the corrective disclosure because the

announcement only notified the market that restatement was forthcoming and did not actually

reveal the specifics of what was to be restated. That information came about in the later

November 8, 2022, restatement which corresponded with an increase in share price.  On this

point, the Court finds *Connor v. Unisys Corp*. persuasive:

> A corrective disclosure is "a release of information that reveals to the market the
> pertinent truth that was previously concealed or obscured by the company's fraud."
> *Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013). While "the announcement
> of an investigation, standing alone, does not qualify as a corrective disclosure, it
> can form the basis of a viable loss causation theory if the complaint also alleges a
> subsequent corrective disclosure by the defendant." *Utesch v. Lannett Co.*, 385 F.
> Supp. 3d 408, 425 (E.D. Pa. 2019) (cleaned up) (quoting *Lloyd v. CVB Fin. Co.*,
> 811 F.3d 1200, 1209–10 (9th Cir. 2016)); *see also Meyer*, 710 F.3d at 1201–02 &
> n.13 ("We merely hold that the disclosure of an SEC investigation, standing alone
> and without any subsequent disclosure of actual wrongdoing, does ... not qualify as
> a corrective disclosure" (emphasis added)).
>
> In such an instance, "no stock price drop need accompany the subsequent corrective
> disclosure." *Rabkin v. Lion Biotechs., Inc.*, No. 17-2086, 2018 WL 905862 at *15,
> 2018 U.S. Dist. LEXIS 25326 at *45 (N.D. Cal. Feb. 15, 2018). (alteration omitted)
> (quoting *Rok v. Identiv, Inc.*, No. 15-5775, 2017 WL 35496, at *19, 2017 U.S. Dist.
> LEXIS 1019, at *56 (N.D. Cal. Jan. 14, 2017)). "[A]ny other rule would allow a
> defendant to escape liability by first announcing a government investigation and
> then waiting until the market reacted before revealing that prior representations
> under investigation were false." *Lloyd*, 811 F.3d at 1210.

*Connor*, 2024 WL 387633, at *12.  Loss causation is foremost a "practical" consideration, yet

Shift4's approach is impractical.  *McCabe*, 494 F.3d at 426.  Here, Shift4 announced that part of

its prior financial statements could no longer be relied upon and that a restatement was

forthcoming.  On this news, the share price dropped.  This, coupled with the subsequent

restatement owning up to the material misstatement, is enough to *plead* loss causation.  Shift4

may argue that the dip was only minor or that the quick rebound undermines Plaintiffs' case, but it would have to do so at a later stage of the litigation.

            b.     *Blue Orca Report*

The Blue Orca report is a closer call. The content of the report is thoroughly rehashed above.  Plaintiffs argue that the report forms a corrective disclosure because it "showed that many of the companies involved in Shift4's residual commission buyouts were low quality distributors/resellers" and that this "information was not previously disclosed."  Resp. at 9. Upon release of the report, Shift4's share price fell $5.95 per share, or 8.68%.

For their part, Shift4 argues that the Blue Orca report did not reveal or disclose any previously unknown information.  Rather, the report merely relied on public information and internet research to form its opinion that the shares were overvalued.  Accordingly, Shift4 argues that the Blue Orca report and the subsequent dip in share price cannot form the basis of a corrective disclosure.

The Court's research has yielded no definitive Third Circuit case law addressing whether a short seller's report may be a corrective disclosure.  And because Plaintiffs have failed to plead scienter, the Court will defer answering that question at this juncture.  Notwithstanding, it offers the following observation that ought to shape Plaintiffs' efforts should they opt to continue pursuing this claim.  Consistent with the definition of 'corrective disclosure,' the Circuit Courts which have addressed this question have focused on the extent to which the short seller's report has disclosed new information to the market or to which it has pieced together publicly available information in a comprehensive, extensive, and expert like manner.  *See generally In re Nektar Therapeutics Sec. Litig*., 34 F.4th 828, 839 (9th Cir. 2022) (considering whether an anonymous short seller report can serve as a corrective disclosure); *see also Lea v. TAL Educ. Grp*., 837 F.

App'x 20, 28 (2d Cir. 2020) (considering whether a short seller report which contained much information "not readily accessible to investors" could serve as a corrective disclosure.)

### C.    Count II - Scheme Liability

Plaintiffs' theory of scheme liability also rests on Isaacman's December 7, 2022, statements that he was "a buyer" despite having not bought Shift4 stock for the six months prior. As noted, scienter is also an element of the scheme-liability claim brought in Count II.  *In re PNC Fin. Servs. Grp., Inc.*, 440 F. Supp. at 434.  Here, Plaintiffs' inference of scienter with regard to scheme liability claim is premised on the same theory as the 10b-5(b) claim discussed in Section IV.A.2.  For the same reasons addressed therein, the Court finds that Plaintiffs have failed to adequately allege scienter with respect to the scheme liability claim.  *Trustees of Welfare & Pension Funds of Loc. 464A - Pension Fund v. Medtronic PLC*, No. 22-CV-2197 (KMM/JFD), 2024 WL 1332262 at *35 (D. Minn. Mar. 28, 2024) (dismissing a scheme liability claim where its averments supporting scienter mirrored that of a deficient misrepresentation claim dismissed in the same opinion); *see also Afr. v. Jianpu Tech. Inc*., No. 21-CV-1419 (JMF), 2023 WL 5432282 (S.D.N.Y. Aug. 23, 2023) (same).

Accordingly, Count II is dismissed without prejudice.[9]

### D.    Count III - Control Person Liability

Plaintiffs have failed to allege any primary violation; accordingly, they cannot establish control person liability.  *Rahman*, 736 F.3d at 247.[10]

## IV.    CONCLUSION

---

[9]    *See Alston*, 363 F.3d at 235.
[10]    *See Alston*, 363 F.3d at 235.

Plaintiffs' claims fail on scienter because the chronology of the facts averred undermine Plaintiffs' theory of motive.  The PSLRA's heightened pleading standard requires that this Court "consider plausible, nonculpable explanations for the defendant's conduct."  *Tellabs*, 551 U.S. at 324.  Having made that assessment, the Court finds the competing nonculpable inference far more compelling: Shift4 believed the classification of customer acquisition costs in the financial statement was correct.

A separate Order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge