# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT BAER, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>                    v.<br><br>SHIFT4 PAYMENTS, INC., and JARED ISAACMAN,<br><br>                              Defendants. | Case No. 5:23-cv-03206-JFL<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Hon. Joseph F. Leeson, Jr.<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Robert Baer ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, allege the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Shift4 Payments, Inc. ("Shift4" or the "Company"), analysts' reports and advisories about the Company, discussions with confidential witnesses, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Shift4 securities between June 5, 2020 and October 21, 2022, both dates inclusive (the "Class Period"), seeking to recover

damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and its Chief Executive Officer ("CEO") Jared Isaacman ("Isaacman").

2.      Shift4 provides software and payment processing solutions in the U.S.  The Company provides, among other products and services, integrated and mobile point-of-sale ("POS") solutions.  Shift4 conducted its initial public offering ("IPO") and began operating as a publicly traded company on June 5, 2020.

3.      Throughout the Class Period, Defendants made materially false and misleading statements and/or failed to disclose that Shift4 had inadequate disclosure controls and procedures and internal controls over financial reporting, and as a result, failed to properly account for customer acquisition costs.

4.      In the run up to the Company's IPO and throughout the Class Period, the Company misclassified its cash outflows associated with capitalized customer acquisition costs without any legitimate basis for the classification. The misclassification enabled the Company to inflate its cash flows provided by operating activities, which is a key financial metric investors use in assessing a company's performance and in pricing an IPO.  This misled investors to believe that the Company generated far more cash from its operating activities than it actually did.  Accordingly, Shift4 would likely be forced to restate, and actually restated, previously issued financial statements going all the way back to 2019.

5.      Isaacman benefitted from the misclassification of cash outflows associated with capitalized customer acquisition costs.  IPO Class A shares were priced at $23, above its expected range of $19 to $21.  Class A shares of Shift4 gained 46% in their first day of trading. But this was

because the shares were artificially inflated as investors were misled to believe that the Company generated far more cash from its operating activities than it actually did. The first trade was issued for $33.10 on June 5, 2020, and shares closed at $33.54.  The Company raised $345 million through its IPO.

6.    Concurrent with the IPO, Isaacman purchased $100 million of Class C common stock at the IPO price of $23, less underwriting discounts and commissions amounting to $1.38 per share, in a private placement through Rook Holdings, Inc. ("Rook"), a corporation wholly owned by him. (Class C shares automatically convert into fully paid shares of Class A common stock on a one-to-one basis upon their transfer to any person.).[1]  When the market closed on June 5, 2020, Isaacman's shares were worth an astounding $155,134,105.

7.    In connection with the IPO, the Company also entered into a new lucrative employment agreement with Isaacman on May 31, 2020.  Isaacman landed himself the prestigious role of public company CEO.  Pursuant to his new employment agreement, most of Isaacman's compensation became equity based, paid in the form of restricted unit awards which, unlike other Shift4 executives, were not subject to time or performance-based vesting.[2]  They vested right away. Because the Company's shares were artificially inflated as a result of the misclassification, Isaacman's total compensation between 2020 and 2021 dramatically increased by almost $5.5 million.

8.    The Company continued to misclassify its cash outflows associated with capitalized customer acquisition costs even after the SEC questioned Shift4's treatment of customer

---

[1] Isaacman purchased 4,625,346 Class C shares at $21.62 per share.
[2] "Restricted unit awards" refers to the right to receive the Company's common stock.

acquisition costs in correspondence dated May 11, 2022 and June 21, 2022. The SEC's correspondence *was not* based on any new SEC guidance.

9.      On or about the same time that the Company was formulating a response to the SEC's June 21, 2022 letter, Isaacman was under a threat of a margin call from a large series of stock pledges. The threat of a margin call provides critical context for the Company's actions in continuing to misclassify cash flows associated with customer acquisition costs and defending its baseless position with the SEC. Indeed, the threat of a margin call could have resulted in Isaacman being forced to sell 10 million shares of Shift4 Class A common stock (~12% of diluted shares outstanding).[3]

10.      Isaacman, through Rook,[4] first entered into a margin loan in September 2020, secured by shares of the Company's Class A and Class B common stock (the "September 2020 Margin Loan"). The September 2020 Margin Loan was repaid and replaced on March 24, 2021 by a new margin loan secured by 10 million Rook Units (which included, among other things, shares of Shift4's Class A and Class B Common Stock) (the "March 2021 Margin Loan"). If Rook were to default, and the default was not cured, the lender would have the right to exchange and sell up to 10 million Rook Units for an equal number of the Company's Class A common stock to satisfy Rook's obligation. At the time, Class A stock was worth about $80 per share.

11.      Given that the March 2021 Margin Loan was taken out shortly before the Company's April 2021 stock price peak of $101.43, Isaacman faced the threat of margin calls as the Company's stock dropped to as low as $29.39 by July 13, 2022 – less than 30 days after the

---

[3] Isaacman received, *in effect*, such a margin call in mid to late-2022, as he increased his collateral by more than 50% (from 10 million to 15 million shares) *and* reduced the size of his margin loan on December 19, 2022.

[4] As per the 2022 10-K, Isaacman is the sole stockholder of Rook.

Company's received the SEC's second letter. At the stock's lowest point in July 2022, the pledged shares – once worth almost $806 million on March 24, 2021 – would have been worth about $294 million.

12.     For this reason, Defendants would have been heavily incentivized to keep the Company's financials looking strong and the stock as high as possible even when the SEC began questioning the Company's basis for its classification of customer acquisition costs on its statement of cash flows.

13.     Additionally, shortly before submitting the Company's response to the SEC's June 21, 2022 letter, Chief Financial Officer ("CFO") Bradley Herring ("Herring") – who signed the Company's response to the SEC's first letter to the Company – abruptly resigned. According to Shift4's August 3, 2022 Form 8-K, on August 3, 2022, CFO Herring and the Company agreed that Herring would no longer serve as the Company's CFO, *effective August 5, 2022*.

14.     The disclosure was silent as to the reason why CFO Herring left the Company but given the timing, Herring's sudden and immediate departure, and that Herring signed the Company's June 3, 2022 letter in response to the SEC's first letter, Plaintiff contends that the CFO's departure was due to his disapproval of the Company's proposed response to the SEC's additional questions regarding the Company's treatment of customer acquisition costs.

15.     On August 8, 2022, three days after Herring's departure, Shift4 finally submitted its response to the SEC's June 21, 2022 letter in further defense of the Company's treatment of customer acquisition costs. However, two months after submitting its response, the Company *completely abandoned its arguments* set forth in its letter to the SEC and restated its previously issued financial statements.

16.     On October 21, 2022, the Company disclosed in an SEC filing that the Company's Q3 2021, full year 2021, first quarter ("Q1") 2022, and second quarter ("Q2") 2022 financial statements should no longer be relied upon and would need to be restated because of a material weakness in the Company's internal control over financial reporting, which had caused it to incorrectly treat customer acquisition costs as cash used in investing activities rather than cash used in operating activities in its Consolidated Statements of Cash Flows.

17.     On this news, Shift4's stock price fell $1.21 per share, or 2.67%, to close at $44.16 per share on October 24, 2022.

18.     On November 8, 2022, Shift4 filed restated financial statements with the SEC to properly account for its historical customer acquisition costs.  The restatements negatively revised its financials as follows:

- For the years ended December 31, 2019, 2020, and 2021, respectively, Shift4 negatively revised its net cash provided by operating activities to $8 million (down from its originally reported $26.7 million), $4 million (down from its originally reported $23.4 million), and $3 million (down from its originally reported $29.2 million).

- For the three months ended March 31, 2021 and 2022, respectively, it negatively revised its net cash used in operating activities to $7.1 million (down from its originally reported $1.7 million) and net cash provided by operating activities to $30.8 million (down from its originally reported $37.1 million);

- For the six months ended June 30, 2021, it negatively revised its originally reported $5 million of net cash *provided by* operating activities to $7.7 million of net cash *used in* operating activities;

- For the six months ended June 30, 2022, it negatively revised net cash provided by operating activities to $70.8 million (down from its originally reported $85 million); and

- For the nine months ended September 30, 2021, it negatively revised its net cash provided by operating activities to $6.3 million (down from its originally reported $25.6 million).

19.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

22.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Shift4 is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

23.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

24.    Lead Plaintiff Robert Baer acquired Shift4 securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. *See Baer v. Shift4 Payments, Inc.*, No. 5:23-cv-03969-JFL (ECF Nos. 1-1, 1-2).

25.    Defendant Shift4 is a Delaware corporation with principal executive offices located at 2202 N. Irving Street, Allentown, Pennsylvania 18109.  Shift4's Class A common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "FOUR".

26.    Defendant Jared Isaacman ("Isaacman") has served as Shift4's Chief Executive Officer ("CEO") at all relevant times.

27.    Isaacman possessed the power and authority to control the contents of Shift4's SEC filings, press releases, and other market communications.  Isaacman was provided with copies of Shift4's SEC filings and other statements and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of his position with Shift4, and his access to material information available to him but not to the public, Isaacman knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  Isaacman is liable for the false statements and omissions pleaded herein.

28.    Shift4 and Isaacman are collectively referred to herein as "Defendants".

## NON-PARTIES

29.    Bradley Herring ("Herring") served as Shift4's CFO from before the start of the Class Period to August 5, 2022.

## SUBSTANTIVE ALLEGATIONS

### I.    Background

30.    Shift4 provides software and payment processing solutions in the U.S.  The Company provides, among other products and services, integrated and mobile POS solutions; a mobile ordering, countertop POS, and self-service kiosk services; a cloud-based business intelligence tool that includes customer engagement, social media management, online reputation management, scheduling, and product pricing, as well as reporting and analytics; SkyTab POS, a POS workstation pre-loaded with software suites and integrated payment functionality; and SkyTab Mobile, a mobile payment solution.

31.    The Company was founded by its CEO, Jared Isaacman.

### A.    The Company's Initial Public Offering

32.    According to Confidential Witness No. 1 (defined herein), Isaacman personally worked on the IPO since 2018.

33.    On November 27, 2019, Shift4 filed a draft registration statement on Form DRS with the SEC in connection with its IPO of shares of Class A common stock. On May 15, 2020, Shift4 filed a registration statement on Form S-1 with the SEC in connection with its IPO, which, after several amendments, was declared effective by the SEC on June 4, 2020 (the "Registration Statement").

34.    On or about June 5, 2020, Shift4 conducted its IPO and its Class A common stock began publicly trading on the NYSE.

35.    IPO Class A shares were priced at $23, above its expected range of $19 to $21. The price of an IPO is based, in part, on the issuer's financial statements.  The Registration Statement for the IPO contained purported historical financial results of the Company.  But those financial

statements contained a misclassification of the Company's cash outflows associated with capitalized customer acquisition costs which enabled the Company to inflate its cash flows provided by operating activities – a key financial metric investors use in assessing a company's performance. This misled investors to believe that the Company generated far more cash from its operating activities than it actually did.

36.     Class A shares of Shift4 gained 46% in their first day of trading. The first trade was issued for $33.10 on June 5, 2020, and shares closed at $33.54. The Company raised $345 million through its IPO.

37.     Concurrent with the IPO, Isaacman purchased $100 million of Class C common stock at the IPO price of $23, less underwriting discounts and commissions amounting to $1.38 per share, in a private placement through Rook, a corporation wholly owned by him. (Class C shares automatically convert into fully paid shares of Class A common stock on a one-to-one basis upon their transfer to any person.)

38.     In connection with the IPO, the Company also entered into a new lucrative employment agreement with Isaacman on May 31, 2020. Isaacman landed himself the prestigious role of public company CEO. Pursuant to the new employment agreement, most of Isaacman's compensation became equity based, paid in the form of restricted unit awards which, unlike other Shift4 executives, were not subject to time or performance-based vesting. They vested right away. Because the Company's shares were inflated as a result of the misclassification, Isaacman's total compensation between 2020 and 2021 dramatically increased by almost $5.5 million.

**B.    Isaacman Has Significant Control of the Company**

39.     The Company is a holding company that was incorporated on November 5, 2019 for purposes of the IPO. After the IPO, the Company became the sole managing member of Shift4

Payments, LLC ("Shift4 Payments"), founded by Isaacman in 1999. Shift4 operates and controls all of the business and affairs of Shift4 Payments, and, through Shift4 Payments and its subsidiaries, conducts its business.

40.    Shift4 Payments is the accounting predecessor of Shift4 for financial reporting purposes.[5] Prior to and after the IPO, Isaacman served as CEO and Chairman of Shift4 Payments' board of managers since its founding in 1999.[6]

41.    After the IPO and as of December 31, 2020, 2021 and 2022, Defendant Isaacman controlled, in the aggregate, approximately 68.0%, 83.3% and 84.2%, respectively, of the voting power represented by all of the Company's outstanding classes of stock.

42.    As a result, Defendant Isaacman continues to exercise significant influence over all matters requiring stockholder approval, including the election and removal of directors, the size of the board, and any approval of significant corporate transactions, and continues to have significant control over the Company's management and policies.

43.    Because Defendant Isaacman has more than 50% of the voting power for the election of directors, the Company is considered a "controlled company" for purposes of the NYSE.

**C.    Isaacman Created an Environment in Which Fraud Was Ignored**

44.    Prior to and during the Class Period, Isaacman's friends and family were hired by Shift4 Payments and the Company for various positions, even if unqualified, given preferential

---

[5] In other words, the historical financial statements for the Company are those of Shift4 Payments which is the Company's accounting predecessor for financial reporting purposes.
[6] Prior to the IPO, Isaacman owned a 46.7% economic interest in Shift4 Payments through Rook. After the IPO, he owned a 32.1% economic interest in Shift4 Payments through Rook.

treatment, and collectively became known as the "boys' club." Isaacman, through his boys' club, knowingly or recklessly created an environment in which fraud was ignored.

45.     Isaacman's older brother, Michael Isaacman, served (and continues to serve) as Shift4's Chief Commercial Officer.   Isaacman's father, Donald Isaacman, has served (and continues to serve) as a member of the Board since the Company's formation.

46.     Confidential Witness ("CW")-1 worked at the Company from 2004 to August 2021 and spent the last four years of her employment as Director of Risk and Recovery.[7]  As Director, CW-1 reported to Emily Hess ("Hess"), VP of Risk.

47.     According to CW-1, from the start, Isaacman maintained an influx of personal friends into the business who were put into positions of leadership.  The terms "boys' club" was widely known throughout the Company and CW-1 stated that the prevailing message was clear – "if you don't like it, keep your mouth shut."

48.     According to CW-1, there was a decline in leadership as the Company expanded, resulting in a "chaotic" atmosphere. CW-1 attributed the chaos to Isaacman hiring and promoting his unqualified friends into positions of authority.  For example, CW-1 could not believe that Isaacman's personal pilot, Doug Demko ("Demko"), was promoted to EVP of Payments and Chief Operating Officer with no experience.  "He was not a credit card guy … he knew nothing about credit cards."  According to CW-1, his only qualification was that he served as Isaacman's personal pilot for several years.

49.     Additionally, Isaacman's "good friend," Brendan Lauber, served as Chief Technology Officer for much of the Class Period.  (He currently serves as Vice Chairman of the Company.)  Taylor Lauber, who appears to be related to Brendan Lauber, has served as the

---

[7] When CW-1 started in 2004, Shift4 was a small, private company.

Company's President since February 4, 2022 and Chief Strategy Officer since the Company's formation.

50.    CW-1 recalled that two other "good old boys" who were brothers – Joe and Anthony Daddona – were put in charge of major departments.  Joe Daddona was in charge of Risk, serving as VP of Operations, and Anthony Daddona was Director of Payment Supports.  (Joe Daddona currently serves as SVP, Operations.)

51.    CW-1 stated that another friend of Isaacman – Tony Bacco – was hired and promoted to a job in CW-1's department.  According to CW-1, Bacco transferred over from Technology to Risk but knew nothing about Risk.  CW-1 recalled that Bacco made some poor decisions and was eventually fired because he missed identifying a significant risk that resulted in a loss to the Company of over a million dollars.

52.    CW-2 echoed CW-1's comments regarding the boys' club.  CW-2 worked at the Company from 2009 to April 2022.  By 2011, CW-2 was Risk Department Manager where she remained until she left the Company in April 2022.  CW-2 reported to Hess and CW-1.

53.    CW-2 stated that Isaacman created several positions primarily for his friends who made up a significant portion of executive management.  According to CW-2, Demko was a pilot and close personal friend of Isaacman.  CW-2 thought Demko exemplified Isaacman's bias in hiring unqualified friends into influential positions.

54.    CW-2 explained that Isaacman was not the only person at the Company giving out positions to unqualified employees.  CW-2 stated that the Company held a yearly gathering for its high-level employees at the Sands-Wind Creek Casino in Bethlehem, Pennsylvania. CW-2 stated that in 2019, managers were not invited to the gathering. Gail Miller, who at the time served as Chief of Accounting, promoted every manager on her accounting team to director so that her

accounting team managers could attend the gathering. The promotions/title changes, which came with raises, were not based on each accounting manager's qualifications.

55.     CW-2 stated that George Chadwick III, EVP of Finance and Brian Downs, SVP of Finance, were also close friends of Isaacman.  CW-2 recalled that Joe Messina, a sales representative for the Company, was another close friend of Isaacman.  CW-2 stated it was common knowledge that Messina and other friends and family were hired by Isaacman, given preferential treatment, and they collectively became known as the "boys' club."

56.     Because Isaacman's friends and family were hired by the Company for various positions, even if unqualified, and given preferential treatment, Isaacman knew, or at the very least recklessly disregarded, that he created an environment which was ripe for fraud.

57.     Isaacman knowingly turned a blind eye to apparent fraud. For example, in 2018, CW-2 had several conversations with Isaacman about issues concerning Restaurant Manager, a POS brand acquired by Shift4 Payments in 2018. After learning of a security breach at Restaurant Manager, CW-2 engaged Isaacman in discussions about the problem. According to CW-2, there was clearly fraud, and CW-2 requested that a hold be placed on Restaurant Manager's accounts. However, Isaacman declined CW-2's request because he thought it would bring negative attention to the acquisition. Notwithstanding Isaacman's denial of CW-2's request, CW-2 put a hold on Restaurant Manager's accounts because of the risk involved. CW-2 thought Isaacman was looking the other way as to this fraud.

58.     According to CW-2, there were several concerns with other accounts, particularly night clubs. For example, the owners of Smiles II nightclub in Roxbury, New Jersey, were indicted for money laundering in 2018.  In or about 2017 or 2018, Smiles had been a client for about six years and CW-2 was able to see that the scope of its business changed dramatically over the years

and indicated that something suspicious was at play. CW-2 stated that Smiles II went from registering approximately $300,000 a month in Visa payments to $500,000 a month, registering only pre-paid gift cards. CW-2 emphasized that in her experience in risk analysis, the Smiles II activity was egregious. Additionally, Smiles had several other processors outside of Shift4 Payments, which made the fraud that much larger. CW-2 flagged the Smiles II account for money laundering, put the account on hold, and brought it to management's attention.

59.    CW-2 engaged Hess, her manager, who was VP of Risk. Hess then engaged Ward, who served as Chief Payments Officer. They all agreed on approaching Joe Messina, the sales representative who managed the Smiles account. Messina was also Isaacman's close friend. CW-2 stated that Messina and Isaacman were making good money off the Smiles account. After expressing repeated concerns to Messina, CW-2 thought he was blowing it off. Messina told Hess that she needed to remove the hold on the account but Hess refused.

60.    CW-2 also stated that both Hess and Ward brought the concerns to the attention of Jordan Frankel, who served as General Counsel and Executive VP of Legal/Compliance, but nothing was done.

61.    Hess and Ward also told Isaacman. Soon thereafter, Isaacman approached CW-2 in person and asked why CW-2 put a full hold on the Smiles account. During their conversation, Isaacman asked CW-2 how much of Smiles' money was being withheld and CW-2 estimated that it was over $300,000. After CW-2 briefed Isaacman, he requested CW-2 to document the issue in an email. CW-2 complied and sent the email directly to Isaacman. Thereafter, Isaacman told CW-2 to remove the hold on the account and release the funds. Once the hold was removed, $300,000 was released to Smiles. CW-2 estimated that this occurred about 30 days before the 2018 money laundering sting at Smiles discussed below in ¶ 63.

62.     It was only through FNBO, Shift4 Payments' support bank, that the company reattached the holds on the Smiles' account. (According to CW-2, the company manages the processing and devices on the front end, but the money comes from FNBO.) FNBO saw the issue at Smiles on the backend and told the company to put the hold back on the Smiles account and close the account.

63.     In 2018, several individuals, including Kevin Lipka who co-owned Smiles and communicated with Messina about the Smiles account (the "Smiles Defendants"), were indicted for money laundering in New Jersey under "Operation Smiles." The Smiles Defendants were charged with conspiring in an elaborate scheme in which they used stolen credit card information—and illegally acquired gift cards—to steal more than $12 million. The Smiles Defendants allegedly defrauded retailers, banks, credit card processing companies and credit card holders. Most of the defendants, including co-owners Kevin Lipka and his wife Shelly Lipka, had already been arrested and charged on criminal complaints in July 2016 following an initial 10-month investigation.[8] CW-2 was subpoenaed to testify during the fraud investigation.

64.     CW-2 stated that Isaacman never said another word to her about the Smiles account. In CW-2's experience, Smiles was a fraud risk that did not concern Isaacman. CW-2 recalled being surprised about his lack of urgency.

**D.      In 2022, the Company's CEO Was Under a Threat of a Margin Call Which Provides Critical Context for the Company's Actions in Continuing to Misclassify Cash Flows Associated with Customer Acquisition Costs and Defending its Baseless Position with the SEC**

65.     Isaacman faced the threat of a margin call during the 2022 bear market, which could

---

[8] https://www.dailyrecord.com/story/news/crime/morris-county/2016/07/28/owner-smiles-ii-go-go-bar-roxbury-charged-major-money-laundering-case/87661322/;
https://www.dailyrecord.com/story/news/2018/07/13/operation-smile-unearths-roxbury-nj-go-go-bar-credit-card-scheme/782198002/.

have resulted in him being forced to sell 10 million shares of Shift4 Class A common stock (~12% of diluted shares outstanding).[9]  Isaacman's margin loan provides critical context for the Company's actions in continuing to misclassify cash flows associated with customer acquisition costs and defend its position with the SEC even though it had no basis for doing so.  Defendants would have been heavily incentivized to keep the Company's financials looking strong and the stock as high as possible even when the SEC began questioning the Company's basis for its classification of customer acquisition costs on its statement of cash flows.

66.    Isaacman, through Rook, first entered into a margin loan in September 2020, secured by shares of the Company's Class A and Class B common stock (the "September 2020 Margin Loan"). The September 2020 Margin Loan was repaid and replaced on March 24, 2021 by a new margin loan secured by 10 million Rook Units (which included, among other things, shares of Shift4's Class A and Class B Common Stock) (the "March 2021 Margin Loan"). If Rook were to default, and the default was not cured, the lender would have the right to exchange and sell up to 10 million Rook Units for an equal number of the Company's Class A common stock to satisfy Rook's obligation.  At the time, Class A stock was worth about $80 per share.

67.    Given that the March 2021 Margin Loan was taken out shortly before the Company's April 2021 stock price peak of $101.43, Isaacman faced the threat of margin calls as the Company's stock dropped to *as low as $29.39 in the summer of 2022*.  At the stock's lowest point in July 2022, the pledged shares – once worth almost $806 million on March 24, 2021 – would have been worth about $294 million.

---

[9] Isaacman received, *in effect*, such a margin call in mid to late-2022, as he increased his collateral by more than 50% (from 10 million to 15 million shares) *and* reduced the size of his margin loan on December 19, 2022.

II.   **THE COMPANY'S FALSE STATEMENTS REGARDING CASH FLOWS ASSOCIATED WITH CUSTOMER ACQUISITION COSTS MISLED INVESTORS TO BELIEVE THAT THE COMPANY GENERATED FAR MORE CASH FROM OPERATING ACTIVITIES THAN IT ACTUALLY DID, WHICH TRIGGERED A RESTATEMENT OF THE COMPANY'S FINANCIALS**

68.   The statement of cash flows is a central component of an entity's financial statements. It provides key information about an entity's financial health and its capacity to generate cash.  The objective of a statement of cash flows is to describe the sources and uses of cash.  The information provided in a statement of cash flows allows financial statement users to do all of the following:

a.   Assess the entity's ability to generate positive future net cash flows;

b.   Assess the entity's ability to meet its obligations, its ability to pay dividends, and its needs for external financing;

c.   Assess the reasons for differences between net income and associated cash receipts and payments; and

d.   Assess the effects on an entity's financial position of both its cash and noncash investing and financing transactions during the period.

ASC 230-10-10-2.

69.   Cash flows are classified in the statement of cash flows as either operating, financing or investing activities, depending on their nature.  ASC 230-10-45-24.  ASC Topic 230, *Statement of Cash Flows*, contains guidance on reporting cash flows in an entity's financial statements.

"Investing activities include making and collecting loans and acquiring and disposing of debt or equity instruments and property, plant, and equipment and other productive assets, that is, assets held for or used in the production of goods or services by the entity (other than materials that are part of the entity's inventory)." ASC 230-10-20.

"Financing activities include obtaining resources from owners and providing them with a return on, and a return of, their investment; … borrowing money and repaying amounts borrowed, or otherwise settling the obligation; and obtaining and paying for other resources obtained from creditors on long-term credit." ASC 230-10-20.

"Operating activities include all transactions and other events that are not defined as investing or financing activities…. Operating activities generally involve producing and delivering goods and providing services. Cash flows from operating activities are generally the cash effects of transactions and other events that enter into the determination of net income." ASC 230-10-20.

70.    In other words, cash flows from operating activities are the residual category in the cash flow statement.  If a cash inflow (receipt) or outflow (payment) does not result from an investing or financing activity, it is classified as operating.  However, investors pay close attention to cash flows from operating activities in assessing a company's financial performance.  Ideally, a company's cash from operating activities should routinely exceed its net income because a positive cash flow speaks to a company's ability to remain solvent and grow its operations.

71.    GAAP requires entities to capitalize (*i.e.*, record as an asset) the incremental costs of obtaining a contract with a customer if the costs are expected to be recovered.  ASC 340-40-25-1.  Incremental costs of obtaining a contract are those "costs that an entity incurs to obtain a contract with a customer that it would not have incurred if the contract had not been obtained (for example, a sales commission)." ASC 340-40-25-2.  GAAP does *not* describe the capitalized costs of obtaining a contract with a customer as assets held for or used in the production of goods or services.  The capitalized costs of obtaining a contract with a customer must be amortized (*i.e.*, expensed) "on a systematic basis that is consistent with the transfer to the customer of the goods or services to which the asset relates." ASC 340-40-35-1

72.    Shift4's periodic filings during the Class Period disclosed only that its Capitalized Acquisition Costs, which the Company presented separately from its Other Intangible Assets,

consisted of "upfront processing bonuses" that were amortized over a period of three years. The Company classified cash payments associated with the capitalized customer acquisition costs *as an investing activity on the statement of cash flows*, rather than cash flows used in operations, which enabled Shift4 to inflate its cash flows from operating activities on the statement of cash flows.

73.     This misclassification started as early as 2018 in the run-up to the IPO. This misled investors in the IPO and thereafter to believe that the Company generated far more cash from its operating activities than it actually did.

### III.     THE SEC QUESTIONS THE COMPANY'S CLASSIFICATION OF CUSTOMER ACQUISITION COSTS ON ITS STATEMENT OF CASH FLOWS AND CFO HERRING RESIGNS DAYS BEFORE THE COMPANY SUBMITS ITS RESPONSE TO THE SEC'S SECOND LETTER

74.     Starting on May 11, 2022, the SEC questioned Shift4's classification of customer acquisition costs (and residual commission buyouts) on its statement of cash flows.[10]  The SEC's questions *did not* relate to any new guidance at the time.

75.     In a June 3, 2022 letter to the SEC signed by CFO Herring,[11] the Company provided an expanded explanation of what it included in the capitalized acquisition costs and explained its position for classifying cash outflows for capitalized acquisition costs as an investing activity:

> Capitalized acquisition costs: The Company pays a one-time upfront payment to third-party distribution partners for each new merchant relationship they acquire for Shift4, representing the initial investment to secure the end-to-end processing relationship between Shift4 and the merchant. These customer relationship assets will produce revenue for Shift4 over a multi-year period. The total upfront payment is recorded on the balance sheet as a separate line item, "capitalized acquisition cost, net" and subsequently amortized on a straight-line basis over the estimated life of the merchant relationship within cost of sales on our statement of income.

---

[10] *See* SEC's May 11, 2022 letter to Shift4,
https://www.sec.gov/Archives/edgar/data/1794669/000000000022005162/filename1.pdf.
[11] *See* ECF No. 39-12 (Shift4's June 3, 2022 letter to the SEC signed by CFO Herring)

* * *

Shift4 believes the capitalized acquisition costs represent customer relationship intangible assets which represent long-term productive assets that generate revenues over the expected life of the merchant relationships. Accordingly, Shift4 capitalizes those amounts, consistent with other intangible assets and property, plant and equipment, and therefore classifies related cash flows as investing activities.

* * *

Shift4 respectfully advises the Staff that it believes its capitalized acquisition costs and residual commission buyouts are properly classified as investing activities on the statements of cash flows.

76.     The Company received follow-up questions from the SEC in a June 21, 2022 letter regarding Shift4's treatment of customer acquisition costs (and residual commission buyouts). Again, the SEC's questions *did not* relate to any new guidance.[12]

77.     On or about the same time that the Company was formulating a response to the SEC's June 21, 2022 correspondence, Isaacman was under a threat of a margin call that could have resulted in Isaacman being forced to sell 10 million shares of Shift4 Class A common stock, as discussed herein.  The threat of a margin call provides critical context for the Company's actions in continuing to misclassify cash flows associated with customer acquisition costs and defending its baseless position with the SEC. Indeed, given that the March 2021 Margin Loan was taken out shortly before the Company's April 2021 stock price peak of $101.43, Isaacman faced the threat of margin calls as the Company's stock dropped to *as low as $29.39 in the summer of 2022*.  At the stock's lowest point in July 2022, the pledged shares – once worth almost $806 million on March 24, 2021 – would have been worth about $294 million.

---

[12] *See* SEC's June 21, 2022 letter to Shift4, https://www.sec.gov/Archives/edgar/data/1794669/000000000022006668/filename1.pdf; *see* ECF No. 39-13 (Shift4's letter to the SEC, dated August 8, 2022).

78.     Shortly before submitting its response to the SEC's second letter, CFO Herring abruptly resigned from the Company.  According to the Company's August 3, 2022 Form 8-K, on August 3, 2022, CFO Herring and the Company agreed that Herring would no longer serve as the Company's CFO, *effective August 5, 2022*.

79.     The disclosure was silent as to the reason why CFO Herring left the Company but given the timing, Herring's sudden and immediate departure, and that Herring signed the Company's June 3, 2022 letter in response to the SEC's first letter, Plaintiff contends that the CFO's departure was due to his disapproval of the Company's proposed response to the SEC's additional questions regarding the Company's treatment of customer acquisition costs.

80.     On August 8, 2022, three days after Herring's departure, Shift4 finally submitted its response to the SEC's June 21, 2022 letter in further defense of the Company's treatment of customer acquisition costs.  ECF No. 39-13. However, shortly after submitting its response to the SEC, the Company *completely abandoned its arguments* set forth in its letter and restated its previously issued financial statements.

81.     On October 21, 2022, the Company announced in a Form 8-K that its Q3 2021, full year 2021, Q1 2022 and Q2 2022 financial statements should no longer be relied upon because the Company identified an error in these financial statements "related to the classification of customer acquisition costs within the Company's statement of cash flows. Specifically, the Company determined that 'customer acquisition costs' should be treated as cash used in operating activities rather than cash used in investing activities, and that the misclassification of cash flow related to customer acquisition costs should be restated through the amendments of the Prior Financial Statements."

82.     It also disclosed that in connection with the restatement, it had concluded that "there

is a material weakness in the design of a control activity with respect to the classification of customer acquisition costs within the statement of cash flows and has determined that the Company's disclosure controls and procedures and internal control over financial reporting was not effective."

83.     On this news, Shift4's stock price fell $1.21 per share or 2.67% to close at $44.16 per share on October 24, 2022.

84.     On November 8, 2022, Shift4 filed a Form 10-Q for the third quarter of 2022, which included a restated statement of cash flows for the nine months ended September 30, 2021 (originally reported in the Form 10-Q for Q3 2021). On the same day, the Company also filed amended forms 10-Q for Q1 and Q2 2022 and amended Form 10-K for 2021. The aforementioned filings contained amendments to the statements of cash flows for full year 2019, 2020, and 2021 as well for Q1 – Q3 2021 and Q1 – Q2 2022:

| | Year Ended December 31, 2019 | | |
| | As Originally Reported | Restatement | As Restated |
|---|---|---|---|
| Net Income (loss) | $      (56.6) | $        - | $      (56.6) |
| Net cash (used in) provided by operating activities | 26.7 | (18.7) | 8.0 |
| Net cash (used in) provided by investing activities | (98.8) | 18.7 | (80.1) |
| Net cash (used in) provided by financing activities | 71.0 | - | 71.0 |
| Change in cash and cash equivalents | $        (1.1) | $        - | $        (1.1) |

| | Year Ended December 31, 2020 | | |
| | As Originally Reported | Restatement | As Restated |
|---|---|---|---|
| Net Income (loss) | $     (111.4) | $        - | $     (111.4) |
| Net cash (used in) provided by operating activities | 23.4 | (19.4) | 4.0 |
| Net cash (used in) provided by investing activities | (102.1) | 19.4 | (82.7) |
| Net cash (used in) provided by financing activities | 1,002.8 | - | 1,002.8 |
| Change in cash and cash equivalents | $       924.1 | $        - | $       924.1 |

| | Three Months Ended March 31, 2021 | | |
| --- | --- | --- | --- |
| | As Originally Reported | Restatement | As Restated |
| Net Income (loss) | $      (51.0) | $        - | $      (51.0) |
| Net cash (used in) provided by operating activities | (1.7) | (5.4) | (7.1) |
| Net cash (used in) provided by investing activities | (77.5) | 5.4 | (72.1) |
| Net cash (used in) provided by financing activities | (3.7) | - | (3.7) |
| Change in cash and cash equivalents | $      (82.9) | $        - | $      (82.9) |

| | Six Months Ended June 30, 2021 | | |
| --- | --- | --- | --- |
| | As Originally Reported | Restatement | As Restated |
| Net Income (loss) | $      (46.5) | $        - | $      (46.5) |
| Net cash (used in) provided by operating activities | 5.0 | (12.7) | (7.7) |
| Net cash (used in) provided by investing activities | (115.5) | 12.7 | (102.8) |
| Net cash (used in) provided by financing activities | (117.6) | - | (117.6) |
| Change in cash and cash equivalents | $     (228.1) | $        - | $     (228.1) |

| | Nine Months Ended September 31, 2021 | | |
| --- | --- | --- | --- |
| | As Originally Reported | Restatement | As Restated |
| Net Income (loss) | $      (60.3) | $        - | $      (60.3) |
| Net cash (used in) provided by operating activities | 25.6 | (19.3) | 6.3 |
| Net cash (used in) provided by investing activities | (162.0) | 19.3 | (142.7) |
| Net cash (used in) provided by financing activities | 496.7 | - | 496.7 |
| Change in cash and cash equivalents | $      360.3 | $        - | $      360.3 |

| | Year Ended December 31, 2021 | | |
| --- | --- | --- | --- |
| | As Originally Reported | Restatement | As Restated |
| Net Income (loss) | $      (74.0) | | $      (74.0) |
| Net cash (used in) provided by operating activities | 29.2 | (26.2) | 3.0 |
| Net cash (used in) provided by investing activities | (196.7) | 26.2 | (170.5) |
| Net cash (used in) provided by financing activities | 471.2 | | 471.2 |
| Change in cash and cash equivalents | $      303.7 | $        - | $      303.7 |

|  | Three Months Ended March 31, 2022 | | | | |
|---|---|---|---|---|---|
|  | As Originally Reported | | Restatement | | As Restated |
| Net Income (loss) | $ | (13.2) | $ - | $ | (13.2) |
| Net cash (used in) provided by operating activities |  | 37.1 | (6.3) |  | 30.8 |
| Net cash (used in) provided by investing activities |  | (43.9) | 6.3 |  | (37.6) |
| Net cash (used in) provided by financing activities |  | (35.7) | - |  | (35.7) |
| Change in cash and cash equivalents | $ | (42.5) | $ - | $ | (42.5) |

|  | Six Months Ended June 30, 2022 | | | | |
|---|---|---|---|---|---|
|  | As Originally Reported | | Restatement | | As Restated |
| Net Income (loss) | $ | 1.8 | $ - | $ | 1.8 |
| Net cash (used in) provided by operating activities |  | 85.0 | (14.2) |  | 70.8 |
| Net cash (used in) provided by investing activities |  | (87.1) | 14.2 |  | (72.9) |
| Net cash (used in) provided by financing activities |  | (211.0) | - |  | (211.0) |
| Change in cash and cash equivalents | $ | (213.3) | $ - | $ | (213.3) |

85.    As shown above, the misclassification of the cash outflows associated with capitalized customer acquisition costs *enabled the Company to inflate its cash flows provided by operating activities*, which is a key financial metric investors use in assessing a company's performance.  The chart below includes the percentages by which cash flows from operations was overstated:

### Year Ended December 31, 2019

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (56.6) | $ - | $ (56.6) | |
| Net cash (used in) provided by operating activities | 26.7 | (18.7) | 8.0 | 234% |
| Net cash (used in) provided by investing activities | (98.8) | 18.7 | (80.1) | |
| Net cash (used in) provided by financing activities | 71.0 | - | 71.0 | |
| Change in cash and cash equivalents | $ (1.1) | $ - | $ (1.1) | |

### Year Ended December 31, 2020

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (111.4) | $ - | $ (111.4) | |
| Net cash (used in) provided by operating activities | 23.4 | (19.4) | 4.0 | 485% |
| Net cash (used in) provided by investing activities | (102.1) | 19.4 | (82.7) | |
| Net cash (used in) provided by financing activities | 1,002.8 | - | 1,002.8 | |
| Change in cash and cash equivalents | $ 924.1 | $ - | $ 924.1 | |

### Three Months Ended March 31, 2021

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (51.0) | $ - | $ (51.0) | |
| Net cash (used in) provided by operating activities | (1.7) | (5.4) | (7.1) | 76% |
| Net cash (used in) provided by investing activities | (77.5) | 5.4 | (72.1) | |
| Net cash (used in) provided by financing activities | (3.7) | - | (3.7) | |
| Change in cash and cash equivalents | $ (82.9) | $ - | $ (82.9) | |

### Six Months Ended June 30, 2021

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (46.5) | $ - | $ (46.5) | |
| Net cash (used in) provided by operating activities | 5.0 | (12.7) | (7.7) | ** |
| Net cash (used in) provided by investing activities | (115.5) | 12.7 | (102.8) | |
| Net cash (used in) provided by financing activities | (117.6) | - | (117.6) | |
| Change in cash and cash equivalents | $ (228.1) | $ - | $ (228.1) | |

** - changed from cash "provided by" operating activities to cash "used by" operating activities.

### Nine Months Ended September 31, 2021

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (60.3) | $ - | $ (60.3) | |
| Net cash (used in) provided by operating activities | 25.6 | (19.3) | 6.3 | 306% |
| Net cash (used in) provided by investing activities | (162.0) | 19.3 | (142.7) | |
| Net cash (used in) provided by financing activities | 496.7 | - | 496.7 | |
| Change in cash and cash equivalents | $ 360.3 | $ - | $ 360.3 | |

### Year Ended December 31, 2021

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (74.0) | $ - | $ (74.0) | |
| Net cash (used in) provided by operating activities | 29.2 | (26.2) | 3.0 | 873% |
| Net cash (used in) provided by investing activities | (196.7) | 26.2 | (170.5) | |
| Net cash (used in) provided by financing activities | 471.2 | - | 471.2 | |
| Change in cash and cash equivalents | $ 303.7 | $ - | $ 303.7 | |

### Three Months Ended March 31, 2022

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ (13.2) | $ - | $ (13.2) | |
| Net cash (used in) provided by operating activities | 37.1 | (6.3) | 30.8 | 20% |
| Net cash (used in) provided by investing activities | (43.9) | 6.3 | (37.6) | |
| Net cash (used in) provided by financing activities | (35.7) | - | (35.7) | |
| Change in cash and cash equivalents | $ (42.5) | $ - | $ (42.5) | |

### Six Months Ended June 30, 2022

|  | As Originally Reported | Restatement | As Restated | Overstated |
|---|---|---|---|---|
| Net Income (loss) | $ 1.8 | $ - | $ 1.8 | |
| Net cash (used in) provided by operating activities | 85.0 | (14.2) | 70.8 | 20% |
| Net cash (used in) provided by investing activities | (87.1) | 14.2 | (72.9) | |
| Net cash (used in) provided by financing activities | (211.0) | - | (211.0) | |
| Change in cash and cash equivalents | $ (213.3) | $ - | $ (213.3) | |

86.     ASC Topic 250, *Accounting Changes and Error Corrections*, addresses accounting and disclosures required when a company discovers errors in its previously filed financial statements.   ASC 250 distinguishes errors from accounting changes (such as a change in an accounting principle, an accounting estimate, or the reporting entity), and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." ASC 250-10-20.

87.     ASC 250 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements including the following:

(a) The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

(b) An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

(c) Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

ASC 250-10-45-23

88.     ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error[,]" including "the effect of the correction on each financial statement line item… for each prior period presented" and "the cumulative effect of the change on retained earnings …as of the beginning of the earliest period presented." ASC 250-10-50-7.

89.     In addition, Item 4.02 of Form 8-K requires specific disclosures when "the registrant's board of directors … concludes that any previously issued financial statements … should no longer be relied upon because of an error in such financial statements."[13]  The Company made these disclosures in its October 21, 2022 Form 8-K, but only with respect to the Q3 2021, full year 2021, Q1 2022 and Q2 2022 financial statements.

90.     Such disclosure of "non reliance on previously issued financial statements" is associated with what is colloquially called by the accounting profession a "Big R restatement."  A Big R restatement occurs when the error is *material* to the prior period financial statements.  When the error is material, the entity is required to alert the users of these financial statements that they, and the related auditor's report, can no longer be relied upon.

91.     The restatement impacted the statements of cash flows and the "liquidity and capital resources" section of the MD&A[14] for the related periods, among other things.  Investors were misled to believe the Company generated far more cash from operating activities than it actually did.  This is important given the Company's disclosure in its originally filed 2021 Form 10-K (at 70) and Q1 2022 Form 10-Q (at 37) that: "We have historically sourced our liquidity requirements *primarily with flows from operations* and, when needed, with borrowings under our Credit Facilities or equity transactions."  (Emphasis added.)

92.     The restatement by the Company is an acknowledgement that its previous financial statements were *materially* misstated.  Although the Company retracted only its Q3 2021, full year 2021, Q1 2022 and Q2 2022 financial statements, the actual restatements of prior periods included statements of cash flows for full year 2019 and 2020 as well as Q1 – Q2 2021.  The restatements

---

[13] https://www.sec.gov/files/form8-k.pdf.
[14] "MD&A" refers to Management's Discussion & Analysis.

in the financial statements which were not restated by the Company were clearly material as cash flows from operations were overstated by 234% for full year 2019 and 485% for full year 2020. The cash flows expended in operations were understated by 76% for Q1 2021. For the six months ended June 20, 2021, the Company disclosed that it generated $5 million from operations when, in fact, it used $7.7 million in operating activities.

93.    Had the Company disclosed the truth at the time, investors would have understood that the Company was less viable than it purported to be.

### **Materially False and Misleading Statements Issued During the Class Period**

94.    The Class Period begins on June 5, 2020, when Shift4's Class A common stock began publicly trading on the NYSE pursuant to the Registration Statement. The Registration Statement contained purported historical financial results of the Company, recording, *inter alia*, $18.7 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $26.7 million in net cash provided by operating activities, for the year ended December 31, 2019.

95.    On August 12, 2020, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2020 (the "Q2 2020 10-Q"). The Q2 2020 10-Q contained purported historical financial results of the Company, recording, *inter alia*, $9.8 million of customer acquisition costs in the investing activities section of its Condensed Statements of Cash Flows, as well as $6.7 million in net cash provided by operating activities, for the six months ended June 30, 2020. The Q2 2020 10-Q's MD&A section similarly states $6.7 million in net cash provided by operating activities, for the six months ended June 30, 2020.

96.    In addition, the Q2 2020 10-Q represented, in relevant part, "that, as of June 30,

2020, our disclosure controls and procedures were effective at the reasonable assurance level."

97.    Appended as exhibits to the Q2 2020 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX certification"), wherein Defendant Isaacman and Herring certified that they reviewed the Q2 2020 10-Q report, and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading…" and that "[t]he financial statements, and other financial information included in [the] report[], fairly present in all material respects the financial condition, results of operations and cash flows of [Shift4.]"

98.    On November 6, 2020, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2020 (the "Q3 2020 10-Q"). The Q3 2020 10-Q contained purported historical financial results of the Company, recording, *inter alia*, $14.4 million of customer acquisition costs in the investing activities section of its Condensed Statements of Cash Flows, as well as $17.0 million in net cash provided by operating activities, for the nine months ended September 30, 2020.  The Q3 2020 10-Q's MD&A section similarly states $17.0 million in net cash provided by operating activities, for the nine months ended September 30, 2020.

99.    In addition, the Q3 2020 10-Q represented, in relevant part, "that, as of September 30, 2020, our disclosure controls and procedures were effective at the reasonable assurance level."

100.    Appended as exhibits to the Q3 2020 10-Q were substantively the same SOX certifications as referenced in ¶ 97, *supra*, signed by Defendant Isaacman and Herring.

101.    On March 8, 2021, Shift4 filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K reiterated certain of the Company's purported

historical financial results as originally reported in the Registration Statement, again recording $18.7 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $26.7 million in net cash provided by operating activities, for the year ended December 31, 2019. The 2020 10-K's MD&A section similarly states $26.7 million in net cash provided by operating activities, for the year ended December 31, 2019.

102.    The 2020 10-K also recorded $19.4 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $23.4 million in net cash provided by operating activities, for the year ended December 31, 2020. The 2020 10-K's MD&A section similarly states $23.4 million in net cash provided by operating activities, for the year ended December 31, 2020.

103.    In addition, the 2020 10-K represented "that, as of December 31, 2020, our disclosure controls and procedures were effective at the reasonable assurance level."

104.    Appended as exhibits to the 2020 10-K were substantively the same SOX certifications as referenced in ¶ 97, *supra*, signed by Defendant Isaacman and Herring.

105.    On May 7, 2021, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2021 (the "Q1 2021 10-Q"). The Q1 2021 10-Q recorded $5.4 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $1.7 million in net cash used in operating activities, for the three months ended March 31, 2021. The Q1 2021 10-Q's MD&A section similarly states $1.7 million in net cash used in operating activities, for the three months ended March 31, 2021.

106.    In addition, the Q1 2021 10-Q represented "that, as of March 31, 2021, our disclosure controls and procedures were effective at the reasonable assurance level."

107.    Appended as exhibits to the Q1 2021 10-Q were substantively the same SOX certifications as referenced in ¶ 97, *supra*, signed by Defendant Isaacman and Herring.

108.    On August 6, 2021, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2021 (the "Q2 2021 10-Q").  The Q2 2021 10-Q recorded $12.7 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $5 million in net cash provided by operating activities, for the six months ended June 30, 2021.  The Q2 2021 10-Q's MD&A section similarly states $5 million in net cash provided by operating activities, for the six months ended June 30, 2021.

109.    In addition, the Q2 2021 10-Q represented "that, as of June 30, 2021, our disclosure controls and procedures were effective at the reasonable assurance level."

110.    Appended as exhibits to the Q2 2021 10-Q were substantively the same SOX certifications as referenced in ¶ 97, *supra*, signed by Defendant Isaacman and Herring.

111.    On November 10, 2021, Shift4 issued a shareholder letter announcing the Company's Q3 2021 financial results.  In the shareholder letter, the Company recorded $19.3 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $25.6 million in net cash provided by operating activities, for the nine months ended September 30, 2021.

112.    On November 12, 2021, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2021 (the "Q3 2021 10-Q").  The Q3 2021 10-Q recorded $19.3 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well $25.6 million in net cash provided by operating activities, for the nine

months ended September 30, 2021.  The Q3 2021 10-Q's MD&A section similarly states $25.6 million in net cash provided by operating activities, for the nine months ended September 30, 2021.

113.    In addition, the Q3 2021 10-Q represented "that, as of September 30, 2021, our disclosure controls and procedures were effective at the reasonable assurance level."

114.    Appended as exhibits to the Q3 2021 10-Q were substantively the same SOX certifications as referenced in ¶ 97, *supra*, signed by Defendant Isaacman and Herring.

115.    On March 1, 2022, Shift4 issued a shareholder letter announcing the Company's fourth quarter ("Q4") and full year 2021 financial results.  In the shareholder letter, the Company recorded $26.2 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $29.2 million in net cash provided by operating activities, for the year ended December 31, 2021.

116.    Also on March 1, 2022, Shift4 filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K").  The 2021 10-K recorded $26.2 million of customer acquisition costs in the investing activities section of its Consolidated Statements of Cash Flows, as well as $29.2 million in net cash provided by operating activities, for the year ended December 31, 2021.  The 2021 10-K's MD&A section similarly states $29.2 million in net cash provided by operating activities, for the year ended December 31, 2021.

117.    In addition, the 2021 10-K represented "that, as of December 31, 2021, our disclosure controls and procedures were effective at the reasonable assurance level" and "that as of December 31, 2021, the Company's internal control over financial reporting was effective."

118.    Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 97, *supra*, signed by Defendant Isaacman and Herring.

119.    On May 5, 2022, Shift4 issued a shareholder letter announcing the Company's Q1 2022 financial results.  In the shareholder letter, the Company recorded $6.3 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $37.1 million in net cash provided by operating activities, for the three months ended March 31, 2022.

120.    On May 6, 2022, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2022 (the "Q1 2022 10-Q").  The Q1 2022 10-Q recorded $6.3 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $37.1 million in net cash provided by operating activities, for the three months ended March 31, 2022.  The Q1 2022 10-Q's MD&A section similarly states $37.1 million in net cash provided by operating activities, for the three months ended March 31, 2022.

121.    In addition, the Q1 2022 10-Q represented "that, as of March 31, 2022, our disclosure controls and procedures were effective at the reasonable assurance level."

122.    Appended as exhibits to the Q1 2022 10-Q were substantively the same SOX certifications as referenced in ¶ 97, *supra*, signed by Defendant Isaacman and Herring.

123.    On August 4, 2022, Shift4 issued a shareholder letter announcing the Company's Q2 2022 financial results.  In the shareholder letter, the Company recorded $14.2 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $85 million in net cash provided by operating activities, for the six months ended June 30, 2022.

124.    On August 5, 2022, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2022 (the

"Q2 2022 10-Q").  The Q2 2022 10-Q recorded $14.2 million of customer acquisition costs in the investing activities section of its unaudited Condensed Consolidated Statements of Cash Flows, as well as $85 million in net cash provided by operating activities, for the six months ended June 30, 2022.  The Q2 2022 10-Q's MD&A section similarly states $85 million in net cash provided by operating activities, for the six months ended June 30, 2022.

125.   In addition, the Q2 2022 10-Q represented "that, as of June 30, 2022, our disclosure controls and procedures were effective at the reasonable assurance level."

126.   Appended as exhibits to the Q2 2022 10-Q were substantively the same SOX certifications as referenced in ¶ 97, *supra*, signed by Defendant Isaacman and Herring.

127.   The statements referenced in ¶¶ 94-125 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Shift4 had inadequate disclosure controls and procedures and internal control over financial reporting; (ii) as a result, Shift4 failed to properly account for customer acquisition costs, thereby artificially inflating its net cash provided by operating activities; (iii) accordingly, Shift4 would likely be forced to restate one or more of its previously issued financial statements; and (iv) all the foregoing, once revealed, was likely to negatively impact Shift4's reputation and business.

**The Truth Begins to Emerge**

128.   On October 21, 2022, after markets closed, Shift4 filed a current report on Form 8-K with the SEC, disclosing that the Company's Q3 2021, full year 2021, Q1 2022, and Q2 2022 financial statements should no longer be relied upon and would need to be restated because of a material weakness in the Company's financial controls, which had caused it to incorrectly treat

customer acquisition costs as cash used in investing activities rather than cash used in operating activities in its Consolidated Statements of Cash Flows. Specifically, the Form 8-K stated, in relevant part:

> On October 17, 2022, the Audit Committee ("Audit Committee") of the Board of Directors of Shift4 Payments, Inc. (the "Company"), after discussion with management, concluded that the Company's (i) previously filed Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and (ii) previously filed Quarterly Reports on Form 10-Qs for each of the quarterly periods ended September 30, 2021, March 31, 2022 and June 30, 2022 (collectively the "Prior Financial Statements"), and any reports, related earnings releases, investor presentations or similar communications of the Company's Prior Financial Statements should no longer be relied upon.

> The determination resulted from an error in the Prior Financial Statements identified by the Company related to the classification of customer acquisition costs within the Company's statement of cash flows. Specifically, the Company determined that "customer acquisition costs" should be treated as cash used in operating activities rather than cash used in investing activities, and that the misclassification of cash flow related to customer acquisition costs should be restated through the amendments of the Prior Financial Statements.

* * *

> The Company intends to restate the Prior Financial Statements on or about November 9, 2022, at the time of the intended filing of its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2022. In connection with such restatement, the Company has concluded that there is a material weakness in the design of a control activity with respect to the classification of customer acquisition costs within the statement of cash flows and has determined that the Company's disclosure controls and procedures and internal control over financial reporting was not effective.

129.    On this news, Shift4's stock price fell $1.21 per share, or 2.67%, to close at $44.16 per share on October 24, 2022.

130.    On November 8, 2022, Shift4 filed an amendment to its 2021 10-K on Form 10-K/A (the "2021 10-K/A"), an amendment to its Q1 2022 10-Q on Form 10-Q/A (the "Q1 2022 10-Q/A"), and an amendment to its Q2 2022 10-Q on Form 10-Q/A (the "Q2 2022 10-Q/A") with the SEC, to properly account for customer acquisition costs in the Company's historical financial

statements.  The 2021 10-K/A negatively revised Shift4's net cash provided by operating activities to $8 million (down from its originally reported $26.7 million), $4 million (down from its originally reported $23.4 million), and $3 million (down from its originally reported $29.2 million) for the years ended December 31, 2019, 2020, and 2021, respectively.  The Q1 2022 10-Q/A negatively revised Shift4's net cash used in operating activities to $7.1 million (down from its originally reported $1.7 million) and net cash provided by operating activities to $30.8 million (down from its originally reported $37.1 million) for the three months ended March 31, 2021 and 2022, respectively.  The Q2 2022 10-Q/A negatively revised Shift4's originally reported $5 million of net cash ***provided by*** operating activities to $7.7 million of net cash ***used in*** operating activities for the six months ended June 30, 2021, as well as negatively revised net cash provided by operating activities to $70.8 million (down from its originally reported $85 million) for the six months ended June 30, 2022.

131.    Also on November 8, 2022, Shift4 filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2022 (the "Q3 2022 10-Q").  The Q3 2022 10-Q also contained revisions to Shift4's historical financial statements to properly account for customer acquisition costs, negatively revising the Company's net cash provided by operating activities to $6.3 million (down from its originally reported $25.6 million) for the nine months ended September 30, 2021.

132.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

133.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Shift4 securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

134. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Shift4 securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Shift4 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

135. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

136. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

137. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether Defendants caused Shift4 to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Shift4 securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

138.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

139.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Shift4 securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Shift4 securities between the time the Defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

140.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

141.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

142.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

143.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

144.    During the Class Period, Defendants knowingly or recklessly made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Such false and misleading statements were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Shift4 securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Shift4 securities at artificially inflated prices.

145.    The Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for Shift4 securities. Such reports, filings, statements and documents were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Shift4's finances and operations.

146.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said statements and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

147.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As CEO of Shift4, Defendant Isaacman had knowledge of the details of Shift4's internal affairs.

148.    Defendant Isaacman is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, Defendant Isaacman was able to and did, directly or indirectly, control the content of the statements of Shift4. As CEO of a publicly held company, Defendant Isaacman had a duty to disseminate timely, accurate, and truthful information with respect to Shift4's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, filings and public statements, the market price of Shift4 securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Shift4's financial

condition and operations which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Shift4 securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

149.    During the Class Period, Shift4 securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Shift4 securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Shift4 securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Shift4 securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

150.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

151.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against Defendant Isaacman)**

152.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.    During the Class Period, Defendant Isaacman participated in the operation and management of Shift4, and conducted and participated, directly and indirectly, in the conduct of Shift4's business affairs.  Because of his position at the Company, he knew the adverse non-public information about Shift4's materially false and misleading statements.

154.    As CEO of a publicly owned company, Defendant Isaacman had a duty to disseminate accurate and truthful information with respect to Shift4's financial condition and results of operations, and to correct promptly any public statements issued by Shift4 which had become materially false or misleading.

155.    Because of his position of control and authority, Defendant Isaacman was able to, and did, control the contents of the various reports, public filings, and statements which Shift4 disseminated in the marketplace during the Class Period concerning Shift4's results of operations. Throughout the Class Period, Defendant Isaacman exercised his power and authority to cause Shift4 to engage in the wrongful acts complained of herein. Defendant Isaacman, therefore, was a "controlling person" of Shift4 within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Shift4 securities.

156.    Defendant Isaacman, therefore, acted as a controlling person of Shift4.  By reason of his position as CEO of Shift4, he had the power to direct the actions of, and exercised the same to cause, Shift4 to engage in the unlawful acts and conduct complained of herein.  Defendant

Isaacman exercised control over the general operations of Shift4 and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

157.    By reason of the above conduct, Defendant Isaacman is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Shift4.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  September 3, 2024                    Respectfully submitted,

                                            **POMERANTZ LLP**

                                            /s/ *Brenda Szydlo*
                                            Jeremy A. Lieberman (admitted *pro hac vice*)
                                            Brenda Szydlo (admitted *pro hac vice*)
                                            Emily C. Finestone (SBN 323709)
                                            Dean P. Ferrogari (admitted *pro hac vice*)
                                            600 Third Avenue, 20th Floor
                                            New York, New York 10016
                                            Telephone: (212) 661-1100
                                            Facsimile: (917) 463-1044

jalieberman@pomlaw.com
bszydlo@pomlaw.com
efinestone@pomlaw.com
dferrogari@pomlaw.com

**THE SCHALL LAW FIRM**
Rina Restaino (admitted *pro hac vice*)
Angus F. Ni (admitted *pro hac vice*)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
rina@schallfirm.com
angus@schallfirm.com

*Co-Lead Counsel for Plaintiff and the
Proposed Class*