**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT BAER, Individually and on Behalf of All Others Similarly Situated, | Case No.  5:23-cv-03206-JFL |
| Plaintiff, | Hon. Joseph F. Leeson, Jr. |
| v. | |
| SHIFT4 PAYMENTS, INC., and JARED ISAACMAN, | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
Emily C. Finestone (SBN 323709)
Dean P. Ferrogari (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bszydlo@pomlaw.com
efinestone@pomlaw.com
dferrogari@pomlaw.com

**THE SCHALL LAW FIRM**
Rina Restaino (admitted *pro hac vice*)
Angus F. Ni (admitted *pro hac vice*)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (310) 301-3335
rina@schallfirm.com
angus@moni.law

*Co-Lead Counsel for Plaintiff and the Proposed Class*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

      A.    The Company's Initial Public Offering .................................................................3

      B.    Isaacman Has Significant Control of the Company................................................4

      C.    Isaacman Created an Environment in Which Fraud Was Ignored..........................5

      D.    In 2022, Isaacman Was Under a Threat of a Margin Call Which Provides Critical Context for the Company's Actions in Continuing to Misclassify Cash Flows Associated with Customer Acquisition Costs and Defending its Baseless Position with the SEC ...............................................................................10

      E.    The SEC Questions the Company's Classification of Customer Acquisition Costs on its Statement of Cash Flows and CFO Herring Resigns Days before the Company Submits its Response to the SEC's Second Letter ..........................11

      F.    Shift4 Announces that the Company's Financial Statements Should No Longer Be Relied upon Because of the Misclassification of Customer Acquisition Costs and Would Be Restated, and the Company's Disclosure Controls and Procedures and Internal Control over Financial Reporting Were Not Effective ..................................................................................................12

STATEMENT OF QUESTIONS INVOLVED.........................................................................14

SUMMARY OF ARGUMENT ...............................................................................................14

LEGAL STANDARD..............................................................................................................15

ARGUMENT...........................................................................................................................16

    I.    PLAINTIFF ADEQUATELY PLEADS SCIENTER .....................................................16

      A.    Isaacman's Motive of Personal Financial Gain Weighs Heavily in Favor of an Inference of Scienter for Him and the Company .............................................16

      B.    Isaacman Faced Substantial Pressure to Maintain the Price of Shift4 Stock Even after the SEC Questioned the Company's Classification of Customer Acquisition Costs..............................................................................................18

      C.    CFO Herring, Who Signed Shift4's Response to the SEC's First Letter to the Company Regarding Its Treatment of Customer Acquisition Costs, Abruptly Resigns Just Three Days before the Company Submits its Response to the SEC's Second Letter to the Company .........................................21

      D.    The Allegations of Fraud Relate to Shift4's Key Business Area..........................22

E.    The Size and Scope of the Restatement ............................................................22

F.    The Fact that the Environment Was Ripe for Fraud Bolsters Scienter ..................24

II.    PLAINTIFF STATES A CLAIM UNDER SECTION 20(a) ........................................25

CONCLUSION ...........................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bodnar v. Amco Ins. Co.*,
  2014 WL 3428877 (M.D. Pa. July 11, 2014)..........................................................................20

*Frater v. Hemispherx Biopharma, Inc.*,
  996 F. Supp. 2d 335 (E.D. Pa. 2014) ...................................................................................17

*Hacker v. Elec. Last Mile Sols. Inc.*,
  687 F. Supp. 3d 582 (D.N.J. 2023) ......................................................................................23

*In re AT&T Corp. Sec. Litig.*,
  2002 WL 31190863 (D.N.J. Jan. 30, 2002) ..........................................................................18

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)...............................................................................................11

*In re Hertz Glob. Holdings, Inc.*,
  905 F.3d 106 (3d Cir. 2018)...........................................................................................23, 24

*In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*,
  2009 WL 2855601 (D.N.J. Sept. 2, 2009) ............................................................................18

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ......................................................................23

*In re Refco Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)...................................................................................18

*In re Viropharma Inc. Sec. Litig.*,
  21 F. Supp. 3d 458 (E.D. Pa. 2014) .....................................................................................22

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................................18

*In re Worldcom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003)...................................................................................19

*Inst'l Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)..................................................................................................16

*Kamden-Ouaffo v. Hucarro*,
  2017 WL 11724428 (D.N.J. Jan. 13, 2017) ..........................................................................20

*Mill Bridge V, Inc. v. Benton*,
  2009 WL 4639641 (E.D. Pa. Dec. 3, 2009) ..........................................................................22

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*
367 F. Supp. 3d 16 (S.D.N.Y. 2019)..................................................................15

*PG Pub. Co. v. Aichele*,
902 F. Supp. 2d 724 (W.D. Pa. 2012), *aff'd*, 705 F.3d 91 (3d Cir. 2013)...............20

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013)..............................................................................16

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*,
2005 WL 1366025 (D.N.J. June 8, 2005) ..........................................................23

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018)..........................................................23

*SEC v. Goldstone*,
2016 WL 3654273 (D.N.M. June 13, 2016) ........................................................20

*Strougo v. Lannett Co.*,
2019 WL 1172992 (E.D. Pa. Mar. 13, 2019).......................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................................15

*United States v. Reyes*,
660 F.3d 454 (9th Cir. 2011) ............................................................................20

*Vanderhoef v. China Auto Logistics Inc.*,
2021 WL 3260849 (D.N.J. July 30, 2021)..........................................................21

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
2015 WL 3755218 (E.D. Pa. June 16, 2015) ...........................................15, 16, 21, 22

**Statutes**

15 U.S.C. § 78j(b) ................................................................................. *passim*

15 U.S.C. § 78t(a) ................................................................................. *passim*

15 U.S.C. § 78u-4(b)(2)(A)...............................................................................15

**Rules**

17 C.F.R. § 240.10b-5.........................................................................................1

iv

**INTRODUCTION**

Lead Plaintiff Robert Baer ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss the Second Amended Class Action Complaint (the "Complaint" or "¶_").[1] This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Shift4 securities between June 5, 2020 and October 21, 2022, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and its Chief Executive Officer ("CEO"), Jared Isaacman.

Plaintiff's claims are strong and sufficiently pled to withstand Defendants' motion. Indeed, the Court previously held that Plaintiff adequately pled all the elements of a Section 10(b) claim, except for scienter. ECF No. 43 (Opinion) at 16-17, 20, 28. The Complaint now alleges several facts which, taken as a whole, are sufficient to plead a cogent and compelling claim of scienter:

- First, Defendant Isaacman's motive of personal financial gain weighs heavily in favor of an inference of scienter. He received concrete benefits directly flowing from the alleged fraud that departs from typical compensation and are accordingly sufficient to give rise to a strong inference of motive. *See infra* at 3-5, 16-18;

- Additionally, Isaacman was under a threat of a margin call which provides critical context for the Company's actions in continuing to misclassify cash flows associated

---

[1] Unless otherwise defined or stated, all capitalized terms used herein have the meanings as provided in the Complaint (ECF No. 45). All internal citations and quotation marks are omitted and emphasis is added. "MTD" refers to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 50-1). "Defs. Ex." refers to Defendants' exhibits filed in support of their motion to dismiss (ECF Nos. 50-6 - 50-19).

with customer acquisition costs and defending its baseless position with the SEC. *See infra* at 10-11, 18-20;

- Plaintiff's scienter allegations are bolstered by the fact that CFO Herring, who signed the Company's response to the SEC's first letter regarding Shift4's treatment of customer acquisition costs, abruptly resigned *just three days* before the Company submitted its response to the SEC's second letter regarding the same. And only two months later, the Company *completely abandoned its arguments* set forth in its letters to the SEC and restated its previously issued financial statements. *See infra* at 11-14, 21;

- Additionally, the fact that the fraud allegations relate to Shift4's core business further supports the inference of scienter. *See infra* at 3, 22;

- Moreover, the size and scope of Shift4's restatement bolsters Plaintiff's scienter allegations as the Complaint describes sufficiently drastic changes in financial data. "Net cash (used in) provided by operating activities" was overstated by **234%** for the year ended December 31, 2019, **485%** for the year ended December 31, 2020, **76%** for the three months ended March 31, 2021, **306%** for the nine months ended September 31, 2021, **873%** for the year ended December 31, 2021, and **20%** for both the three months ended March 31, 2022l and the six months ended June 30, 2022. *See infra* at 12-14, 22-24;

- And finally, Isaacman knew or at the very least recklessly disregarded that he created an environment that was ripe for fraud. Isaacman's friends and family were hired by the Company for various positions, even if unqualified, and given preferential treatment. Moreover, Isaacman knowingly turned a blind eye to apparent fraud with respect to various customer accounts. *See infra* at 5-9, 24-25.

Additionally, Plaintiff states a claim under Section 20(a).  Defendants contend that because Plaintiff failed to adequately plead a predicate Section 10(b) violation, Plaintiff's claim under Section 20(a) should also be dismissed.  However, because Plaintiff has adequately pled a Section 10(b) claim, Defendants' argument fails.  *See infra* at 25.

## STATEMENT OF FACTS

Shift4 provides software and payment processing solutions in the U.S.  The Company provides, among other products and services, integrated and mobile point-of-sale ("POS") solutions; a mobile ordering, countertop POS, and self-service kiosk services; a cloud-based business intelligence tool that includes customer engagement, social media management, online reputation management, scheduling, and product pricing, as well as reporting and analytics; SkyTab POS, a POS workstation pre-loaded with software suites and integrated payment functionality; and SkyTab Mobile, a mobile payment solution.  The Company was founded by its CEO, Jared Isaacman.  ¶¶31, 39-40.

### A.    The Company's Initial Public Offering

Shift4 conducted its initial public offering ("IPO") and began operating as a publicly traded company on June 5, 2020.  Its Class A common stock began publicly trading on the NYSE that same day.  Isaacman personally worked on the IPO since 2018.  ¶¶32, 73.

IPO Class A shares were priced at $23, above its expected range of $19 to $21. The price of an IPO is based, in part, on the issuer's financial statements.  The Registration Statement for the IPO contained purported historical financial results of the Company.  But those financial statements contained a misclassification of the Company's cash outflows associated with capitalized customer acquisition costs which enabled the Company to inflate its cash flows provided by operating activities – a key financial metric investors use in assessing a company's performance.  This misled investors to believe that the Company generated far more cash from its

3

operating activities than it actually did.  ¶35.

Class A shares of Shift4 gained 46% in their first day of trading.  The first trade was issued for $33.10 on June 5, 2020, and shares closed at $33.54.  The Company raised $345 million through its IPO.  ¶36.  Concurrent with the IPO, Isaacman purchased $100 million of Class C common stock at the IPO price of $23, *less underwriting discounts and commissions amounting to $1.38 per share*, in a private placement through Rook, a corporation wholly owned by him. (Class C shares automatically convert into fully paid shares of Class A common stock on a one-to-one basis upon their transfer to any person.)  ¶37.  In connection with the IPO, the Company also entered into a new lucrative employment agreement with Isaacman on May 31, 2020.  Isaacman landed himself the prestigious role of public company CEO.  Pursuant to the new employment agreement, most of Isaacman's compensation became equity based, paid in the form of restricted unit awards which, *unlike other Shift4 executives*, were not subject to time or performance-based vesting.  They vested right away.  Because the Company's shares were inflated as a result of the misclassification, Isaacman's total compensation between 2020 and 2021 dramatically increased by almost $5.5 million.  ¶38.

### B.   Isaacman Has Significant Control of the Company

The Company is a holding company that was incorporated on November 5, 2019 for purposes of the IPO. After the IPO, the Company became the sole managing member of Shift4 Payments, LLC ("Shift4 Payments"), founded by Isaacman in 1999.  Shift4 operates and controls all of the business and affairs of Shift4 Payments, and, through Shift4 Payments and its subsidiaries, conducts its business.  ¶39.  Shift4 Payments is the accounting predecessor of Shift4 for financial reporting purposes.[2]  ¶40.   Prior to and after the IPO, Isaacman served as CEO and

---

[2] In other words, the historical financial statements for the Company are those of Shift4 Payments which is the Company's accounting predecessor for financial reporting purposes.

Chairman of Shift4 Payments' board of managers since its founding in 1999.[3]  After the IPO and as of December 31, 2020, 2021 and 2022, Defendant Isaacman controlled, in the aggregate, approximately 68.0%, 83.3% and 84.2%, respectively, of the voting power represented by all of the Company's outstanding classes of stock.  ¶41.  As a result, Defendant Isaacman continues to exercise significant influence over all matters requiring stockholder approval, including the election and removal of directors, the size of the board, and any approval of significant corporate transactions, and continues to have significant control over the Company's management and policies.  ¶42.  Because Defendant Isaacman has more than 50% of the voting power for the election of directors, the Company is considered a "controlled company" for purposes of the NYSE.  ¶43.

### C.     Isaacman Created an Environment in Which Fraud Was Ignored

Prior to and during the Class Period, Isaacman's friends and family were hired by Shift4 Payments and the Company for various positions, even if unqualified, given preferential treatment, and collectively became known as the "boys' club."  Isaacman, through his boys' club, knowingly or recklessly created an environment in which fraud was ignored.  ¶44.

Isaacman's older brother, Michael Isaacman, served (and continues to serve) as Shift4's Chief Commercial Officer.  ¶45.  Isaacman's father, Donald Isaacman, has served (and continues to serve) as a member of the Board since the Company's formation. *Id.*

Confidential Witness ("CW")-1 worked at the Company from 2004 to August 2021 and spent the last four years of her employment as Director of Risk and Recovery.[4]  ¶46.  As Director, CW-1 reported to Emily Hess ("Hess"), VP of Risk.  *Id.*  According to CW-1, from the start, Isaacman maintained an influx of personal friends into the business who were put into positions

---

[3] Prior to the IPO, Isaacman owned a 46.7% economic interest in Shift4 Payments through Rook. After the IPO, he owned a 32.1% economic interest in Shift4 Payments through Rook.  ¶40 n.6.
[4] When CW-1 started in 2004, Shift4 was a small, private company.  ¶46 n.7.

of leadership.  ¶47.  The terms "boys' club" was widely known throughout the Company and CW-1 stated that the prevailing message was clear – "if you don't like it, keep your mouth shut."  *Id.*

CW-1 stated that there was a decline in leadership as the Company expanded, resulting in a "chaotic" atmosphere.  ¶48.  CW-1 attributed the chaos to Isaacman hiring and promoting his unqualified friends into positions of authority.  *Id.*  For example, CW-1 could not believe that Isaacman's personal pilot, Doug Demko ("Demko"), was promoted to EVP of Payments and Chief Operating Officer with no experience.  *Id.*  "He was not a credit card guy … he knew nothing about credit cards."  *Id.*  According to CW-1, his only qualification was that he served as Isaacman's personal pilot for several years.  *Id.*  Additionally, Isaacman's "good friend," Brendan Lauber, served as Chief Technology Officer for much of the Class Period.  (He currently serves as Vice Chairman of the Company.)  ¶49.  Taylor Lauber, who appears to be related to Brendan Lauber, has served as the Company's President since February 4, 2022, and Chief Strategy Officer since the Company's formation.  *Id.*  CW-1 recalled that two other "good old boys" who were brothers – Joe and Anthony Daddona – were put in charge of major departments.  ¶50.  Joe Daddona was in charge of Risk, serving as VP of Operations, and Anthony Daddona was Director of Payment Supports.  (Joe Daddona currently serves as SVP, Operations.)  *Id.*  CW-1 stated that another friend of Isaacman – Tony Bacco – was hired and promoted to a job in CW-1's department.  ¶51. According to CW-1, Bacco transferred over from Technology to Risk but knew nothing about Risk.  *Id.*  CW-1 recalled that Bacco made some poor decisions and was eventually fired because he missed identifying a significant risk that resulted in a loss to the Company of over a million dollars.  *Id.*

CW-2 echoed CW-1's comments regarding the boys' club.  ¶52.  CW-2 worked at the Company from 2009 to April 2022.  *Id.*  By 2011, CW-2 was Risk Department Manager where she remained until she left the Company in April 2022.  *Id.*  CW-2 reported to Hess and CW-1.

6

*Id.* CW-2 stated that Isaacman created several positions primarily for his friends who made up a significant portion of executive management. ¶53. According to CW-2, Demko was a pilot and close personal friend of Isaacman. *Id.* CW-2 thought Demko exemplified Isaacman's bias in hiring unqualified friends into influential positions. *Id.* CW-2 explained that Isaacman was not the only person at the Company giving out positions to unqualified employees. ¶54. CW-2 stated that the Company held a yearly gathering for its high-level employees at the Sands-Wind Creek Casino in Bethlehem, Pennsylvania. *Id.* CW-2 stated that in 2019, managers were not invited to the gathering. *Id.* Gail Miller, who at the time served as Chief of Accounting, promoted every manager on her accounting team to director so that her accounting team managers could attend the gathering. *Id.* The promotions/title changes, which came with raises, were not based on each accounting manager's qualifications. *Id.* CW-2 stated that George Chadwick III, EVP of Finance and Brian Downs, SVP of Finance, were also close friends of Isaacman. ¶55. CW-2 recalled that Joe Messina, a sales representative for the Company, was another close friend of Isaacman. *Id.* CW-2 stated it was common knowledge that Messina and other friends and family were hired by Isaacman, given preferential treatment, and collectively became known as the "boys' club." *Id.*

Because Isaacman's friends and family were hired by the Company for various positions, even if unqualified, and given preferential treatment, Isaacman knew, or at the very least recklessly disregarded, that he created an environment which was ripe for fraud. ¶56. In fact, Isaacman knowingly turned a blind eye to fraud. ¶57.

For example, in 2018, CW-2 had several conversations with Isaacman about issues concerning Restaurant Manager, a POS brand acquired by Shift4 Payments in 2018. *Id.* After learning of a security breach at Restaurant Manager, CW-2 engaged Isaacman in discussions about the problem. *Id.* According to CW-2, there was clearly fraud, and CW-2 requested that a hold be placed on Restaurant Manager's accounts. *Id.* However, Isaacman declined CW-2's request

because he thought it would bring negative attention to the acquisition. *Id.* Notwithstanding Isaacman's denial of CW-2's request, CW-2 put a hold on Restaurant Manager's accounts because of the risk involved. *Id.* CW-2 thought Isaacman was looking the other way as to this fraud. *Id.*

According to CW-2, there were several concerns with other accounts, particularly night clubs. ¶58. For example, the owners of Smiles II nightclub in Roxbury, New Jersey, were indicted for money laundering in 2018. *Id.* In or about 2017 or 2018, Smiles had been a client for about six years and CW-2 was able to see that the scope of its business changed dramatically over the years and indicated that something suspicious was at play. *Id.* CW-2 stated that Smiles II went from registering approximately $300,000 a month in Visa payments to $500,000 a month, registering only pre-paid gift cards. *Id.* CW-2 emphasized that in her experience in risk analysis, the Smiles II activity was egregious. *Id.* Additionally, Smiles had several other processors outside of Shift4 Payments, which made the fraud that much larger. *Id.*

CW-2 flagged the Smiles II account for money laundering, put the account on hold, and brought it to management's attention. *Id.* CW-2 engaged Hess, her manager, who was VP of Risk. ¶59. Hess then engaged Ward, who served as Chief Payments Officer. *Id.* They all agreed on approaching Joe Messina, the sales representative who managed the Smiles account. *Id.* Messina was also Isaacman's close friend. *Id.* CW-2 stated that Messina and Isaacman were making good money off the Smiles account. *Id.* After expressing repeated concerns to Messina, CW-2 thought he was blowing it off. *Id.* Messina told Hess that she needed to remove the hold on the account but Hess refused. *Id.* CW-2 also stated that both Hess and Ward brought the concerns to the attention of Jordan Frankel, who served as General Counsel and Executive VP of Legal/Compliance, but nothing was done. ¶60.

Hess and Ward also told Isaacman. ¶61. Soon thereafter, Isaacman approached CW-2 in person and asked why CW-2 put a full hold on the Smiles account. *Id.* During their conversation,

8

Isaacman asked CW-2 how much of Smiles' money was being withheld and CW-2 estimated that it was over $300,000. *Id.* After CW-2 briefed Isaacman, he requested CW-2 to document the issue in an email. CW-2 complied and sent the email directly to Isaacman. *Id.* Thereafter, Isaacman told CW-2 to remove the hold on the account and release the funds. *Id.* Once the hold was removed, $300,000 was released to Smiles. *Id.* CW-2 estimated that this occurred about 30 days before a 2018 money laundering sting at Smiles. *Id.* It was only through FNBO, Shift4 Payments' support bank, that the company reattached the holds on the Smiles' account. ¶62. (According to CW-2, the company manages the processing and devices on the front end, but the money comes from FNBO.) FNBO saw the issue at Smiles on the backend and told the company to put the hold back on the Smiles account and close the account. *Id.* In 2018, several individuals, including Kevin Lipka who co-owned Smiles and communicated with Messina about the Smiles account (the "Smiles Defendants"), were indicted for money laundering in New Jersey under "Operation Smiles." ¶63. The Smiles Defendants were charged with conspiring in an elaborate scheme in which they used stolen credit card information—and illegally acquired gift cards—to steal more than $12 million. *Id.* The Smiles Defendants allegedly defrauded retailers, banks, credit card processing companies and credit card holders. *Id.* Most of the defendants, including co-owners Kevin Lipka and his wife Shelly Lipka, had already been arrested and charged on criminal complaints back in July 2016 following an initial 10-month investigation. *Id.* CW-2 was subpoenaed to testify during the fraud investigation. *Id.* CW-2 stated that Isaacman never said another word to her about the Smiles account. ¶64. In CW-2's experience, Smiles was a fraud risk that did not concern Isaacman. *Id.* CW-2 recalled being surprised about his lack of urgency. *Id.*

9

**D.     In 2022, Isaacman Was Under a Threat of a Margin Call Which Provides Critical Context for the Company's Actions in Continuing to Misclassify Cash Flows Associated with Customer Acquisition Costs and Defending its Baseless Position with the SEC**

Isaacman faced the threat of a margin call during the 2022 bear market, which could have resulted in him being forced to sell 10 million shares of Shift4 Class A common stock (~12% of diluted shares outstanding).[5]  ¶65.  Isaacman's margin loan provides critical context for the Company's actions in continuing to misclassify cash flows associated with customer acquisition costs and defend its position with the SEC even though it had no basis for doing so.  *Id.  Defendants would have been heavily incentivized to keep the Company's financials looking strong and the stock as high as possible even when the SEC began questioning the Company's basis for its classification of customer acquisition costs on its statement of cash flows.  Id.*

Isaacman, through Rook, first entered into a margin loan in September 2020, secured by shares of the Company's Class A and Class B common stock (the "September 2020 Margin Loan").  ¶66.  The September 2020 Margin Loan was repaid and replaced on March 24, 2021 by a new margin loan secured by 10 million Rook Units (which included, among other things, shares of Shift4's Class A and Class B Common Stock) (the "March 2021 Margin Loan").  *Id.*  If Rook were to default, and the default was not cured, the lender would have the right to exchange and sell up to 10 million Rook Units for an equal number of the Company's Class A common stock to satisfy Rook's obligation.  *Id.*  At the time, Class A stock was worth about $80 per share.  *Id.* Given that the March 2021 Margin Loan was taken out shortly before the Company's April 2021 stock price peak of $101.43, Isaacman faced the threat of margin calls as the Company's stock dropped to *as low as $29.39 in the summer of 2022*.  ¶67.  At the stock's lowest point in July 2022,

---

[5] Isaacman received, *in effect*, such a margin call in mid to late-2022, as he increased his collateral by more than 50% (from 10 million to 15 million shares) *and* reduced the size of his margin loan on December 19, 2022.  ¶65 n.9.

the pledged shares – once worth almost $806 million on March 24, 2021 – would have been worth about $294 million.  *Id.*

> **E.    The SEC Questions the Company's Classification of Customer Acquisition Costs on its Statement of Cash Flows and CFO Herring Resigns Days before the Company Submits its Response to the SEC's Second Letter**

Starting on May 11, 2022, the SEC questioned Shift4's classification of customer acquisition costs on its statement of cash flows.[6]  ¶74.  The SEC's questions *did not* relate to any new guidance at the time.[7]  *Id.*  In a June 3, 2022 letter to the SEC signed by CFO Herring,[8] the Company provided an expanded explanation of what it included in the capitalized acquisition costs and explained its position for classifying cash outflows for capitalized acquisition costs as an investing activity.  ¶75.  The Company received follow-up questions from the SEC in a June 21, 2022 letter regarding Shift4's treatment of customer acquisition costs.  ¶76.  Again, the SEC's questions *did not* relate to any new guidance.[9]  On or about the same time that the Company was formulating a response to the SEC's June 21, 2022 correspondence, Isaacman was under a threat of a margin call, as described above.  ¶77.

Shortly before submitting its response to the SEC's second letter, CFO Herring *abruptly* resigned from the Company.  ¶78.  According to the Company's August 3, 2022 Form 8-K, on August 3, 2022, CFO Herring and the Company agreed that Herring would no longer serve as the Company's CFO, *effective August 5, 2022*.  *Id.*  The disclosure was silent as to the reason why

---

[6] *See* SEC's May 11, 2022 letter to Shift4, which is incorporated by reference in the Complaint (*see* ¶¶8, 74 n.10; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997)), and available at
 https://www.sec.gov/Archives/edgar/data/1794669/000000000022005162/filename1.pdf.
[7] ECF No. 43 (Opinion) at 16.
[8] *See* Defs. Ex. 8 (Shift4's June 3, 2022 letter to the SEC signed by CFO Herring).
[9] *See* SEC's June 21, 2022 letter to Shift4, which is incorporated by reference in the Complaint (*see* ¶¶ 8-9, 13, 15, 76-77, 80), and available at
https://www.sec.gov/Archives/edgar/data/1794669/000000000022006668/filename1.pdf; *see*
Defs. Ex. 9 (Shift4's letter to the SEC, dated August 8, 2022).

CFO Herring left the Company but given the timing, Herring's sudden and immediate departure, and that Herring signed the Company's June 3, 2022 letter in response to the SEC's first letter, Plaintiff contends that the CFO's departure was due to his disapproval of the Company's proposed response to the SEC's additional questions regarding the Company's treatment of customer acquisition costs. ¶79. On August 8, 2022, three days after Herring's departure, Shift4 finally submitted its response to the SEC's June 21, 2022 letter in further defense of the Company's treatment of customer acquisition costs. Defs. Ex. 9. But only two months later, the Company *completely abandoned its arguments* set forth in its letter and restated its previously issued financial statements. ¶80.

**F.    Shift4 Announces that the Company's Financial Statements Should No Longer Be Relied upon Because of the Misclassification of Customer Acquisition Costs and Would Be Restated, and the Company's Disclosure Controls and Procedures and Internal Control over Financial Reporting Were Not Effective**

On October 21, 2022, the Company announced in a Form 8-K that its Q3 2021, full year 2021, Q1 2022 and Q2 2022 financial statements should no longer be relied upon because the Company identified an error in these financial statements "related to the classification of customer acquisition costs within the Company's statement of cash flows. Specifically, the Company determined that 'customer acquisition costs' should be treated as cash used in operating activities rather than cash used in investing activities, and that the misclassification of cash flow related to customer acquisition costs should be restated through the amendments of the Prior Financial Statements." ¶81. It also disclosed that in connection with the restatement, it had concluded that "there is a material weakness in the design of a control activity with respect to the classification of customer acquisition costs within the statement of cash flows and has determined that the Company's disclosure controls and procedures and internal control over financial reporting was not effective." ¶82. On this news, Shift4's stock price fell $1.21 per share or 2.67% to close at $44.16 per share on October 24, 2022. ¶83.

12

On November 8, 2022, Shift4 filed a Form 10-Q for the third quarter of 2022, which included a restated statement of cash flows for the nine months ended September 30, 2021 (originally reported in the Form 10-Q for Q3 2021).  ¶84.  On the same day, the Company also filed amended forms 10-Q for Q1 and Q2 2022 and amended Form 10-K for 2021.  *Id.*  The aforementioned filings contained amendments to the statements of cash flows for full year 2019, 2020, and 2021 as well for Q1 – Q3 2021 and Q1 – Q2 2022.  *Id.*  The misclassification of the cash outflows associated with capitalized customer acquisition costs ***enabled the Company to inflate its cash flows provided by operating activities***, which is a key financial metric investors use in assessing a company's performance.   ¶85.   The Complaint includes a chart showing the percentages by which cash flows from operations was overstated.  *Id.*

The restatement impacted the statements of cash flows and the "liquidity and capital resources" section of the MD&A[10] for the related periods, among other things.  ¶91.  Investors were misled to believe the Company generated far more cash from operating activities than it actually did.  *Id.*  This is important given the Company's disclosure in its originally filed 2021 Form 10-K and Q1 2022 Form 10-Q that: "We have historically sourced our liquidity requirements *primarily with flows from operations* and, when needed, with borrowings under our Credit Facilities or equity transactions."  *Id.*  The restatement by the Company is an acknowledgement that its previous financial statements were *materially* misstated.  ¶92.  Although the Company retracted only its Q3 2021, full year 2021, Q1 2022 and Q2 2022 financial statements, the actual restatements of prior periods included statements of cash flows for full year 2019 and 2020 as well as Q1 – Q2 2021.  *Id.*  The restatements in the financial statements which were not restated by the Company were clearly material as cash flows from operations were overstated by 234% for full year 2019 and 485% for full year 2020.  *Id.*  The cash flows expended in operations were

---

[10] "MD&A" refers to Management's Discussion & Analysis.

13

understated by 76% for Q1 2021.  *Id.*  For the six months ended June 20, 2021, the Company disclosed that it generated $5 million from operations when, in fact, it used $7.7 million in operating activities.  *Id.*  Had the Company disclosed the truth at the time, investors would have understood that the Company was less viable than it purported to be.  ¶93.

## STATEMENT OF QUESTIONS INVOLVED

Whether the Court should deny Defendants' motion to dismiss the Complaint for failure to adequately allege scienter.

## SUMMARY OF ARGUMENT

Plaintiff properly pleads scienter.  First, Defendant Isaacman's motive of personal financial gain weighs heavily in favor of an inference of scienter.  He received concrete benefits directly flowing from the alleged fraud that departs from typical compensation and are accordingly sufficient to give rise to a strong inference of motive.  *See infra* at 16-18.  Additionally, Isaacman was under a threat of a margin call which provides critical context for the Company's actions in continuing to misclassify cash flows associated with customer acquisition costs and defending its baseless position with the SEC.  *See infra* at 18-20.  Plaintiff's scienter allegations are also bolstered by the fact that CFO Herring, who signed the Company's response to the SEC's first letter regarding Shift4's treatment of customer acquisition costs, abruptly resigned *just three days* before the Company submitted its response to the SEC's second letter regarding the same.  And two months after submitting its second response, the Company *completely abandoned its arguments* set forth in its letters to the SEC and restated its previously issued financial statements. *See infra* at 21.  Additionally, the fact that allegations of fraud relate to a Defendants' core business further supports an inference of scienter.  *See infra* at 22.  Moreover, the size and scope of Shift4's restatement bolsters Plaintiff's scienter allegations as the Complaint describes sufficiently drastic changes in financial data.  *See infra* at 22-24.  Furthermore, Isaacman knew or at the very least

14

recklessly disregarded that he created an environment that was ripe for fraud.  Isaacman's friends and family were hired by the Company for various positions, *even if unqualified*, and given preferential treatment.  Moreover, Isaacman *knowingly turned a blind eye to apparent fraud with respect to various customer accounts*.  *See infra* at 24-25.  Taken as a whole, the allegations are sufficient to plead a cogent and compelling claim of scienter.

Additionally, Plaintiff states a claim under Section 20(a).  Defendants contend that because Plaintiff failed to adequately plead a predicate Section 10(b) violation, Plaintiff's claim under Section 20(a) should also be dismissed.  However, because Plaintiff has adequately pled a Section 10(b) claim, Defendants' argument fails.  *See infra* at 25.

## LEGAL STANDARD

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  A "strong inference" of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter . . . at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324-26 (2007).  The inference "need not be irrefutable, … or even the most plausible of competing inferences."  *Id.* at 324.  In evaluating the strength of an inference of scienter, "courts must consider the complaint in its entirety" because the "inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in insolation, meets that standard."  *Id.* at 322-23 (emphasis in original). Moreover, at the motion to dismiss stage, a tie on scienter goes to the plaintiff.  *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.* 367 F. Supp. 3d 16, 38-39 (S.D.N.Y. 2019).  "To plead scienter properly, a plaintiff must allege facts that constitute circumstantial evidence of either reckless or conscious behavior."  *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,

15

2015 WL 3755218, at *15 (E.D. Pa. June 16, 2015). In the securities context, recklessness means conduct that is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*

**ARGUMENT**

**I.    PLAINTIFF ADEQUATELY PLEADS SCIENTER**

> **A.    Isaacman's Motive of Personal Financial Gain Weighs Heavily in Favor of an Inference of Scienter for Him and the Company**

Plaintiff alleges Isaacman's personal financial gain as a motive for his participation in the fraud. Indeed, as this Court previously noted, "'motive can be persuasive when conducting a holistic review of the evidence' supporting the inference of scienter." ECF No. 43 (Opinion) at 21 (quoting *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013)). In accordance with the Third Circuit's opinion in *Avaya*, Plaintiff alleges concrete and personal benefits to Defendant Isaacman resulting from the fraud. *Inst'l Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 278-79 (3d Cir. 2009).

Isaacman personally worked on the IPO since 2018. In the run up to the Company's IPO (and throughout the Class Period), the Company misclassified its cash outflows associated with capitalized customer acquisition costs *without any legitimate basis for the classification*. The misclassification enabled the Company to inflate its cash flows provided by operating activities, which is a *key financial metric investors use in assessing a company's performance and in pricing an IPO*. This misled investors to believe that the Company generated far more cash from its operating activities than it actually did. ¶¶4-5, 35, 72-73.

Isaacman benefitted from the misclassification of cash outflows associated with capitalized customer acquisition costs. IPO Class A shares were priced at $23, above its expected range of $19 to $21. Class A shares of Shift4 gained 46% in their first day of trading. But this was because

16

the shares were artificially inflated as investors were misled to believe that the Company generated far more cash from its operating activities than it actually did.  The first trade was issued for $33.10 on June 5, 2020, and shares closed at $33.54.  The Company raised $345 million through its IPO. ¶¶5, 36.

Concurrent with the IPO, Isaacman purchased $100 million of Class C common stock at the IPO price of $23, *less underwriting discounts and commissions amounting to $1.38 per share*, in a private placement through Rook Holdings, Inc. ("Rook"), a corporation wholly owned by him. (Class C shares automatically convert into fully paid shares of Class A common stock on a one-to-one basis upon their transfer to any person.).[11]  When the market closed on June 5, 2020, Isaacman's shares were worth an astounding $155,134,105.

In connection with the IPO, the Company also entered into a new lucrative employment agreement with Isaacman on May 31, 2020.  Isaacman landed himself the prestigious role of public company CEO.  Pursuant to his new employment agreement, most of Isaacman's compensation became equity based, paid in the form of restricted unit awards which, *unlike other Shift4 executives, were not subject to time or performance-based vesting*.[12]  They vested right away. Because the Company's shares were artificially inflated as a result of the misclassification, Isaacman's total compensation between 2020 and 2021 dramatically increased by almost $5.5 million.  ¶¶7, 38.

These are concrete benefits directly flowing from the alleged fraud that departs from typical compensation and are accordingly sufficient to give rise to a strong inference of motive.  *See, e.g.*, *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (finding motive where plaintiff adequately alleged that "change of control bonus provision gave [president and

---

[11] Isaacman purchased 4,625,346 Class C shares at $21.62 per share.  ¶6 n.1.
[12] "Restricted unit awards" refers to the right to receive the Company's common stock.

chairman] personal incentives relating to a stock sale in a way *that departs from executives' typical compensation incentives*"); *In re Refco Sec. Litig.*, 503 F. Supp. 2d 611, 646 (S.D.N.Y. 2007) (finding motive from "a concrete benefit directly flowing from the alleged fraud" where plaintiffs alleged that "by fraudulently concealing the uncollectible receivables [in connection with the IPO, the officers] could drive up demand for Refco shares, which would result in purchases of shares from which defendants would be directly compensated"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (finding plaintiffs sufficiently alleged CEO and Vivendi had motive for inflating appearance of Vivendi's financial performance where CEO received large bonus for boosting Vivendi EBITDA by more than 30%); *see also In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at \*25 (D.N.J. Jan. 30, 2002) (holding motive and opportunity sufficiently alleged where defendants made false statements regarding business unit "to maintain investor interest and translate that information into a successful IPO" and the company received a concrete benefit – a $10.6 billion gain).[13]

### B.     Isaacman Faced Substantial Pressure to Maintain the Price of Shift4 Stock Even after the SEC Questioned the Company's Classification of Customer Acquisition Costs

The Company continued to misclassify its cash outflows associated with capitalized customer acquisition costs even after the SEC questioned Shift4's treatment of customer acquisition costs in correspondence dated May 11, 2022 and June 21, 2022.  On or about the same time that the Company was formulating a response to the SEC's June 21, 2022 letter, Isaacman was under a threat of a margin call from a large series of stock pledges.  The threat of a margin call provides critical context for the Company's actions in continuing to misclassify cash flows

---

[13] As Shift4's CEO at all relevant times (and CEO and Chairman of Shift4 Payments' board of managers), Isaacman also "had substantial opportunity to engage in fraudulent acts due to [his] executive-level positions." *In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*, 2009 WL 2855601, at \*5 (D.N.J. Sept. 2, 2009).

associated with customer acquisition costs and defending its baseless position with the SEC. Indeed, the threat of a margin call could have resulted in Isaacman being forced to sell 10 million shares of Shift4 Class A common stock (~12% of diluted shares outstanding).[14]  ¶¶8-9, 65.

Isaacman's September 2020 Margin Loan was secured by shares of the Company's Class A and Class B common stock.  The September 2020 Margin Loan was repaid and replaced on March 24, 2021 by a new margin loan secured by 10 million Rook Units (which included, among other things, shares of Shift4's Class A and Class B Common Stock).  If there was a default, and the default was not cured, the lender would have the right to exchange and sell up to 10 million Rook Units for an equal number of the Company's Class A common stock to satisfy the obligation. At the time, Class A stock was worth about $80 per share.  Given that the March 2021 Margin Loan was taken out shortly before the Company's April 2021 stock price peak of $101.43, Isaacman faced the threat of margin calls as the Company's stock dropped to as low as $29.39 by July 13, 2022 – less than 30 days after the Company's received the SEC's second letter.  At the stock's lowest point in July 2022, the pledged shares – once worth almost $806 million on March 24, 2021 – would have been worth about $294 million.  ¶¶66-67, 77.

For this reason, Defendants would have been heavily incentivized to keep the Company's financials looking strong and the stock as high as possible even when the SEC began questioning the Company's basis for its classification of customer acquisition costs on its statement of cash flows.  ¶¶12, 65.  These additional facts bolster Plaintiff's scienter allegations.  *See In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 416-17 (S.D.N.Y. 2003) (finding scienter adequately alleged where CEO had considerable personal loans secured by his WorldCom

---

[14] Isaacman received, *in effect*, such a margin call in mid to late-2022, as he increased his collateral by more than 50% (from 10 million to 15 million shares) *and* reduced the size of his margin loan on December 19, 2022.

holdings and faced substantial pressure to maintain the price of Worldcom stock in order to avoid or mitigate margin calls from lenders).

Defendants (again) contend that Isaacman could not have been motivated to commit securities fraud because he is a wealthy man. MTD at 11 ("Isaacman is a billionaire and it is not plausible he would commit [the alleged] fraud …."), 13 ("Isaacman's wealth undermines the plausibility of the supposed motive.").[15] While Plaintiff alleges personal financial gain as a motive for Isaacman's participation in the fraud, *there are no allegations that Isaacman is otherwise a billionaire or wealthy man.* Moreover, Defendants' argument is irrelevant and makes no sense as *"[a] rich man's greed is as much a motive to steal as a poor man's poverty." United States v. Reyes*, 660 F.3d 454, 464 (9th Cir. 2011).

Accordingly, Isaacman's wealth is irrelevant as to motive and Defendants' request for judicial notice of Defendants' Ex. 7 (Forbes Profile) should be denied. *See SEC v. Goldstone*, 2016 WL 3654273, at *12 (D.N.M. June 13, 2016) (stating that while evidence linking a defendant's financial compensation to his possible motives for participating in an alleged fraud is relevant to proving fraud, the default rule is not to admit evidence of wealth because it is usually irrelevant and prejudicial); *Bodnar v. Amco Ins. Co.*, 2014 WL 3428877, at *5 (M.D. Pa. July 11, 2014) (finding that Defendants bear the burden of establishing "that the facts requested [to be judicially noticed are] relevant to the case at hand"); *Kamden-Ouaffo v. Hucarro*, 2017 WL 11724428, at *2 (D.N.J. Jan. 13, 2017) ("Courts are not required to take judicial notice of irrelevant materials."); *PG Pub. Co. v. Aichele*, 902 F. Supp. 2d 724, 735 (W.D. Pa. 2012) (declining to take judicial notice of irrelevant information), *aff'd*, 705 F.3d 91 (3d Cir. 2013).

---

[15] Defendants' brief refers to Isaacman as a billionaire in three instances. *See* MTD at 10, 11, 13.

**C.　　CFO Herring, Who Signed Shift4's Response to the SEC's First Letter to the Company Regarding Its Treatment of Customer Acquisition Costs, Abruptly Resigns Just Three Days before the Company Submits its Response to the SEC's Second Letter to the Company**

Plaintiff's scienter allegations are bolstered by the fact that CFO Herring, who signed the Company's response to the SEC's first letter regarding Shift4's treatment of customer acquisition costs, abruptly resigned *just three days* before the Company submitted its response to the SEC's second letter regarding the same.  According to Shift4's August 3, 2022 Form 8-K, *on August 3, 2022*, CFO Herring and the Company agreed that Herring would no longer serve as the Company's CFO, *effective August 5, 2022*.  ¶78.  The disclosure was silent as to the reason why CFO Herring left the Company but given the (i) timing of his resignation, (ii) his sudden and immediate departure, and (iii) that Herring signed the Company's June 3, 2022 letter in response to the SEC's first letter, Plaintiff contends that the CFO's departure was due to his disapproval of the Company's proposed response to the SEC's *additional questions* regarding the Company's treatment of customer acquisition costs.  ¶79.  On August 8, 2022, *just three days after Herring's departure*, Shift4 finally submitted its response to the SEC's June 21, 2022 letter in further defense of the Company's treatment of customer acquisition costs.  ¶80.  *But only two months later*, the Company *completely abandoned its arguments* set forth in its letters to the SEC and restated its previously issued financial statements.  *Id.*

These additional facts bolster Plaintiff's scienter allegations.  *See DFC Glob.*, 2015 WL 3755218, at *16-17 ("[W]hen considering the totality of Plaintiffs' scienter allegations, the Court concludes that the resignation of key executives, including the President and COO responsible for implementing new regulations, bolsters the evidence of conscious or reckless behavior."); *see also Vanderhoef v. China Auto Logistics Inc.*, 2021 WL 3260849, at *5 (D.N.J. July 30, 2021) (holding executive resignations, including CEO and CFO, in tandem with other allegations, support inference of scienter).

### D.    The Allegations of Fraud Relate to Shift4's Key Business Area

The fact that allegations of fraud relate to a Defendants' core business further supports an inference of scienter.  *DFC Glob.*, 2015 WL 3755218, at \*16; *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014) ("[T]he fact that sales of [the drug] comprised [the company's] 'core business,' also supports the inference that Defendants either knew or should have been aware of the issues concerning the drug's approval."); *see also Mill Bridge V, Inc. v. Benton*, 2009 WL 4639641, at \*31 (E.D. Pa. Dec. 3, 2009) ("[W]hile a court may not infer that a defendant was aware of information merely by virtue of his or her position within a company, where the information relates to the organization's core business, such facts are powerful circumstantial evidence of scienter.").

Here, the Company's payments platform is its core business.  *See* ¶¶2, 30.  Indeed, the Company's 2020 and 2021 Form 10-Ks state that the Company derives the majority of its revenue from fees paid by merchants who use Shift4's payments platform.[16]  Additionally, Defendants admit in their brief that "[i]t is very important to Shift4's business to build and maintain relationships with merchants who use Shift4's payment processing products and services" *and to do so, it makes payments to "third parties to help acquire new customers—termed 'customer acquisition costs.'"*  MTD at 3; *see also* ECF No. 43 (Opinion) at 4.

Consequently, these facts bolster Plaintiff's scienter allegations.

### E.    The Size and Scope of the Restatement

Plaintiff also contends that the size and scope of Shift4's restatement bolsters Plaintiff's scienter allegations.  Indeed, courts in the Third Circuit have held that the magnitude of a

---

[16] 2020 Form 10-K, filed Mar. 8, 2021, at 6, which is incorporated by reference in the Complaint (*see* ¶¶101-04), and is available at https://www.sec.gov/Archives/edgar/data/1794669/000156459021011368/four-10k_20201231.htm; Defs. Ex. 5 (2021 Form 10-K, filed Mar. 1, 2022) at 8.

restatement may help support an inference of scienter.  *See, e.g.*, *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 116 (3d Cir. 2018); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *20 (D.N.J. July 27, 2018); *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 WL 1366025, at *8 (D.N.J. June 8, 2005).

The Complaint describes sufficiently drastic changes in financial data and reproduces a chart from the Company's SEC filings that identifies the numbers as originally stated, the amount it was restated by, and the restated amount.  ¶84.  The chart shows that the misclassification of the cash outflows associated with capitalized customer acquisition costs enabled the Company to inflate its cash flows provided by operating activities, which is a key financial metric investors used in assessing a company's performance.  ¶85.

The Complaint also includes a second chart which includes the percentages by which cash flows from operations was overstated.  *Id.*  "Net cash (used in) provided by operating activities" was overstated by **234%** for the year ended December 31, 2019, **485%** for the year ended December 31, 2020, **76%** for the three months ended March 31, 2021, **306%** for the nine months ended September 31, 2021, **873%** for the year ended December 31, 2021, and **20%** for both the three months ended March 31, 2022 and the six months ended June 30, 2022.  *Id.*[17]

This is sufficiently drastic to bolster scienter.  *See Hacker v. Elec. Last Mile Sols. Inc.*, 687 F. Supp. 3d 582, 600 n.38 (D.N.J. 2023) ("[T]he rough size of the GAAP errors' alleged financial impact was easily large enough to support a strong inference of scienter."); *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *15-17 (S.D.N.Y. Aug. 11, 2021) (finding size of restatement bolstered scienter allegations where "2018 revenues had to be reduced by $9 million, or 28%, and

---

[17] Copies of both charts are attached to the Declaration of Brenda Szydlo, dated October 30, 2024, as Exs. 1 and 2, respectively.

even more for the first half of 2019").[18]

Defendants contend that the restatement did not affect any key financial metric (MTD at 19), but the Complaint alleges that the statement of cash flows "provides key information about an entity's financial health and its capacity to generate cash" (¶68) and "investors pay close attention to cash flows from operating activities in assessing a company's financial performance" (¶70). Here, investors were misled to believe the Company generated more cash from operating activities than it actually did. This is important given the Company's disclosure in its originally filed 2021 Form 10-K and Q1 2022 Form 10-Q that: "We have historically sourced our liquidity requirements *primarily with flows from operations* and, when needed, with borrowings under our Credit Facilities or equity transactions." ¶91. Moreover, Defendants' argument conflicts with the Company's August 8, 2022 response to the SEC which stated that "grouping cash flows into operating, investing, and financing activities 'links cash flows that are often perceived to be related…. *Those relationships and trends in them provide information useful to investors and creditors.*'" Defs. Ex. 9 (alteration and emphasis in original).

**F.      The Fact that the Environment Was Ripe for Fraud Bolsters Scienter**

Plaintiff alleges that prior to and during the Class Period, Isaacman knew or at the very least recklessly disregarded that he created an environment that was ripe for fraud. As stated above, Isaacman's friends and family were hired by the Company for various positions, *even if unqualified*, and given preferential treatment. Moreover, Isaacman *knowingly turned a blind eye to apparent fraud with respect to various customer accounts*. *See supra* at 5-9; ¶¶57-64. Consequently, these facts bolster scienter. *See Hertz*, 905 F.3d at 117 (explaining that allegations

---

[18] *Cf. Hertz*, 905 F.3d at 116 ("[w]hen broken down by year, the Restatement shows that Hertz overstated those income categories by between 9.97% and 32.12%" which "was not sufficiently drastic to give rise to a strong inference of scienter absent particularized allegations of fraudulent intent").

of mismanagement can bolster scienter "if they are coupled with allegations that the defendants were aware, or recklessly disregarded, that their mismanagement created an environment in which fraud was occurring").

## II.    PLAINTIFF STATES A CLAIM UNDER SECTION 20(a)

Defendants contend that because Plaintiff has failed to adequately plead a predicate Section 10(b) violation, Plaintiff's claim under Section 20(a) should also be dismissed.  MTD at 21.  However, because Plaintiff has adequately pled a Section 10(b) claim, their argument fails.  *See Strougo v. Lannett Co.*, 2019 WL 1172992, at *16 (E.D. Pa. Mar. 13, 2019).

**CONCLUSION**

For all the above reasons, Defendants' motion should be denied in its entirety.

Dated: October 30, 2024                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brenda Szydlo*
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
Emily C. Finestone (SBN 323709)
Dean P. Ferrogari (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bszydlo@pomlaw.com
efinestone@pomlaw.com
dferrogari@pomlaw.com

**THE SCHALL LAW FIRM**
Rina Restaino (admitted *pro hac vice*)
Angus F. Ni (admitted *pro hac vice*)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (310) 301-3335
rina@schallfirm.com
angus@moni.law

25

*Co-Lead Counsel for Plaintiff and the
Proposed Class*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

Dated:  October 30, 2024

*/s/ Brenda Szydlo*
Brenda Szydlo