UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

ROBERT BAER and ALFRED O'MEARA,          :
Individually and on Behalf of All Others Similarly  :
Situated,                                 :
                        Plaintiff,        :        No.   5:23-cv-3206
                                          :
            v.                            :
                                          :
SHIFT4 PAYMENTS, INC., and JARED          :
ISAACMAN,                                 :
                        Defendants.       :

_____

**O P I N I O N**
**Defendants' Motion to Dismiss, ECF No. 50 – Granted**

**Joseph F. Leeson, Jr.**                              **January 22, 2025**
**United States District Judge**

## I.    INTRODUCTION

Plaintiff alleges that Shift4 implemented and then defended a questionable accounting

practice to inflate its share price for the benefit of its CEO.  However, after the SEC pressed

Shift4 on this practice, Shift4 retreated and issued a restatement which caused the share price to

fall.  Plaintiff now brings this suit alleging securities fraud.

## II.    BACKGROUND

### A.    Factual Background

The following facts are taken from the Second Amended Complaint ("SAC").  *See* Am.

Compl., ECF No. 45.

#### 1.    Isaacman, Shift4, and the Initial Public Offering

Shift4 is a publicly traded technology company which provides, among other things,

"integrated and mobile point-of-sale ("POS") solutions."  *Id.* ¶ 2.  The company was founded in

1999 by its current Chief Executive Officer Jared Isaacman. *Id*. ¶¶ 39-40. As Shift4's founder and CEO, Isaacman has "exercise[d] significant influence over all matters requiring stockholder approval, including the election and removal of directors, the size of the board, and any approval of significant corporate transactions, and continues to have significant control over the Company's management and policies." *Id*. ¶ 42.

In the SAC, Plaintiff again paints an unflattering portrait of Shift4's innerworkings and how Isaacman uses this control. Plaintiff alleges that Shift4 is a "boys' club" where nepotism is rampant. *Id*. ¶¶ 44-56. Isaacman's older brother Michael serves as Shift4's CCO, his father serves on the Board of Directors, his personal pilot was promoted to Executive Vice President of Payments and COO, and his unqualified friends are placed in key leadership roles. *Id*. ¶¶ 45, 48. For instance, one non-party friend of Isaacman's was placed in Risk despite knowing "nothing about Risk" and was fired after "he missed identifying a significant risk that resulted in a loss to the Company of over a million dollars." *Id*. ¶ 51. This attitude purportedly trickled down through the ranks. The SAC describes an instance in which the Chief of Accounting "promoted every manager on her accounting team to director" so that they could attend a yearly gathering reserved for high-level employees at the Sands-Wind Creek Casino. *Id*. ¶ 54.

Plaintiff also alleges that this lax attitude "created an environment which was ripe for" and tolerated fraud. *Id*. ¶ 56. The SAC describes two particular instances in which Confidential Witness 2 ("CW-2") approached Isaacman with concerns of client fraud which the CEO declined to address. In the first, CW-2 flagged an instance of "clear[] fraud" related to a newly acquired point-of-sale brand and asked that a hold be placed on its account. *Id*. ¶ 57. However, Isaacman refused out of concern for the negative attention the hold would bring to Shift4's new

acquisition.  *Id*. ¶ 57.[1]  In the second, CW-2 flagged and then placed a hold on the suspect transactions of Smiles II, a New Jersey nightclub.  *Id*. ¶ 58.  Smiles II was a long-term client of Shift4 which "went from registering approximately $300,000 a month in Visa payments to $500,000 a month, registering only pre-paid gift cards."  *Id*. ¶ 58.  CW-2's concern was brought to the Vice President of Risk and to the Chief Payments Officer before all agreed to bring the matter to the attention of Joe Messina, the sales representative on the account and a member of the purported "boys' club."  *Id*. ¶ 59.  When Messina instructed CW-2 to remove the hold on the Smiles II account, she refused.  *Id*.  When the concern eventually reached Isaacman, he too directed that CW-2 remove the hold.  *Id*. ¶ 61.  After the hold was removed, owners and employees of Smiles II were later criminally indicted over the matter.  *Id*. ¶ 63.

As its founder and CEO, a great deal of Isaacman's considerable fortune is tied to Shift4's share price.  On June 5, 2020, Shift4 conducted its IPO which Isaacman had personally worked on since 2018.  *Id*. ¶¶ 32, 34.  The IPO was a success as Class A shares of Shift4 gained 46% on their first day of trading.  *Id*. ¶ 36.  Isaacman personally benefitted as well.  The $100 million of Class C common stock he purchased concurrent with the IPO was worth over $155 million when the market closed on June 5th.  *Id*. ¶ 6.  Further, Isaacman and Shift4 entered into a new and favorable employment agreement with equity-based compensation.  *Id*. ¶ 7.

In September of 2020, Isaacman, through Rook Holdings, Inc., a corporation wholly owned by him, entered into a first margin loan which was secured by shares of the Shift4's Class A and B common stock.  *Id*. ¶¶ 6, 10.  That first margin loan was repaid and replaced in March of 2021 when Shift4's share price was near its peak.  *Id*. ¶ 11.  However, not long after, Shift4's share price began to tumble, reaching a low in July of 2022.  *Id*.  By then, "the pledged shares –

---

[1]     Notwithstanding, CW-2 placed a hold on the accounts.  SAC ¶ 57.

once worth almost $806 million on March 24, 2021 – would have been worth about $294 million." *Id*. Because of this falling share price, Isaacman purportedly faced the threat of a margin call on the loan. *Id*. ¶ 12.[2] Thus, Plaintiff alleges, Isaacman and Shift4 took measures designed to keep the share price afloat and relieve the pressure of the call.

> ### 2.    The Misclassification of Cash Flows Associated with Customer Acquisition Costs

The vehicle for the fraud alleged in this case is the misclassification of cash payments associated with customer acquisition costs which began "as early as 2018 in the run-up to the IPO." *Id*. ¶ 73. Much of the allegations related to the misclassification are unchanged from the First Amended Complaint. To reiterate, to grow its business, Shift4 must establish new merchant relationships. To do so, Shift4 has stated that it relies on third parties to find new relationships on its behalf. *Id*. ¶ 75. For each deal sold, the third party was paid, in part, an upfront processing bonus. *Id*. That upfront payment was "recorded on the balance sheet as a separate line item, 'Capitalized acquisition cost, net' and subsequently amortized on a straight-line basis over the estimated life of the merchant relationship within cost of sales on [Shift4's] statement of income." *Id*. Plaintiff contends that this practice was incorrect and misrepresented Shift4's statement of cash flows. *Id*. ¶ 4.

An accurate statement of cash flows helps an analyst, *inter alia*:

a. Assess the entity's ability to generate positive future net cash flows;
b. Assess the entity's ability to meet its obligations, its ability to pay dividends, and its needs for external financing;
c. Assess the reasons for differences between net income and associated cash receipts and payments; and
d. Assess the effects on an entity's financial position of both its cash and noncash investing and financing transactions during the period.

---

[2]    Indeed, Plaintiff alleges that Isaacman received such a margin call when, "in mid to late-2022," he increased his collateral and reduced the size of the loan. SAC ¶ 65, n.9.

*Id.* ¶ 68.  However, Shift4's practice distorted this picture where it "classified cash payments associated with the capitalized customer acquisition costs *as an investing activity on the statement of cash flows*, rather than cash flows used in operations, which enabled Shift4 to inflate its cash flows from operating activities on the statement of cash flows."  *Id.* ¶ 72 (emphasis in original).  This was particularly important in Shift4's situation given the "disclosure in its originally filed 2021 Form 10-K (at 70) and Q1 2022 Form 10-Q (at 37) that: We have historically sourced our liquidity requirements primarily with flows from operations and, when needed, with borrowings under our Credit Facilities or equity transactions."  *Id.* ¶ 91 (internal citation omitted).

On May 11, 2022, the SEC began to question this method of classification.  *Id.* ¶ 74.  Shift4 initially defended the practice, explaining that these upfront payments "represent[ ] the initial investment to secure the end-to-end processing relationship between Shift4 and the merchant."  *Id.* ¶ 75.  Thus, the company reasoned, "Shift4 believes the capitalized acquisition costs represent customer relationship intangible assets which represent long-term productive assets that generate revenues over the expected life of the merchant relationships."  *Id.*

Several weeks later, the SEC responded with follow up questions.  *Id.* ¶ 76.  However, before submitting a response to the second letter, CFO Herring resigned from Shift4.  *Id.* ¶ 78.  Plaintiff infers that Herring's resignation was related to the accounting practice and the attention of the SEC's it drew.  *Id.* ¶ 79.  Plaintiff also notes that the lettered correspondence with the SEC roughly coincides with the low in Shift4's share price and, consequently, Isaacman's margin loan troubles.  *Id.* ¶ 77.

Shortly after, Shift4 "*abandoned its arguments* in its [second] response and restated its previously issued financial statements." *Id*. ¶ 79 (emphasis in original). In particular, Shift4 announced that its:

> Q3 2021, full year 2021, Q1 2022 and Q2 2022 financial statements should no longer be relied upon because the Company identified an error in these financial statements "related to the classification of customer acquisition costs within the Company's statement of cash flows. Specifically, the Company determined that 'customer acquisition costs' should be treated as cash used in operating activities rather than cash used in investing activities, and that the misclassification of cash flow related to customer acquisition costs should be restated through the amendments of the Prior Financial Statements."

*Id*. ¶ 81.  The restatement also disclosed that Shift4 had concluded that "there is a material weakness in the design of a control activity with respect to the classification of customer acquisition costs within the statement of cash flows and has determined that the Company's disclosure controls and procedures and internal control over financial reporting was not effective." *Id*. ¶ 82.  Shift4's stock fell $1.21 per share (2.67%) on this news. *Id*. ¶ 83.  "On November 8, 2022, Shift4 Payments filed a Form 10-Q for the third quarter of 2022, which included a restated statement of cash flows for the nine months ended September 30, 2021 (originally reported in the Form 10-Q for Q3 2021)." *Id*. ¶ 84.  Shift4 also filed amended 10-Q forms for Q1 and Q2 for 2022 and amended its 10-K for 2021. *Id*.  These filings also "contained amendments to the statements of cash flows for full year 2019, 2020, and 2021 as well for Q1 – Q3 2021 and Q1 – Q2 2022." *Id*.  Plaintiff summarizes the effect of the restatement as follows:

> [1] For the years ended December 31, 2019, 2020, and 2021, respectively, Shift4 negatively revised its net cash provided by operating activities to $8 million (down from its originally reported $26.7 million), $4 million (down from its originally reported $23.4 million), and $3 million (down from its originally reported $29.2 million).
> [2] For the three months ended March 31, 2021 and 2022, respectively, it negatively revised its net cash used in operating activities to $7.1 million (down from its originally reported $1.7 million) and net cash provided by operating activities to $30.8 million (down from its originally reported $37.1 million);

[3] For the six months ended June 30, 2021, it negatively revised its originally reported $5 million of net cash ***provided by*** operating activities to $7.7 million of net cash ***used in*** operating activities

[4] For the six months ended June 30, 2022, it negatively revised net cash provided by operating activities to $70.8 million (down from its originally reported $85 million); and

[5] For the nine months ended September 30, 2021, it negatively revised its net cash provided by operating activities to $6.3 million (down from its originally reported $25.6 million).

*Id.* ¶ 18 (emphasis in original).[3]

### B.     Procedural Background

On August 18, 2023, Plaintiff brought the instant suit arising under the Private Securities Litigation Reform Act.  *See* ECF No. 1.  On November 3, 2023, this Court consolidated the related actions, appointed Robert Baer Lead Plaintiff, and appointed Pomerantz LLP and The Schall Law Firm as Co-Lead Counsel. *See* ECF No. 17.  On January 5, 2024, Plaintiff filed the First Amended Complaint.  *See* ECF No. 35.

On February 19, 2024, Defendants moved to dismiss the First Amended Complaint.  *See* ECF No. 39.  In its August 14, 2024, Opinion this Court granted Defendants' Motion to Dismiss and dismissed Plaintiff's First Amended Complaint without prejudice.  *See* ECF Nos. 43, 44.  On September 3, 2024, Plaintiff filed a Second Amended Complaint.   *See* ECF No. 45.  On October 1, 2024, Defendants filed the instant Motion to Dismiss.  *See* ECF No. 50.  The matter is fully briefed and ready for disposition.  For the reasons that follow, the Motion is granted.

---

[3]      These figures are taken directly from the Second Amended Complaint.  *See* SAC ¶¶ 18, 85.

### III.    LEGAL STANDARDS

#### A.    PSLRA and Heightened Pleading Standards – Review of Applicable Law

"Section 10(b) of the Securities Exchange Act makes it unlawful for any person to 'use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 15 U.S.C. § 78j(b)).  Rule 10b-5, which implements § 10(b), renders it unlawful to:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Section 10(b) provides a private cause of action much like the one brought here.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318 (2007).

"To adequately allege a § 10(b) securities fraud claim, a plaintiff must plead '(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation.'" *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014)).  "[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."  *Tellabs*, 551 U.S. at

322.  However, the claimant must also comport with the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA.

Under Rule 9(b), the "party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b). "Under that standard, the complaint must describe the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity."  *City of Warren Police & Fire Ret. Sys. V. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023).  Further, "if allegations of falsity are based on information and belief, instead of on 'evidentiary support,' Fed. R. Civ. P. 11(b)(3), the PSLRA requires the complaint to plead, with particularity, facts 'sufficient to support a reasonable belief as to the misleading nature of the statement or omission' before the allegations can be accepted as true."  *Id.*  For its part, the PSLRA imposes a higher pleading standard on the material misrepresentation/omission and scienter elements.

## 1.    Scienter – Review of Applicable Law

The PSLRA's heighted pleading standard also requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  The Third Circuit has expounded on the state of mind requirement as one "'embracing [an] intent to deceive, manipulate, or defraud,' either knowingly or recklessly."  *Hertz*, 905 F.3d at 114 (quoting *Institutional I'nv'rs Grp. v. Avaya, Inc*., 564 F.3d 242, 252 (3d Cir. 2009)).  "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Tellabs*, 551 U.S. at 323–24.  "A complaint will survive . . . only if a reasonable person would deem the

inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

### B.    Control Person Liability – Review of Applicable Law

Section 20(a) of the Exchange Act imposes joint and several liability for "controlling persons." *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 275 (3d Cir. 2005). "The elements of a § 20(a) claim, or a 'control person' claim, are: (1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud." *Howard v. Arconic Inc.*, 2021 WL 2561895, at *29 (W.D. Pa. June 23, 2021) (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006)). "Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252.

## IV.    ANALYSIS

### A.    Scienter

In light of the Court's prior Opinion, Defendants focus their Motion to Dismiss on the element of scienter only. In that Opinion, the Court held as follows:

> Having considered the allegations of the Amended Complaint, the Court finds that the inference of scienter is far less compelling than the opposing inference: Shift4 believed the classification of customer acquisition costs in the financial statement was correct. In particular, the Court finds it difficult to square Plaintiffs' theory of motive with the facts averred because the suspect practice long predates the financial pressure caused by the falling share price.

*Baer v. Shift4 Payments, Inc.*, No. 5:23-CV-3206, 2024 WL 3836676, at *13 (E.D. Pa. Aug. 14, 2024) ("*Baer I*"). So, what has changed? The Court's reading of the SAC yields just two noteworthy additions. First, the SAC expounds on the environment of fraud that allegedly permeated the company. Second, because the Court previously held that the chronology of

Plaintiff's theory of motive did not square with the facts averred, the SAC adds averments to show that Isaacman benefited from the flawed accounting practice *even earlier*.

Ultimately, what controls is the holistic *Tellabs* review of the allegations.  There are essentially two inferences to draw from the allegations in the SAC.  The first is that Shift4 mistakenly believed that the accounting practice was correct.  The second is that the practice was a fraudulent measure.  Thus, the Court will review the allegations of the SAC, place each allegation on one side of a balance scale, and see if the inference of scienter is at least as compelling as the opposing nonfraudulent inference.  *See Tellabs,* 551 U.S. at 314.

           1.      Environment of Fraud: the "boys' club"; turning a blind eye to client fraud; and the CFO's resignation.

Plaintiff draws inferences of fraud from the inner workings of Shift4, relying on allegations of incompetence in leadership and a tolerance for its customers' fraud.  To start, the SAC reiterates its "boys' club" averments, alleging that Isaacman placed unqualified individuals in key leadership positions.  The SAC also added allegations that Isaacman willingly turned a blind eye to fraudulent client activity from which the company stood to gain.  Now, the implication is that the combination of unqualified leaders and Isaacman's own attitude toward client fraud creates an inference that Shift4 would bend the rules and employ a questionable accounting practice if and when circumstances called for it.

To reiterate, Shift4's leadership ranks draw heavily from Isaacman's friends and family. His brother serves as Chief Commercial Officer, his father is on the Board, his personal pilot was Executive Vice President of Payments and Chief Operating Officer, Isaacman's friend and friend's brother served in roles including Chief Technology Officer, Chief Strategy Officer and President.  These individuals formed a nucleus of "good old boys," elsewhere referred to

members of the "boys' club." *See* SAC ¶¶ 44-55. Other friends and members of the boys' club served critical roles in major departments such as Risk and Operations.

In its prior opinion, the Court discounted the "boys' club" allegations nearly out of hand, reasoning that "Plaintiffs fail[ed] to flesh out a theory as to how these details figure into the 'fraudulent' conduct alleged." *Baer I*, 2024 WL 3836676, at *13. The SAC's new allegations attempt to address that concern by detailing the two instances, in 2017 or 2018, in which Isaacman resisted efforts to curb client fraud by declining to place a hold on two accounts flagged by the Risk Department.

This "environment of fraud" theory relies upon *In re Hertz Glob. Holdings Inc*, 905 F.3d 106 (3d Cir. 2018). Central to *In re Hertz*, another securities fraud case, was a financial restatement in which "the Company admitted that 'an inconsistent and sometimes inappropriate tone at the top was present under the then existing senior management' and that the tone 'resulted in an environment which in some instances may have led to inappropriate accounting decisions and the failure to disclose information critical to ... effective review[.]'" *Id*. In the aftermath of the restatement, Hertz's CFO, Senior Vice President of Finance, and Corporate Controller resigned. *Id*. at 112-13. However, the Third Circuit rejected an inference of scienter, reasoning, in part, that "[a]llegations of mismanagement will only support a securities fraud claim if they are coupled with allegations that the defendants were aware, or recklessly disregarded, that their mismanagement created an environment *in which fraud was occurring*." *In re Hertz*, 905 F.3d at 117 (emphasis added).

Here, Plaintiff puts forward a similar 'environment of fraud' or 'tone-at-the-top' theory which likewise resulted in inappropriate accounting decisions and the resignation of a company leader. In contrast with *Hertz*, however, Plaintiff argues that there existed an environment in

which fraud was *actually occurring*.  Specifically, plaintiff cites the fraud of Shift4's customers to which Isaacman willingly turned a blind eye.  This is more particular than the facts of *Hertz*.

However, while the Court places these allegations on the side of the balance scale tending to find scienter, it finds that the inferential value of these allegations are seriously limited in two ways.  First, according to the allegations, Shift4 was not the entity perpetrating the fraud.  While Shift4 benefitted from that alleged fraud, the SAC alleges only that Defendants willingly turned a blind eye to it.  This lessens the inference that Shift4 was inclined to engage in fraud *itself*.  Second, whatever pressure existed to allow the client fraud was not brought to bear on the accounting department.  Rather, the SAC simply states that Isaacman ignored the concerns of the Risk department.  *See Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 186 (5th Cir. 2019) (finding only a minimal inference of scienter where there existed no allegations that the inappropriate tone at the top applied pressure to the finance personnel.)

Further, the SAC does little to allege that the "boys' club" culture or nepotistic hiring practices permeated the accounting department.[4]  Indeed, the only averments specific to accounting are that the Chief of Accounting gave raises and promotions to members of the accounting team so that they could attend an employee gathering at a casino.  That is a very thin basis on which to infer fraud.  Plaintiff also contends that CFO Herring's departure from Shift4 "was due to his disapproval of the Company's proposed response to the SEC's additional

---

[4]      It is also worth noting that incompetent or nepotistic hiring seems to lend itself better to a theory of recklessness rather than a theory of knowledge if the inference is that the classification of customer acquisition costs is so far beyond the bounds of reasonable accounting practice that it falls within the PSLRA's ambit.  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) (quoting *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979)) (putting forth the "definition of a reckless statement as one 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it'").  Nevertheless, that is not the theory put forward here.

questions regarding the Company's treatment of customer acquisition costs." SAC ¶ 14. The implication is that Herring pushed back against Shift4's responses to the SEC and was forced out or resigned in protest. However, the fact that Shift4 soon after abandoned its arguments (the arguments Herring purportedly resigned over) and restated its financials tends to suggest his resignation was because the accounting measure was a mistake and not a fraud.

      2.     Isaacman's Motive: Shift4's IPO and the 2022 Margin Call

          a.     The IPO

The SAC has also added averments surrounding Shift4's June 5, 2020, IPO. However, it is essentially premised on the same theory; namely, that the misclassification of Shift4's cash outflows "enabled the Company to inflate its cash flows provided by operating activities, which is a key financial metric investors use in assessing a company's performance and in pricing an IPO." SAC ¶ 4. This misclassification artificially inflated Shift4's share price on the first day it publicly traded and resulted in a windfall for Isaacman who purchased a significant amount of shares concurrent with the IPO. In connection with the "artificially inflated" IPO, Isaacman also entered into a new equity-based compensation agreement, the awards of which vested immediately. Thus, the theory is that Isaacman had a motive to misclassify Shift4's cash outflows where he stood to gain from the artificially inflated share price and the success of the IPO.

This theory has a more direct inference of motive. For one, it *partially* mitigates the flaw in chronology. While the misclassification began in 2018 (long before the June 5, 2020, IPO), the SAC casts the misclassification as an effort with the IPO in mind. However, the theory is, at the same time, more generic. "Motive must be supported by facts stated 'with particularity,' and must give rise to a 'strong inference' of scienter." *GSC Partners CDO Fund v. Washington*, 368

F.3d 228, 237 (3d Cir. 2004) (quoting *In re Advanta*, 180 F.3d at 535; 15 U.S.C. § 78u–4(b)(2)).

Accordingly, "motives that are generally possessed by most corporate directors and officers do

not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual

defendants resulting from this fraud." *Id*. (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d

Cir.2001)).

First, the fact that Isaacman secured the position of CEO at a company he led since he

founded it and over which he exercised "significant control" is not particularly compelling.  SAC

¶¶ 39-43.  Nor is the fact that Isaacman stood to gain from a higher share price all that particular.

*See Leventhal v. Tow*, 48 F.Supp.2d 104, 115 (D.Conn.1999) (quoting *Acito v. IMCERA Grp.,*

*Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("[T]he allegation that the defendants artificially inflated [the

company's] stock price in order to 'protect and enhance their executive positions' and 'negotiate

as favorable a deal as possible' on a pending employment contract also fail[s] to give rise to a

strong inference of scienter. This motive has been rejected routinely.")); *see also Tuchman v.*

*DSC Communications Corp*., 14 F.3d 1061, 1068 (5th Cir.1994) ("[I]ncentive compensation can

hardly be the basis on which an allegation of fraud is predicated.") (citation omitted); *In re*

*Synchronoss Techs., Inc. Sec. Litig.*, No. CV 17-2978 (FLW) (LHG), 2019 WL 2849933, at *16

n.12 (D.N.J. July 2, 2019) (rejecting the inference of scienter based upon generalized motives).

However, the Court does not outright disregard the IPO motive because it is generic in

nature.  *GSC Partners* instructs that "[s]uch allegations *alone* cannot give rise to a 'strong

inference' of fraudulent intent."  *GSC Partners*, 368 F.3d at 237 (emphasis added).  The rationale

behind that general caution is that inferring fraudulent intent *solely* from such ubiquitous motives

would open the floodgates of litigation and undermine the PSLRA's heightened pleading

standard.  *See Phillips v. LCI Int'l, Inc*., 190 F.3d 609 (4th Cir. 1999) ("allowing a plaintiff to

prove a motive to defraud by simply alleging a corporate defendant's desire to retain his position with its attendant salary, or realize gains on company stock, would force the directors of virtually every company to defend securities fraud actions every time that company effected a merger or acquisition.") (internal citation omitted).

Here, Plaintiff offers additional allegations.  Thus, the Court will not disregard the IPO motive altogether.  Indeed, Isaacman stood to gain and did gain substantially from an IPO with a flawed accounting practice.  However, the generic nature of the motive *substantially* discounts its inferential value.  Further, as explained below, when considered in conjunction with Plaintiff's margin call motive, the IPO motive loses its coherence.

> b.    The Margin Call

The margin call theory is similar to that put forward in the First Amended Complaint.  To reiterate, Plaintiff alleges that as Shift4's share price fell in 2022, Isaacman faced a margin call. Accordingly, he was under considerable pressure to keep the share price inflated.  In its prior opinion, the Court reasoned that "the chronology of the customer acquisition cost classification does not fit into Plaintiffs' theory of motive where the complained of accounting practice substantially predates that threat."  *Baer*, 2024 WL 3836676, at *11.  That reasoning applies equally to the SAC.  In a typical fraud case, the perpetrator engages in deceptive activity to achieve a gain.  That gain may be motivated by fear or greed or any human impulse.  However, the desired gain *invites* the deceptive activity.  That chronology logically connects the two.  The problem with Plaintiff's margin call theory is that the desired gain (to avoid the margin call) did not invite any deceptive activity where Shift4 merely *continued* an accounting practice which preexisted the desired gain by some four years.  *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 283–84 (D.N.J. 2007) ("If the plaintiff desires to employ the "motive and opportunity"

method, the plaintiff should demonstrate a logical connection between the alleged fraud and motive in order to establish a reasonable inference of fraud.")

Perhaps recognizing this, Plaintiff has made a subtle adjustment to his theory. Now, he argues that the pressure of the margin call was so great that simply defending the accounting practice to the SEC was an act of fraud taken to keep the share price afloat. The Court finds that this inference strains credulity, particularly given Shift4's reversal of position which shortly followed the initial response.

Further, in attempting to square both the IPO and margin call theories of motive, the Court does not see how Plaintiff can have it both ways. On the one hand, Plaintiff argues that the classification of customer acquisition costs was a fraudulent measure designed (in 2018) to bolster Isaacman's position in the wake of the 2020 IPO. But on the other hand, this unchanged accounting practice, baked into Shift4's reporting, which predated any margin loan by some two years, is also a measure taken *in response* to the margin call Isaacman faced four years later. In Plaintiff's attempt to layer Plaintiff's disjointed theory of motive, Plaintiff weakens the overall case. While the presence or absence of motive is not dispositive in a scienter analysis, s*ee Tellabs,* 551 U.S. at 325, the Court finds that the incoherence of Plaintiff's narrative weighs heavily against a finding an inference of scienter.

3.    Other Considerations: Core Business and Size of the Restatement

Plaintiff argues that where the allegations of fraud relate to Shift4's "core business," its actions tend to support an inference of scienter. The Court disagrees. One case Plaintiff cites in support, *In re Viropharma*, illustrates the distinction. That case concerned a misrepresentation regarding the prospect that a pharmaceutical company's lucrative drug would be granted an additional three years of exclusivity — thereby preventing generic drugs from entering the

market and diluting the valuable drug's market share. *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 465 (E.D. Pa. 2014). When the drug was denied exclusivity and the generics were approved, the pharmaceutical company's share price fell 21% and a class action ensued. *Id.* The Court found that where sales of the drug comprised a significant portion[5] of the pharmaceutical company's "core business," the company "either knew or should have been aware of the issues concerning the drug's approval." *Id.* at 473. In other words, given the importance of the drug to the pharmaceutical company's bottom line, it would be reasonable to infer that the company was very aware of the drug's true prospects for continued exclusivity. Thus, any misrepresentations to the contrary tended to support a strong inference of scienter. *Id.*

While the SAC avers that Shift4 derives its revenue from fees paid by Shift4 customers, that does not make an accounting practice recording commission payments for those fees a core aspect of its business. Further, as Defendants argue, Plaintiff is "conflat[ing] customer acquisition costs with customer revenue more generally." Reply at 12. In other words, *where* Shift4 gets the bulk of its revenue is a part of its core business. *How* Shift4 incentivizes third parties to get that revenue is adjacent to its core business. However, how Shift4 *elects to classify* the latter is not part of its core business.

Finally, Plaintiff offers one more piece of the puzzle in the size of the restatement. However, it is difficult to place this piece. In its prior Opinion, the Court reasoned that a large restatement *can* be probative of scienter — the reasoning being that "the further the departure from accounting norms, the more likely the prior practice moves away from a mere mistake or reasonable difference of opinion and ventures into the realm of fraud." *Baer,* 2024 WL 3836676,

---

[5]     Indeed, sales of the drug "accounted for more than 50%" of the company's revenue and profit margins. *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d at 473.

at *11.  However, a large accounting error, made in earnest, may also require a large restatement.

Thus, the size of the restatement alone does not do away with the competing inference that the

error requiring the restatement was made without fraudulent intent.  *See In re Hertz Glob.*

*Holdings Inc*, 905 F.3d at 116 ("The inferential force of a restatement is lessened when the

plaintiff fails to plead particularized allegations of fraudulent intent.")

Defendants urge the Court to discount the inferential value of the restatement for a

number of reasons.  First, they argue that the years-old accounting practice survived the routine

audits of PriceWaterhouseCoopers LLP and were reviewed by the SEC.  ECF No. 50-11 at 81-

82.[6]  The implication is that reasonable minds may differ on the propriety of the accounting

practice if it managed to survive the review of an independent auditor.  This would run counter to

the idea that the size of the restatement was so large that it could only have been the product of

fraud.

Second, Defendants discount the restatement's size where it "had no impact on Shift4's

key performance indicators" and instead merely shuffled cash flows from one "submetric" to

another.  Mot. at 18.  In other words, as Defendants argue, while the size of the restatement is

eye-catching, "cash flow from 'operating activities' was offset dollar for dollar by cash flows

from 'investing activities.'"  *Id*. at 19.  Plaintiff argues against this, noting that Shift4 itself has

espoused the importance of its operations cash flow in stating that the company has "historically

sourced [its] liquidity requirements primarily with flows from operations."  SAC ¶ 91.

---

[6]     This is among the documents of which Defendants ask the Court to take judicial notice.
*See* ECF No. 50-5.  Plaintiff takes no position on this particular request for judicial notice.  *See*
ECF No. 51-5.  Since Plaintiff does not oppose Defendants' request and because the SAC relies
on the cited document, the Court will take judicial notice of Exhibit 5 only.  *See Buck v.
Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

Again, it is difficult to place the size and nature of this restatement into the scienter puzzle. While Defendants themselves admit that "cash flow from operating activities" has some value for investors, this is not an instance in which earnings, revenues, or profit have been overstated or altogether invented. *Cf. In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (reasoning that the "size and nature" of the restatement supported the inference of scienter where the restatement "transformed [the defendant] from a company with retained earnings of approximately $185 million to a company with an accumulated deficit of approximately $178 million."); *see also In re Pareteum Sec. Litig*., No. 19 CIV. 9767 (AKH), 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) (regarding a restatement related to revenue); *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V*., No. CIV.A. 00-5965 (JCL), 2005 WL 1366025 (D.N.J. June 8, 2005) (same). It is instead a categorization problem. This substantially lessens what inferential value the size of the restatement offers.

### 4.    *Tellabs* Holistic Analysis

Next, the Court must consider, "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326. As noted, the Court is faced with essentially two opposing inferences. First, that Shift4 mistakenly believed that the accounting practice was correct. Second, that the practice was a fraudulent measure. Having considered the Second Amended Complaint, the Court again finds the first inference far more compelling. On the "fraudulent" side of the scale sits the SAC's new allegations regarding the top down "environment of fraud" and the size of the restatement. However, for the reasons noted above, the inferential value of these allegations are marginal at best. The non-fraudulent side is heavily weighed down by the incoherence of Plaintiff's overall theory of motive. For the above reasons,

a reasonable person would far more readily infer that the classification of customer acquisition costs was not a dual-purpose measure of fraud but instead a flawed accounting measure from the start.

Accordingly, the Court finds that Plaintiff has failed to plead scienter. Since Plaintiff has failed to establish an element of the claim, the Court dismisses Count I. Finally, because this is Plaintiff's third attempt at stating a claim, the Court will dismiss the claim with prejudice.[7]

### B.    Control Person Liability

Plaintiff has failed to allege any primary violation; accordingly, he cannot establish control person liability. *Rahman v. Kid Brands, Inc.,* 736 F.3d 237, 247 (3d Cir. 2013). This claim too will be dismissed with prejudice.

### V.    CONCLUSION

For the reasons set forth herein, the Court grants Defendants' Motion to Dismiss.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

---

[7]    *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that "if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile").